Christopher W. Mixson, Esq. (Nev. Bar. #10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Tel: (702) 385-6000
c.mixson@kempjones.com

Elizabeth L. Lewis (*pro hac vice forthcoming*)
William S. Eubanks II (*pro hac vice forthcoming*)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006
Tel.: (970) 703-6060
Tel.: (202) 618-1007
bill@eubankslegal.com
lizzie@eubankslegal.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FRIENDS OF NEVADA WILDERNESS and BASIN AND RANGE WATCH,<br><br>        Plaintiff,<br><br>    vs.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, and the NATIONAL PARK SERVICE,<br><br>        Defendants, | Case No.:<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs Friends of Nevada Wilderness and Basin and Range Watch challenge the decisions by the U.S. Bureau of Land Management ("BLM"), U.S. Fish and Wildlife Service ("FWS"), and the National Park Service's ("NPS") (collectively, "Federal Defendants" or "Defendants") to approve an enormous, environmentally destructive electric transmission line project—known as "Greenlink West" (the "Project")—in Nevada's Great Basin Desert, an area that provides irreplaceable habitat for iconic wildlife, including bighorn sheep and desert

1

tortoises, as well as precious historic, archeological, and paleontological artifacts and resources. The Project will also cut through the Tule Springs Fossil Beds National Monument ("TUSK"), a unit of the National Park System that encompasses one of the largest and most diverse late Pleistocene vertebrate fossil assemblages in the southern Great Basin and Mojave Deserts.

2.    Notwithstanding extensive adverse impacts on this unique and fragile ecosystem and historic region, Defendants have issued authorizations for a right-of-way ("ROW") to NV Energy to construct and operate the Project pursuant to federal law, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the National Park Service Organic Act ("Organic Act"), 54 U.S.C. §§ 100101-104909. However, these authorizations—which include the Project's Record of Decision ("ROD") adopting the Final Environmental Impact Statement ("EIS") and Proposed Range Management Plan ("RMP") Amendment, FWS's Biological Opinion, and NPS's Non-Impairment Finding, and without which the project could not lawfully proceed— fail to meaningfully address the Project's indirect effects in connection with hundreds of thousands acres of industrial solar energy development that will result from the Project and that will have adverse impacts on the natural, cultural, and paleontological resources of the Mojave and Great Basin Deserts, including bighorn sheep, ESA-listed species, fossils, intact landscape and habitats, and archaeological artifacts. Defendants' decision to authorize the Project thus violate NEPA, the ESA, and the Organic Act, and are otherwise arbitrary, capricious, and contrary to law, were taken in excess of statutory jurisdiction, and/or were adopted without observance of procedure required by law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

3.    Defendants' violations of NEPA, the ESA, and the Organic Act are particularly egregious because there are reasonable alternatives to the Project that would have far less dire impacts on the exceptional environmental, historic, and cultural values of the Great Basin Desert. Yet, Defendants have refused to engage in a meaningful analysis and comparison of such alternatives, instead deferring to NV Energy's unsubstantiated assertion that any option other than NV Energy's preferred approach and route would be impracticable. Defendants'

decisions thus violate NEPA, the ESA, and the Organic Act, and are arbitrary and capricious, were taken in excess of statutory jurisdiction, and/or were adopted without observance of procedure required by law, in violation of the APA.

4.    For these reasons, as well as those set forth below, Defendants' authorization of the Project violates federal environmental law and is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," "in excess of statutory jurisdiction [and/or] authority," and "without observance of procedure required by law" within the meaning of the APA. Accordingly, the Court should enjoin construction of the Project; set aside the Project's ROD and its associated authorizations, including the Biological Opinion and Non-Impairment Findings; and remand the matter to Defendants for further deliberation in accordance with applicable law.

**JURISDICTION**

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

**PARTIES**

6.    Plaintiff Friends of Nevada Wilderness ("FNW") is a non-profit organization headquartered in Sparks, Nevada that is dedicated to the conservation of Nevada's wild public lands. Founded in 1984, FNW's mission is to preserve all qualified Nevada public lands as wilderness, protect all present and potential wilderness from ongoing threats, educate the public about the values of and need for wilderness, and improve the management and restoration of wild lands. FNW is actively involved in species, habitat, landscape, and other natural and cultural protection issues throughout Nevada, including protection of plant and animal species from the impacts of climate change, wildfires, and human-caused habitat destruction. FNW also works to conduct on-the-ground inventories of public lands to identify wild areas that may have wilderness characteristics and thus qualify for additional management considerations and protections. FNW boasts more than 20,000 members and supporters. FNW brings this action on its own institutional behalf and on behalf of its staff and its members and supporters, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities in and concerning the areas and resources that are harmed by the decisions challenged

in this case.

7.     Plaintiff Basin and Range Watch is a non-profit organization dedicated to conserving the deserts of Nevada and California, helping local communities, and educating the public about the diversity of life, culture, and history of the ecosystems and wild lands of the desert. Basin and Range Watch has over 6,400 followers and supporters. Basin and Range Watch has played a central role in protecting the natural and cultural resources of the Mojave and Great Basin Deserts—including those at issue in this case—through public education efforts, news alerts, citizen science, and position papers. Basin and Range Watch's staff and members use and enjoy the public lands within the Great Basin and Mojave Deserts—including the TUSK and other specific areas at issue in this case—for a variety of purposes, including hiking, camping, viewing and photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Basin and Range Watch's staff and members derive scientific, aesthetic, recreational, vocational, and spiritual benefits from the public lands within these desert basins, including in the specific areas at issue here, as well as in the specific species at issue and habitat (including critical habitat) where those species are found or are likely to be found within the Project area. Basin and Range Watch brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities in and concerning the areas and resources that are harmed by the decisions challenged in this case

8.     Plaintiff organizations' staff and members have been actively involved in conservation and other scientific endeavors regarding the Nevada desert and its natural and cultural resources for many years. For example, FNW's advocacy campaigns have resulted in the designation of more than 3.6 million acres of public land in Nevada as Wilderness Areas— seventy-three Wilderness areas in total—forever protecting those lands from any use other than the peaceful solitude of dispersed recreation and the conservation of critical water resources, wildlife habitat, and uniquely dark skies. FNW's stewardship program has likewise engaged thousands of volunteers in citizen science projects, trail maintenance, and other conservation activities. Basin and Range Watch has similarly engaged volunteers in citizen science

monitoring of desert resources and energy impacts, and has actively participated in public decision making processes regarding energy development on federal lands. Plaintiff organizations have each worked to enhance legal protections for public lands, wildlife and habitat, and cultural and paleontological resources in the Nevada and California deserts, including by authoring multiple comments on and official protests to federal land management decisions affecting those resources. Plaintiff organizations' staff and members intend to, and have concrete plans to, continue using and enjoying the public lands and associated natural and cultural resources that will be affected by the Project (including, e.g., the TUSK) regularly and on an ongoing basis in the future, including in 2025 and 2026.

9.    The health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of Plaintiffs, their staff, and their members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of NEPA, the ESA, the Organic Act and other NPS authorities (including, e.g., the TUSK enabling legislation), and the APA continue. The relief sought will redress Plaintiffs' and their members' injuries by preventing Project construction that will harm Plaintiffs' concrete interests in the public lands and natural and cultural resources at issue until the agencies have fully considered the effects of the Project on those resources and evaluated less harmful alternatives to the selected Project route, in accordance with federal law. The relief sought will also provide additional process under federal law that will bring the best available science to bear on Defendants' decisions, which likely will benefit these species and their habitat of particular importance to Plaintiffs and their members.

10.    Defendant BLM is a federal agency within the United States Department of Interior charged with the management of public lands, including those within the Project area. BLM is the lead agency responsible for coordinating the Project's NEPA process and environmental analysis, and is responsible for ensuring that its actions comply with NEPA and all other federal laws.

11.    Defendant FWS is a federal agency within the United States Department of Interior charged with implementing and enforcing the ESA. FWS is responsible for ensuring its

5

1  implementation of section 7 consultation complies with the ESA and other federal laws.

2      12.    Defendant NPS is a federal agency within the United States Department of

3  Interior charged with the management of the National Park System, including the TUSK. NPS

4  is responsible for ensuring that its actions comply with NEPA, the Organic Act, applicable

5  enabling legislation, and other federal laws.

6                **STATUTORY AND REGULATORY FRAMEWORK**

7      A.    **National Environmental Policy Act**

8      13.    Congress enacted NEPA in 1969 to "encourage productive and enjoyable

9  harmony between man and his environment" and to promote government efforts "which will

10  prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA is the "basic

11  national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] At the most basic

12  level, NEPA is intended to "ensure that agencies identify, consider, and disclose to the public

13  relevant environmental information early in the process before decisions are made and before

14  actions are taken," and to "help public officials make decisions that are based on understanding

15  of environmental consequences, and to take actions that protect, restore, and enhance the

16  environment." *Id.* § 1500.1(b)-(c).

17      14.    The Council on Environmental Quality ("CEQ")—an agency within the

18  Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40

19  C.F.R. §§ 1500-1508, which are "binding on all federal agencies." *Id.* § 1500.3(a). NEPA

20  regulations are "intended to ensure that relevant environmental information is identified and

21  considered early in the process in order to ensure informed decision making by Federal

22  agencies." *Id.* § 1500.1(b).

23  _____

24  [1] On February 25, 2025, the Council on Environmental Quality ("CEQ"), the agency
25  responsible for coordinating federal environmental policy, issued an interim final rule to
     permanently remove CEQ's regulations that have implemented NEPA since 1978. *See* 90 Fed.
26  Reg. 10,610 (Feb. 25, 2025). However, the removal of these regulations expressly "does not
     constitute a retroactive change in agencies' practices or an alteration of the public or project
27  sponsors' engagement under NEPA with respect to those agency actions." 90 Fed. Reg. at
     10,614. Accordingly, "agencies should, in defending actions they have taken, continue to rely
28  on the version of CEQ's regulations that was in effect at the time that the agency action under
     challenge was completed." *Id.* This Complaint therefore cites to the NEPA regulations that

15.    Under NEPA, federal agencies are required to consider the potential environmental impact of all agency actions. 42 U.S.C. §§ 4321-4347. The touchstone of NEPA is the EIS; federal agencies must prepare an EIS for any "major Federal action significantly impacting the quality of the human environment." *Id.* § 4332(c). An EIS must describe (1) "the reasonably foreseeable environmental effects of the proposed agency action," (2) "any reasonably foreseeable adverse environmental effects which cannot be avoided," and (3) "a reasonable range of alternatives to the proposed action." *Id.* § 4332(C)(i)-(iii). An EIS ensures that all potentially significant environmental effects have been considered and disclosed to the public during the decision-making process. 40 C.F.R. §§ 1501.2, 1502.5.

16.    Within the EIS itself, federal agencies must identify and disclose all direct, indirect, and cumulative impacts of the proposed action, consider a reasonable range of alternative actions and their potential impacts, and disclose all irreversible and irretrievable commitments of resources attributable to the action. 42 U.S.C. § 4332(2). The alternatives analysis is considered "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

17.    The agency's identification and disclosure of all potential impacts (and the alternatives thereto) are commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its decision. The three kinds of effects ordinarily discussed in an EIS are "direct effects," "indirect effects," and "cumulative impacts." 40 C.F.R. § 1508.1(i). "Direct effects" are those that "are caused by the action and occur at the same time and place." *Id.* "Indirect effects" are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* Indirect effects "may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate." *Id.* Cumulative impacts are those which "result from the incremental effects of

_____

were effective on September 13, 2024, the date of the final decisions challenged herein.

the action when added to the effects of other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* When analyzing the impacts of a proposed action, NEPA regulations require an agency to include information "relevant to reasonably foreseeable significant adverse impacts" in an EIS if it is "essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable." 40 C.F.R. § 1502.21(b).

18.    The Department of Interior—the parent agency of BLM, FWS, and NPS—has its own NEPA regulations that supplement (without supplanting) CEQ's NEPA regulations. *See* 43 C.F.R. part 46.

**B.    Endangered Species Act**

19.    Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. As such, the ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

20.    Section 9 of the ESA makes it unlawful for any person to "take" an endangered or threatened species without express authorization from FWS. 16 U.S.C. § 1538(a)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" is further defined by FWS regulations to encompass "habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. FWS's regulations define "harass[ment]" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by

1  annoying it to such an extent as to significantly disrupt normal behavioral patterns which
2  include, but are not limited to, breeding, feeding or sheltering." *Id.*

3      21.    Section 7(a)(2) of the ESA requires all federal agencies to "insure that any action
4  authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued
5  existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this obligation,
6  before undertaking any action that may have direct or indirect effects on listed species, an action
7  agency must engage in consultation with FWS in order to evaluate the impact of the proposed
8  action. *See id.* FWS has defined the term "action" for the purposes of Section 7 broadly to mean
9  "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by
10  Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or
11  control," *id.* § 402.03.

12      22.    The purpose of consultation is to ensure that the action at issue "is not likely to
13  jeopardize the continued existence of any endangered species or threatened species or result in
14  the destruction or adverse modification of [designated] habitat of such species." 16 U.S.C.
15  § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy
16  to a listed species if it "reasonably would be expected, directly or indirectly, to reduce
17  appreciably the likelihood of both the survival and recovery of a listed species in the wild by
18  reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Under
19  those same regulations, an action will destroy or adversely modify critical habitat if it will cause
20  a "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole
21  for the conservation of a listed species." *Id.* Thus, during consultation the action agency and
22  FWS must consider, in evaluating the effects to the species and its critical habitat, whether "the
23  agency action will [] appreciably reduce the odds of success for future recovery planning, by
24  tipping a listed species too far into danger." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*
25  *Serv.*, 524 F.3d 917, 936 (9th Cir. 2008). The evaluation of the effects of the proposed action on
26  listed species and their habitat (including critical habitat) during consultation must use "the best
27  scientific . . . data available." 16 U.S.C. § 1536(a)(2).

28      23.    Consultation under Section 7(a)(2) may be "formal" or "informal" in nature.

9

1   Informal consultation is "an optional process" consisting of all correspondence between the

2   action agency and FWS, which is designed to assist the action agency, rather than FWS, in

3   determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an

4   informal consultation, the action agency requests information from FWS as to whether any

5   listed species may be present in the action area. The "action area" is defined as "all areas to be

6   affected directly or indirectly by the Federal action and not merely the immediate area involved

7   in the action." *Id.* If listed species may be present, Section 7(c) of the ESA requires the action

8   agency to prepare and submit to FWS a "biological assessment" ("BA") that evaluates the

9   potential effects of the action on listed species and critical habitat. As part of the BA, the action

10  agency must make a finding as to whether the proposed action may affect listed species and

11  submit the BA to FWS for review and potential concurrence with its finding. 16 U.S.C. §

12  1536(c). If the action agency finds that the proposed action "may affect, but is not likely to

13  adversely affect" any listed species or critical habitat, and FWS concurs with this finding, then

14  the consultation process is terminated. 50 C.F.R. § 402.14(b).

15          24.     On the other hand, if the action agency finds that the proposed action "may

16  affect" listed species or critical habitat by having any adverse effect that is not insignificant or

17  discountable, then formal consultation is required. *See* 50 C.F.R. § 402.11. Following

18  completion of the BA, the action agency must initiate formal consultation through a written

19  request to FWS. *See* 50 C.F.R. § 402.14(c). The result of a formal consultation is the

20  preparation of a biological opinion ("BiOp") by FWS, which is a compilation and analysis of

21  the best available scientific data on the status of the species and how it would be affected by the

22  proposed action. When preparing a BiOp, FWS must: (1) "review all relevant information;" (2)

23  "evaluate the current status of the listed species;" and (3) "evaluate the effects of the action and

24  cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). As such, a

25  BiOp must include a description of the proposed action, a review of the status of the species and

26  its designated critical habitat, a discussion of the environmental baseline, and an analysis of the

27  direct and indirect effects of the proposed action and the cumulative effects of reasonably

28  certain future state, tribal, local, and private actions. *Id.*

10

25.    At the end of the formal consultation process, FWS issues either a no-jeopardy or a jeopardy BiOp. With a no-jeopardy BiOp, FWS determines that the proposed action is not likely to jeopardize the continued existence of listed species or adversely modify critical habitat. If, as part of a no-jeopardy BiOp, FWS determines that the proposed action will nevertheless result in the incidental taking of listed species, then FWS must provide the action agency with a written incidental take statement ("ITS") specifying the "impact of such incidental taking on the species" and "any reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact" and setting forth "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4). Take in excess of that authorized by the ITS violates the prohibition on take contained in Section 9 of the ESA. *Id.* § 1538. With a jeopardy BiOp, FWS determines that the proposed action will jeopardize the continued existence of listed species or destroy or adversely modify critical habitat. In a jeopardy BiOp, FWS may offer the action agency reasonable and prudent alternatives to the proposed action that will avoid jeopardy to a listed species or adverse habitat modification, if they exist. *Id.* § 1536(b)(3)(A).

26.    Where a BiOp has been issued and "discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency is required to reinitiate consultation with FWS in certain circumstances, including: (1) "[i]f the amount or extent of taking specified in the [ITS] is exceeded"; (2) "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or (3) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16(a)(1)-(3).

27.    The ESA provides that agencies must hold action in abeyance until any legally required consultation is complete. Section 7(d) of the ESA prohibits an action agency from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [Section 7] (a)(2)." 16 U.S.C.

§ 1536(d). "This prohibition . . . continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. The purpose of this requirement is to ensure that the status quo will be maintained during the consultation process. *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir.1992) ("In order to maintain the status quo, section 7(d) forbids 'irreversible or irretrievable commitment of resources' during the consultation period.").

C.    **NPS Organic Act and the Tule Springs Fossil Beds National Monument Enabling Legislation**

28.    Unlike other federal lands, the National Park System's sole purpose is conservation. *Mich. United Conservation Clubs v. Lujan*, 949 F.2d 202, 207 (6th Cir. 1991) ("[U]nlike national forests, Congress did not regard the National Park System to be compatible with consumptive uses."). To that end, Congress has mandated that the units of the National Park System—including National Monuments, 54 U.S.C. § 100501—be administered so as to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such a manner and by such means as will leave them unimpaired to the enjoyment of future generations." *Id.* § 100101(a). Thus, NPS must determine that any activities it permits in National Park units are not in "derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." *Id.* § 100101(b).

29.    As explained in NPS's Management Policies, an action constitutes impairment when its impacts "harm the integrity of park resources or values, including the opportunities that otherwise will be present for the enjoyment of those resources or values" NPS Mgmt. Policies § 1.4.5 (2006). To determine whether an action violates the non-impairment requirement, NPS must evaluate the "particular resources and values that will be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." *Id.* An impact on a park resource or value is more likely to constitute an impairment to the extent that it affects a resource or value whose conservation is: "necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park"; "key to the natural or cultural integrity of

12

the park or to opportunities for enjoyment of the park"; "identified in the park's general management plan or other relevant NPS planning documents as being of significance"; "or an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated." *Id.*

30.    The TUSK was established in 2014. *Carl Levin and Howard P "Buck" McKeon National Defense Authorization*, Pub. L. 113-291, § 3092, 128 Stat. 3292, 3861 (2014) (statutory note to 54 U.S.C. § 320301). The TUSK Enabling Act included a map depicting the boundaries of the Monument. 128 Stat. 3862.

31.    The TUSK enabling legislation directs NPS to "administer the Monument in a manner that conserves, protects, interprets, and enhances the resources and values of the Monument." 128 Stat. 3863. NPS must also manage the Monument in accordance with the "laws generally applicable to units of the National Park System (including the [NPS] Organic Act." *Id.* To that end, the Enabling Act directed NPS to "develop a management plan that provides for the long-term protection and management of the Monument." *Id.*

32.    The TUSK enabling legislation also directs BLM to "issue to the qualified electric utility a 400-foot-wide [ROW] for the construction and maintenance of high-voltage transmission facilities." 128 Stat. 3864. However, NPS's authority to issue the ROW is limited in two important ways. First, NPS may only issue the ROW within the corridor "depicted on the map entitled 'North Las Vegas Valley Overview' and dated November 5, 2013, as 'Renewable Energy Transmission Corridor.'" *Id.* Second, NPS may only issue the ROW where "the high-voltage transmission facilities do not conflict with other previously authorized rights-of-way within the corridor." *Id.*

33.    The Paleontological Resources Protection Act ("PRPA") was enacted to preserve paleontological resources for current and future generations because these resources are non-renewable and are an irreplaceable part of America's heritage. The statute defines "paleontological resources" to mean "fossilized remains that are of paleontological interest and inform the history of life on earth." 16 U.S.C. § 470aaa(4). Therefore, the PRPA only protects certain fossils, i.e., those of "paleontological interest."

34.    In accordance with the Organic Act's mandate, NPS's management policies establish that all fossils on NPS lands are considered paleontological resources and are considered for protection equally, regardless of perceived significance. Indeed, NPS's policies require that "[p]aleontological resources . . . be protected, preserved, and managed for public education, interpretation, and scientific research." NPS Mgmt. Policies § 4.8.2.1 (2006). Additionally, where construction will occur on National Park System lands "with potential paleontological resources," NPS "must" conduct "a preconstruction surface assessment prior to disturbance." *Id.* "For any occurrences noted, or when the site may yield paleontological resources," NPS must prioritize avoidance of the resources. *Id.* (explaining that "the site *will be avoided* or the resources will, if necessary, be collected and properly cared for before construction begins").

### D.    Administrative Procedure Act

35.    The APA, 5 U.S.C. §§ 701–706, provides for judicial review of agency action. Under the APA, a reviewing court "shall" hold unlawful and set aside "agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

36.    When reviewing agency action under the APA, a court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

14

# FACTUAL BACKGROUND

37.    The Project will consist of a new, approximately 472-mile system of new overhead electric transmission facilities, substations, and ancillary project components, and will be constructed in western Nevada between North Las Vegas and Reno. The Project route will slice through the Great Basin Desert, disrupting sensitive desert ecosystems and marring some of the last remaining intact landscapes within the state. The Project will also cross the TUSK boundary, impairing park resources and destroying irreplaceable fossil resources.

A.    **Exceptional Natural And Historic Resources Will Be Gravely Impacted By The Project**

38.    The Project will cut through western Nevada between Las Vegas and Reno, occupying predominantly BLM-owned lands in Clark, Nye, Esmeralda, Mineral, Lyon, Storey, and Washoe counties. Particularly relevant here, the Project will cut through the proposed Esmeralda/Fish Lake Area of Critical Environmental Concern ("ACEC") and the TUSK National Monument.

1.    *Proposed Esmeralda/Fish Lake ACEC*

39.    An ACEC is defined as an area "within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards." 43 C.F.R. § 1610.7-2(a). ACECs "shall be managed to protect the relevant and important values for which they are designated." *Id.* To be designated as an ACEC, an area must meet three criteria: (1) relevance, meaning that the area "contains important historic, cultural, or scenic values; fish or wildlife resources; natural systems or processes; or natural hazards potentially impacting life and safety"; (2) importance, meaning that the resource value for which the ACEC is established "has qualities of special worth, consequence, meaning, distinctiveness, or cause for concern; national or more than local importance, subsistence value, or regional contribution of a resource, value, system, or process; or contributes to ecosystem resilience, landscape intactness, or habitat connectivity"; and (3) the resource value must require special management attention, meaning additional

management prescriptions that "[p]rotect and prevent irreparable damage to the relevant and important values," and "[w]ould not be prescribed if the relevant and important values were not present." *Id.* § 1610.7-2(d). BLM must prioritize the designation and protection of ACECs in the development and revision of land use plans, including RMPs. *Id.* § 1610.7-2(b).

40.    In August 2023 (as supplemented in December 2023), Plaintiff FNW submitted to BLM a nomination for the Esmeralda/Fish Lake ACEC. Located west of Tonopah on the western edge of the Great Basin Desert, the proposed Esmeralda/Fish Lake ACEC is among the last remaining intact large-scale landscapes in Nevada. Encompassing approximately 850,000 acres, the area harbors a diversity of natural terrain, such as rugged canyons and colorful slopes flanked by prominent alluvial fans, basalt lava flows, rhyolite volcanic crags, and marshes and springs. These varied habitats in turn support myriad wildlife species, including desert bighorn sheep, as well as raptors, lizards, Botta's pocket gopher, bobcats, and coyotes. Several species of state-designated protected plant and animal species are found within the Project area and adjacent habitat, such as the loggerhead shrike, granite serpentweed, sagebrush cholla, and Tiehm's buckwheat. With respect to federally-listed species, FWS recently proposed the Fish Lake Valley tui chub, an olive-brass colored fish found only in Esmeralda County, for listing as endangered under the ESA due to the loss of aquatic habitat. Additionally, the area boasts hundreds of sensitive prehistoric archaeological sites, many of which existing within the nationally significant Pleistocene Lake Tonopah Locality. In recognition of these and other relevant and important resource values, including expansive intact landscapes, habitat linkages, and dark-sky resources, FNW proposed that BLM designate the area as an ACEC and manage the area for conservation and recreation purposes.

41.    Several prehistoric site types, including rock shelter habitations, lithic scatters and quarries, open habitations, and rock writing sites, are prevalent throughout the proposed Emeralda/Fish Lake ACEC. In particular, the areas immediately surrounding the pluvial Lake Tonopah, located within the Big Smoky Valley in the heart of the proposed ACEC, have been found to contain an incredibly dense concentration of Paleoindian sites that contain hundreds of artifacts. Additional archaeological sites containing petroglyphs exist in a rock shelter near

Silver Peak and in alluvial fans near Rhyolite Ridge and Emigrant Peak. Together, the high number and concentration of known prehistoric sites in the area span a time frame of uninterrupted pre-contact human occupation from the terminal Pleistocene to the late Holocene Epochs. Not only are these sites invaluable to researchers seeking to understand the North American continent's first peoples, but they are also "significant cultural resources that are regarded by the Timbisha Shoshone and Big Pine Tribes as sacred warranting protection." *See* FNW Comments on Draft EIS at 13.

42. The proposed ACEC encompasses Monte Cristo South area, which has been recognized as lands with wilderness characteristics ("LWC"). Within the Monte Cristo South LWC lies the rock formations known as Monte Cristo's Castle, a premiere destination for astrotourism and astrophotography due to its uninterrupted vistas and dark southern horizon, negligible light pollution, and reputation for world-class dark skies with a Bortle Class 1 rating. In recognition of the area's dark sky resources, local tourism organizations and businesses, non-profit organizations, land management agencies, and the National Park Service launched "Park to Park in the Dark," Nevada's first astrotourism route. The route that connects the two International Dark Sky Parks, Death Valley National Park and Great Basin National Park, runs just east of the proposed ACEC. U.S. Highway 6, which runs through the ACEC, also connects to Yosemite National Park, an area known for its exceptional dark sky resources.

43. The proposed Esmeralda/Fish Lake ACEC contains pristine desert habitat—including intact desert landscapes—that supports significant fish and wildlife resources. In particular, the area provides habitat connectivity for several special status species, such as bighorn sheep. According to Nevada's Department of Wildlife, Esmeralda County supports three populations of desert bighorn sheep: the Silver Peaks population; the Monte Cristo population; and the Lone Mountain population, which is considered by some researchers to be the state's most genetically endemic population. Bighorn sheep are highly sensitive to environmental changes, and are therefore considered indicator species that convey the health of their surrounding ecosystems. Populations within Nevada—including the three populations in Esmeralda County—have experienced steep declines over the past several years due to drought

and disease. In particular, the vitally important Lone Mountain population experienced a disease event in 2021 that resulted in a forty percent loss of the herd. *See* Nev. Dep't of Wildlife, *Nevada's 2022-2023 Bighorn Sheep & Mountain Goat Statewide Harvest and Population Status* (2024), *available at* https://tinyurl.com/482dnj8d. In 2020, the Monte Cristo population likewise suffered a die-off event that resulted in a sixty-seven percent loss. *Id.* Continued poor lamb recruitment and declining population trends in both the Lone Mountain and the Monte Cristo populations led Nevada to close the hunts in these management areas in 2024. *See* Nev. Dep't of Wildlife, *Big Game Status 2023-2024* 62-63 (2024), *available at* https://tinyurl.com/yt2e6mdf.

44.    The three Esmeralda County populations of bighorn sheep reside in the mountain ranges surrounding the Project corridor, and are connected by migration corridors that connect critical winter and summer habitat and provide for genetic exchange, which in turn supports genetic diversity and population resiliency. Historically, movement between the three populations occurred regularly; however, today, such movement has slowed considerably, largely as a result of anthropogenic-driven habitat fragmentation, alteration, and degradation. *See* Nev. Dep't of Wildlife, *2018-2019 Big Game Status* 81-83 (2019), *available at* https://tinyurl.com/2ej6xs6s. Actions that further impede and/or restrict bighorn sheep movement in Esmeralda County—actions like the construction of a massive transmission line that bisects important bighorn sheep movement and migration corridors—will only exacerbate the challenges facing both these populations and the species as a whole. For example, further restricting the already reduced movement between populations in the county will only increase genetic isolation, which will in turn decrease the populations' resiliency and adaptability, as well as their ability to weather stochastic events. As these populations become more isolated, less resilient, and more vulnerable to stochastic events, the desert bighorn sheep species will become increasingly vulnerable to extinction through reduced genetic diversity, limited adaptability, and inbreeding depression. Indeed, for at least fifty years, the well-studied Lone Mountain population has served as an important source of individuals for translocation efforts to boost the genetic diversity—and thus, the survivability—of other isolated bighorn sheep

1    populations throughout the state.

2        45.    In March 2024, BLM declined to designate the proposed Esmeralda/Fish Lake

3    ACEC. BLM determined that proposed ACEC satisfied the relevance criteria in light of the

4    area's significant historic, cultural, and scenic values; fish and wildlife resources; and natural

5    processes or systems. BLM also determined that certain relevant resource values within the

6    proposed ACEC—including cultural and archeological resources and vegetation and plant

7    resources—satisfied the importance criteria in light of the resources' national significance and

8    sensitivity to anthropogenic disturbance. However, BLM determined that the proposed ACEC

9    did not require special management attention. According to the agency, existing laws, including

10   the National Historic Preservation Act and the ESA, are sufficient to adequately protect and

11   manage the relevant and important resource values.

12       46.    In its denial of FNW's ACEC nomination, BLM noted several challenges to the

13   proposed designation, as well as opportunities to revise the nomination to better satisfy the

14   criteria. BLM suggested that the biggest obstacle to the designation of the Esmeralda/Fish Lake

15   ACEC as proposed was the size of the area. At approximately 850,000 acres, BLM explained

16   that the area "would be difficult to manage" and suggested that "[s]maller areas that meet

17   relevance and importance criteria and require special management attention could be evaluated

18   as smaller ACECs" at a later date.

19                    2.  *Mojave Desert Tortoise*

20       47.    Listed as threatened on April 2, 1990, *see* 55 Fed. Reg. 12,178, the Mojave

21   desert tortoise is a large, herbivorous reptile native to southeastern California, southern Nevada,

22   southwestern Utah, and northwestern Arizona. Like many other desert-adapted species, the

23   tortoise lives on the edge of physiological tolerances, and climate change combined with other

24   impacts are testing the outer limits of the tortoise's tolerance.

25       48.    In 2011, FWS issued a Revised Recovery Plan for the Mojave desert tortoise,

26   which updated information on the species and threats impeding its recovery, identified five

27   recovery units, and reaffirmed the agency's recovery strategy and actions. The revised recovery

28   plan lists three objectives and associated criteria to achieve the ultimate goal of delisting: (1)

"maintain self-sustaining populations of desert tortoises within each recovery unit," which is defined as positive population growth for a period of at least 25 years; (2) "maintain well-distributed populations of desert tortoises throughout each recovery unit," as measured by an increase in distribution over a period of at least 25 years; and (3) "ensure that habitat within each recovery unit is protected and managed to support long-term viability of desert tortoise populations," which requires that "the quantity of desert tortoise habitat within each conservation area be maintained with no net loss until population viability is ensured." The revised plan also recommends connecting blocks of suitable desert tortoise habitat to maintain gene flow and population connectivity. Relevant here, the Project occurs within the Northeastern Mojave Recovery Unit and Eastern Mojave Recovery Unit.

49.     The revised recovery plan listed myriad threats faced by the desert tortoise, the "most apparent" of which "are those that result in mortality and permanent habitat loss across large areas, such as urbanization and large-scale renewable energy projects and those that fragment and degrade habitats, such as proliferation of roads and highways, . . . and habitat invasion by non-native invasive plant species." None of these threats has abated. Moreover, because their life history strategy includes delayed sexual maturity and low recruitment, any impacts from these threats are especially long-lasting. Consequently, the status of the desert tortoise has not improved since its listing under the ESA. In fact, all reliable data and analysis prepared since the species was listed indicate that its population has continued to decrease. Indeed, as recognized in a 2023 report on desert tortoise population connectivity prepared for BLM in connection with the proposed Bonanza Solar Project, experts acknowledged that "[l]ong-term monitoring has revealed that tortoise populations continue to decline even within most protected areas, likely influenced by anthropogenic habitat use."

### 3.  *Proposed Cactus Springs ACEC*

50.     In September 2022, during the planning process for the Bonanza Solar Project, Plaintiff Basin and Range Watch submitted to BLM a nomination for the Cactus Springs ACEC. The proposed Cactus Springs ACEC included approximately 58,000 acres of land in the Indian Springs Valley, and was nominated "primarily for protection of [Mojave desert] tortoise

[habitat] connectivity." Other resource values that the proposed ACEC was intended to protect included "cacti species, . . . Gila monsters, spring resources . . . , cultural and historic resources, and paleontological resources." During the review period, BLM increased the nomination area to include desert tortoise habitat within a narrow corridor between the Red Rock Canyon National Conservation Area and Highway 160, for a total of 82,573 acres.

51.     Noting that the "[r]ecovery of the federally threatened Mojave desert tortoise is reliant on not only preserving protected areas . . . but even more importantly, maintaining connectivity of those protected areas to preserve genetic connectivity," BLM "found relevance and importance . . . values for the Mojave desert tortoise and its habitat occur within the revised nominated ACEC boundary." Specifically, the proposed Cactus Springs ACEC would "[i]nclude the only remaining tortoise connectivity between the west and east sides of the Spring Mountains, and between the Eastern Mojave Recovery Unit and the Northeastern Mojave Recovery Unit," which has "been identified as critical for maintaining tortoise genetic connectivity between the two Recovery Units."

52.     Despite the fact that, by BLM's own admission, the proposed Cactus Springs ACEC satisfies both the relevance and importance criteria, BLM did not make a final determination regarding the proposed ACEC during this land use planning process.

        4.     *TUSK National Monument*

53.     Located in the upper Las Vegas Wash, north of the cities of Las Vegas and North Las Vegas, Nevada, the TUSK was established as the 405th unit of the National Park System on December 19, 2014. The monument "encompasses one of the largest and most diverse late Pleistocene vertebrate fossil assemblages in the southern Great Basin and Mojave Deserts," and therefore "is rich with paleontological resources." For example, the TUSK boasts "a vertebrate fossil assemblage" containing the fossilized remnants of the megafauna that roamed North America during the last Ice Age thousands of years ago (e.g., mammoth, camel, dire wolves, and saber-toothed cats). The park encompasses the Las Vegas Formation, a network of vast pleistocene deposits which "contain paleontological and paleoecological resources such as fossilized plants, animals, and their traces that were deposited in spring-fed ponds, meadows,

marshes, and streams during periods of abundant rainfall in the Pleistocene Epoch." "The paleontological record represented at the monument ranges from approximately 100,000 to 12,500 years ago, part of a geologic formation that spans multiple important global climate cooling and warming episodes during at least the last 500,000 years." The fossils found in the TUSK "help to tell an important story regarding how the region's climate varied," and can help inform our understanding of the impacts of our own changing climate.

54.    In addition to the abundance of fossils, the TUSK contains an important desert ecosystem with multiple habitats that support a variety of plants and animal populations, including federally-listed endangered and threatened species. The TUSK provides important habitat for the threatened Mojave desert tortoise, as well as for kit foxes, Le Conte's Thrasher, burrowing owls, kestrels, barn owls, and great horned owls. In all, more than fifty-two species of mammals and thirty-one species of reptiles and amphibians can be found within the monument's boundaries. Accordingly, "[t]he monument helps protect an important wildlife corridor from urbanization, spanning multiple federal land units."

55.    Relevant here, at NPS's request, NV Energy applied ground-penetrating radar at seven locations within the TUSK to assess if fossils could be detected. Although NPS requested that NV Energy survey each site within the monument where ground disturbance would occur, NV Energy reportedly refused to do so. Ultimately, three of the seven study locations were within the Project's permanent ROW. At all seven study locations, "anomalies" that are indicative of the presence of fossils were detected. Subsequent data analysis included developing 3-D images of the results from one of the study locations within the Project ROW. The results suggested that one of the anomalies at the location was consistent with the skull and limb bone of a member of the elephant family. Significantly, at six of the seven study locations, the fossils were not visible on the surface; rather, data indicated that the likely fossils ranged in depth from 1.6 feet to 32.8 feet below surface.

**B.    The Project Is Intended To Trigger A Significant Expansion Of Commercial Solar Development In Southwestern Nevada**

56.    NV Energy intends to construct, operate, and maintain a new, approximately

472-mile system of new overhead electric transmission facilities, substations, and ancillary project components to be built in western Nevada between North Las Vegas and Reno. According to the Draft EIS, NV Energy's purpose and need for the Project are to "facilitat[e] access to and stronger transmission interconnection of diversified renewable energy resources to the western grid," including solar energy, and to "facilitate access to BLM-titled Designated Lease Areas and Nevada Solar Energy Zones."[2] The Final EIS further explains that NV Energy's purpose and need for the Project are to "provide greater access to [the] renewable energy resources through a reliable, statewide, interconnected transmission grid system that renewable energy industries can access, including transmission connections to BLM-titled Designated Lease Areas and Nevada Solar Energy Zones (SEZ) including Amargosa Valley, Gold Point, and Millers SEZs." According to both BLM and NV Energy, the development of the Project is critical to the substantial expansion of commercial solar energy in Nevada in order to "meet the electrical demand of the end users and respond to electrical service requests, improve overall system reliability, and provide regional redundancy."

57.    The Project has long been controversial, even within the state Public Utilities Commission. In March 2021, the Nevada Public Utilities Commission initially refused to fully approve the Project; citing the cost to ratepayers, the regulators gave approval only for a line spanning from Las Vegas to Reno.[3] Less than two months later, an omnibus energy bill— SB448—was rushed through the state legislature. SB448 included an effective mandate to build the Project as proposed.[4] Despite assurances from NV Energy and the bill's sponsors that

---

[2] Solar Energy Zones ("SEZs") are designated leasing areas that BLM determines to be well suited for utility-scale production of solar energy, and that will therefore be prioritized for solar energy and associated transmission infrastructure development. *See* 43 C.F.R. § 2804.35(b).

[3] Joint Application of Nevada Power Company d/b/a NV Energy and Sierra Pacific Power Company d/b/a NV Energy for approval of the fourth amendment to its 2018 Joint Integrated Resource Plan to update and modify the renewable portion of the Supply-Side Action Plan and the Transmission Action Plan, Nevada Commission Docket No. 20-07023, (Mar. 22, 2021).

[4] *See, e.g.*, Amy Alonzo, *A huge NV Energy project has doubled in cost. Ratepayers are being asked to help fund it*, Nev. Independent (Dec. 8, 2024), *available at*

23

"Nevadans will not be asked to pay for this investment until at least five to six years down the road," the cost of the Project has since doubled to a reported $4.24 billion.[5] In 2023, the Federal Energy Regulatory Commission ("FERC") approved NV Energy's request for permission to incorporate some construction costs into wholesale customers' electric bills before the transmission lines are operational.[6] FERC also granted the company's request for permission to recoup costs from consumers should the transmission lines ultimately fail to be fully built due to circumstances outside the company's control.[7] FERC's action prompted the Nevada Bureau of Consumer Protection to petition for rehearing on both requests, arguing that NV Energy's method of funding the project will "create significant upward pressure on the general rates paid by customers of the Nevada electric utilities."[8] The request was denied by operation of law.[9]

### C.   BLM's Draft EIS

58.     In May 2023, BLM issued for public comment its Draft EIS for the Project, which will consist of a new, approximately 472-mile system of new overhead electric transmission facilities, substations, and ancillary project components. The Draft EIS explained that under the preferred alternative, the Project would cross the TUSK boundary and run for approximately 1.5 miles before exiting the park. Within the TUSK, the Project would consist of 11 steel vertical monopole structures, as well as temporary and permanent ROWs to support

---

https://tinyurl.com/3m9n6z8x; Jimmy Tobias, *How the Renewable Energy Boom Is Remaking the American West*, Inside Climate News (Dec. 15, 2024), *available at* https://tinyurl.com/3bt4cjuk.

[5] Jimmy Tobias, *supra* note 4.

[6] *See* Order Granting Petition for Declaratory Order re Nevada Power Company, FERC Dkt. No. EL22-73-000 (Mar. 23, 2023).

[7] *Id.*

[8] Request for Rehearing of the Office of the Nevada Attorney General, Bureau of Consumer Protection, FERC Dkt. No. EL22-73-000 (Apr. 21, 2023).

[9] If FERC fails to take any action on a request for rehearing within thirty days of filing, the request for rehearing is deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713(f) (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020). Because FERC did not act on the request within thirty days, it was deemed to have been denied. *See* Notice of Denial of Rehearing by Operation of Law, FERC Dkt. No. EL22-73-000 (May 22,

1    construction activities and ancillary facilities.

2    59.    The Draft EIS explained the purpose and need for the action for NV Energy, the

3    Project proponent, as well as for BLM, the lead agency, and NPS, a coordinating agency.

4    According to the Draft EIS, NV Energy's purpose and need for the Project are to "facilitat[e]

5    access to and stronger transmission interconnection of diversified renewable energy resources to

6    the western grid," including solar energy, and to "facilitate access to BLM-titled Designated

7    Lease Areas and Nevada Solar Energy Zones." BLM stated that the purpose of its action is to

8    "respond to the [Project] application," while the need for the action "is to fulfill the BLM's

9    responsibility under FLPMA and its ROW regulations to manage the public lands for multiple

10   uses, including the transmission of electric energy." Finally, NPS's purpose "is to respond to the

11   [Project] application," while its need is "to fulfill the NPS responsibility under NPS ROW

12   regulations to manage Tule Springs Fossil Beds National Monument (TUSK) in compliance

13   with the 2015 National Defense Authorization Act enabling legislation and the NPS 2006

14   Management Policies."

15   60.    The Draft EIS's alternatives analysis grouped routing alternatives into nine

16   geographic areas, ostensibly "to allow for localized comparisons among the various line routes."

17   Relevant here, the TUSK Transmission Line Group Alternatives consisted of eight alternatives.

18   Four of these alternatives lie within the TUSK boundary and "involve different structure and

19   location options within the TUSK along the TUSK boundary": TUSK Transmission Alternative

20   A, TUSK Transmission Alternative B, the Initial Proposed Action, and the Proposed Action.

21   The remaining four TUSK Transmission Alternatives fall outside of the TUSK boundary:

22   TUSK Transmission Alternative E, which would have located the Project ROW south of the

23   TUSK boundary in accordance with the map accompanying the TUSK enabling legislation;

24   TUSK Transmission Alternative D, which would double-circuit the Project with an existing

25   transmission line that runs on the south side of the road bordering the TUSK boundary; TUSK

26   Transmission Alternative F, which would have collocated the Project along a highway corridor,

27

28   2023).

adding approximately three miles to the Proposed Action; and TUSK Transmission Alternative G, which would have been similar to Alternative F, but followed a different route.

61.     With respect to the TUSK Transmission Line Group Alternatives, two of the four alternatives within the TUSK boundary—Alternative A and the Initial Proposed Action—were eliminated from detailed analysis because they "would have substantially similar or greater effects than the Proposed Action." At the same time, *every single alternative* that would fall outside the TUSK boundary was eliminated from detailed consideration. Relevant here:

- TUSK Transmission Alternative D was eliminated because "it would be economically infeasible, nearly doubling the projected costs for construction of this segment . . . while at the same time increasing visual impacts," and "would be ineffective in meeting the purpose and need for the [Project] by not improving electric reliability." However, this alternative would add a mere $2.2 to $2.7 million to the $4.24 *billion* project. The Draft EIS does not explain how adding such a comparatively small cost—indeed, what amounts to a drop in the bucket to this massive Project—would render it economically infeasible. Moreover, although collocating the lines would require towers that are approximately 40 feet taller than those in place, the Draft EIS did not meaningfully weigh these purportedly greater visual impacts against the Project's preferred alternative of disturbing irreplaceable fossils within the Monument. Finally, while collocating high-voltage transmission lines does present some challenges with respect to maintenance, the Draft EIS does not meaningfully weigh those costs against the many benefits, including *increased* reliability due to system redundancy, enhanced capacity, space efficiency, and fewer resource impacts. Nor does the Draft EIS explain whether methods to mitigate the challenges associated with double-circuit lines (e.g., line shielding or line discharging grounding switches) were explored as part of the alternative. Instead, the Draft EIS insists that "[t]he double-circuit structure would be less reliable than a single-circuit structure because both circuits would need to be out of service simultaneously for any

maintenance or emergency repairs." But, as recognized by many industry experts, "one of the benefits of double-circuit transmission lines is that line maintenance work can be performed on a de-energized circuit while the other circuit remains energized." In such cases, live-line working techniques, where workers perform maintenance while the line is energized, or temporary measures like shifting the load to the other circuit while one line is de-energized for maintenance, might be used. The Draft EIS ignores this possibility entirely.

- TUSK Transmission Alternative E, which would have located the Project ROW south of the TUSK boundary in accordance with the map accompanying the TUSK enabling legislation, was eliminated because Congressional action would be required to resolve the apparent conflict" between the enabling legislation and the location of the electric utility corridor, which could take several years to resolve and therefore, would not serve the purpose and need of meeting "the electrical power needs of Nevada in a timely manner." The Draft EIS does not provide any evidence for its assertion that the location of the utility corridor in the TUSK enabling legislation was a "mistake." Nor does the Draft EIS explain why, if this mistake was so obvious, no federal agency or electrical utility has sought Congressional intervention in the decade since the enabling legislation was enacted.

- TUSK Transmission Alternative F, which would have collocated the Project with existing roadways, was eliminated "from detailed analysis because it would be economically infeasible—nearly doubling the projected costs of this segment— and maintenance on the transmission line would be more difficult as well as disruptive and hazardous to the public." However, the cost of the segment is estimated to be approximately $2.7 million. Therefore, this alternative would add a mere $2.7 million to the $4.24 *billion* Project. Once again, the Draft EIS does not explain how adding such a comparatively small cost—indeed, what amounts to a miniscule fraction of the cost of this massive Project—would render it

1    economically infeasible. Nor does the Draft EIS meaningfully explain how the

2    purported public disruptions associated with maintenance of the line outweigh

3    the impacts to irreplaceable fossils within a designated National Monument.

4    62.    The Draft EIS also considered one alternative to avoid resources in the

5    Goldfield-Tonopah geographic area. The Goldfield-Tonopah Alternative A would conform with

6    BLM's own recommendation to revise the existing energy corridor to follow US 95 from

7    Stonewall Pass, through Tonopah, and on to Coaldale in order to "collocate with existing

8    infrastructure and provide access to the Millers SEZ [Solar Energy Zone]." This route would

9    have fewer impacts on LWC inventoried units and the Mojave desert tortoise Eastern Mohave

10    Recovery Unit. On the other hand, Alternative A would result in greater visual impacts to

11    downtown Goldfield and Tonopah. Additionally, the alternative would "*potentially* interfere

12    with authorized mining operations present in the corridor." (emphasis added). The Draft EIS

13    does not explain how the Project would interfere with mining claims, nor does it explain why

14    such conflicts could not be avoided. The alternative route would be 24.5 miles longer than the

15    Proposed Action and would cost an additional $35.2 million, "which reflect[s] the additional

16    material and time necessary to construct the added miles of transmission line." The Draft EIS

17    explains that the "Goldfield-Tonopah Transmission Alternative A was eliminated from detailed

18    analysis because it would be inconsistent with the BLM's basic policy objectives for cultural

19    resources . . . [and] due to the economic infeasibility associated with the $35.2 million increase

20    in construction costs."

21    63.    Although the Draft EIS purported to consider the Project's impacts on various

22    resources, its discussion merely lists the impacts that *might* occur to each resource (e.g., listed

23    species, special status species, general wildlife, cultural resources, paleontological resources,

24    etc.), including habitat loss, degradation, and/or fragmentation; increased anthropological

25    disturbance; increased sedimentation and discharges into water sources; increased injury and/or

26    mortality from vehicles or personnel; proliferation of roads; and increased predation. However,

27    the Draft EIS is largely devoid of meaningful consideration of the extent and scope of the

28    impacts on resources at the local, regional, or national level.

64.    For example, with respect to bighorn sheep, the Draft EIS conceded that the species "may be particularly vulnerable to disturbance," and that the Project will have temporary and permanent impacts on sheep habitat and movement corridors. Indeed, the Project ROW will impact nearly 11,000 acres of bighorn sheep habitat, including nine movement corridors. Yet, the Draft EIS does not meaningfully consider the impacts on individuals or on particular populations, such as the three Esmeralda County populations that may be especially vulnerable to genetic and geographic isolation as a result of the Project. Nor does the Draft EIS meaningfully examine the Project's impact on specific habitat areas, or compare the relative importance of affected habitat between alternatives. Instead, the Draft EIS acknowledges that "[i]mpacts to bighorn sheep may occur at the population level impacts to movement corridors," but insists that mitigation measures, such as restrictions on helicopter use and speed limits, will minimize the impacts on bighorn sheep populations. The Draft EIS fails to explain precisely how the risks of habitat fragmentation and degradation for this sensitive species—particularly with respect to the vital migration corridors in the Esmeralda Valley that support genetic diversity and population resiliency—will be "minimized."

65.    With respect to paleontological resources, the Draft EIS briefly notes that the effects of the Project include [t]he discovery, successful documentation, and salvage of fossils that meet significance criteria as paleontological resources," as well as the "loss" of fossils destroyed during construction and the concomitant loss of "the potential scientific contribution of these fossils to the general public and/or scientific community." However, the Draft EIS does not meaningfully consider the magnitude of the Project's impacts on particular areas with high fossil yields, such as the TUSK.

66.    With respect to cumulative effects, the Draft EIS's analysis relies on several assumptions. Relevant here, the cumulative effects analysis assumes that: the Project would proceed independently of the development (or not) of the identified reasonably foreseeable future actions, including proposed solar facilities; and the reasonably foreseeable future solar facilities would look to other means of distributing generated power if the Project were not built. However, BLM has acknowledged in other land management planning endeavors,

including in the Western Solar PEIS, that access to transmission infrastructure is one of the most significant limiting factors in solar development. Indeed, many solar projects on public lands are located near (less than 3 miles from) existing or planned transmission line infrastructure. Here, the Project is expressly intended to "create[] a renewable energy highway that allows access to Nevada's resource rich renewable energy zones" that, "[r]ight now, . . . cannot be tapped into . . . due to the lack of necessary transmission infrastructure."[10] Accordingly, many of the identified reasonably foreseeable solar facilities are strategically placed along the Project route. Yet, the Draft EIS insists without evidence that "[i]f the ROW applications for the [Project] were to be denied by the federal ROW agencies, the pending solar projects would look at other transmission lines to distribute their generated power." The Draft EIS does not attempt to reconcile the apparent contradiction between its assumption that the solar facilities will proceed notwithstanding the decision regarding the Project, and the fact that the Project is expressly intended to facilitate the construction of solar facilities in areas that currently lack the necessary transmission infrastructure to support such development. Put differently, because proximity to transmission capacity is an important consideration for solar projects, and the Project is expressly intended to create transmission capacity in areas where none exists, it stands to reason that if the Project is not constructed, it is likely that at least *some* of the planned solar projects that are strategically located adjacent to the line would, at the very least, be moved closer to other existing or planned transmission lines. As a result, the impacts to areas with high concentrations of proposed solar energy developments, including the proposed Esmeralda/Fish Lake ACEC, would likely be substantially decreased. However, the Draft EIS does not grapple with these facts; it neither identifies whether other transmission lines would be available for interconnection, nor explains how the solar facilities that are strategically placed to straddle the Project in areas without transmission infrastructure would proceed in the absence of the Project.

67.    The Draft EIS purports to examine cumulative impacts using a three-step

---

[10] NV Energy, *Greenlink by NV Energy*, https://www.nvenergy.com/cleanenergy/greenlink-

process: first, the Draft EIS identifies the cumulative effects' analysis area for each resource and relevant time period; second, the Draft EIS "identif[ies] and describe[s] past, present, future, and [reasonably foreseeable future actions] that are similar in kind and effect as the Action Alternatives or have considerable impact to environmental resources to which the Action Alternatives' effects will cumulatively contribute"; and finally, the Draft EIS "evaluate[s] the Action Alternatives for the potential to have cumulative contributions to environmental effects that could affect the environment."

68.     With respect to the first step—identifying the cumulative effects analysis areas— the Draft EIS lists the relevant areas for each resource in an appendix. Most analysis areas are defined by the distance from the centerline of the proposed ROW. For example, the cumulative effects analysis area for cultural resources is defined as "3 miles from centerline of GLWP transmission lines based on the delineation of the visual APE," while the cumulative effects analysis area for wildlife is defined as a "5-mile buffer based on large wildlife species range." The Draft EIS does not explain how it arrived at these distances, or why cumulative impacts will be limited to those defined areas. Nor does the Draft EIS attempt to reconcile its selection of radii ranging from 0.5 miles to 5 miles to define the cumulative effects analysis areas with BLM's own Western Solar Plan EIS, which designates as available for solar applications those lands within *fifteen miles* of existing and planned transmission lines.

69.     With respect to the third step—evaluating the cumulative impacts of the Project and the reasonably foreseeable future actions—the Draft EIS acknowledged that the Project will result in cumulative impacts on various resources. However, a vigorous analysis of those impacts is conspicuously absent. For example, with respect to special status species and general wildlife, the Draft EIS concedes that the Project may contribute to habitat loss, degradation, and/or fragmentation; increased anthropogenic disturbance (e.g., noise, human presence); vehicular collisions; release of toxins to aquatic resources; and water consumption. Many of those impacts would result from urbanization, large-scale renewable energy projects,

nevada.

transportation projects, and mining and mineral exploration. The Draft EIS further acknowledges that cumulative impacts to resources would be greater where there are larger concentrations of reasonably foreseeable future actions, including the vicinity of Beatty, Big Smoky Valley, Amargosa Desert, Indian Springs Valley, and Las Vegas Valley. The Draft EIS then summarily concludes for each resource that "[i]n combination, past, present, and [reasonably foreseeable future actions] would result in cumulative impacts." The Draft EIS neither quantifies those impacts, nor qualitatively evaluates and describes their nature and scope.

### D.    Comments on the Draft EIS

70.    FNW and other stakeholders submitted extensive comments on the Draft EIS identifying numerous errors and omissions in the environmental analysis. For example, FNW explained that the area encompassed by the proposed Esmeralda/Fish Lake ACEC "includes interconnected valleys, watersheds, important springs and aquifers, and playas that provide ecological connectivity, intactness, ecological resiliency, and protect world-class visual resources and recreational opportunities." The Project would bisect the proposed ACEC and "place a new substation in the middle," expanding transmission capacity into an area that currently has none and entirely "bypass[ing] the Miller SEZ." As FNW explained, this "decision [] has already garnered applications for 60,000 acres of solar energy generation facilities on BLM variance lands," which would in turn, "destroy ecological intactness and habitat connectivity." This is particularly concerning in light of the fact that "[t]he landscape comprising the Esmeralda/Fish Lake ACEC has not been evaluated in a BLM resource management plan for well over 25 years." FNW explained that the incredible resource values of the proposed ACEC merit protection—or at the very least, consideration—in the EIS process before the construction of a transmission line that would open the area to development.

71.    FNW's comments also explained that the Draft EIS's consideration of alternatives was inadequate. FNW reminded BLM that its own Energy Corridor Review Report recommended realigning the transmission corridor to collocate with exiting transmission lines and utility corridors. This "conservation alternative" would "run the Esmeralda Section of the

GLWP east from the 18-224 milepost 85 to co-locate with the existing transmission line around the north of the Monte Cristo Range to Millers Substation, then south along the US 95 Utility corridors to rejoin the 18-224 corridor at milepost 166." Yet, despite requests during the scoping process that BLM consider the conservation alternative in detail, the Draft EIS's consideration of alternatives in the Goldfield-Tonopah area discussed (and quickly dismissed from detailed consideration) only a single alternative that significantly deviated from the conservation alternative. Instead, the Draft EIS's Goldfield-Tonopah Transmission Alternative A was "longer, convoluted, and reduced 35 miles of colocation . . . with existing transmission lines." This alternative also drove the Project directly through the historic town of Tonopah instead of bypassing the area by collocating the line with existing lines that exist merely 3 miles west. The Draft EIS then relied upon the ostensibly greater impacts to the National Register-eligible Tonopah historic district that would result from the Goldfield-Tonopah Transmission Alternative A to dismiss the proposal from detailed consideration. FNW asserted that the Goldfield-Tonopah Transmission Alternative A therefore appears to have been designed to fail. FNW concluded that BLM must fully "analyze and consider" alternatives—including the conservation alternative from the Energy Corridor Review Report—before making a final decision.

72.    FNW's comments also requested that BLM fully "[e]valuate the [P]roject's role in enabling extensive new solar energy development and fully disclose the environmental impacts of the [Project] and the associated pending or foreseeable energy generation and storage projects made possible by this proposed line."

73.    Basin and Range Watch submitted extensive comments on the Draft EIS. Basin and Range Watch noted that the Project will "create significant impacts to western Nevada," and implored BLM to ensure that conservation values are fully considered. The organization explained that the Draft EIS's discussion of the Project's direct, indirect, and cumulative impacts on several resources was woefully inadequate.

74.    For example, the Project will bisect bighorn sheep habitat, leading to habitat loss and fragmentation. Bighorn sheep are particularly sensitive to habitat disturbance, and the

Nevada populations have suffered precipitous declines in recent years. In particular, as explained, the three Esmeralda County populations have experienced recent negative population trends due to disease and drought. Yet, as Basin and Range Watch explained, the Draft EIS failed to meaningfully examine the direct, indirect, and cumulative impacts that the loss of foraging habitat and movement corridors will have on populations that are already stressed. In particular, the Draft EIS has "no detailed discussion of the impacts to bighorn sheep" from the Bare Mountains bighorn sheep population—"one of the best populations of desert bighorn in the state of Nevada"—"of all the new roads, construction equipment, noise, habitat fragmentation, or water resource" use. Likewise, the "Mount Grant and the Wassuk Range have an important population of desert bighorn sheep," yet the Draft EIS does not contain any detailed discussion of the Project's localized impacts. This omission is particularly egregious in light of the solar energy development that indisputably will result from the construction and operation of the Project.

75.    Relatedly, Basin and Range Watch also decried the Draft EIS's failure to meaningfully consider the Project's impacts in light of the large-scale solar energy development that the Project is expressly intended to facilitate. Basin and Range Watch explained that the remote areas that the Project will cut through "have no transmission infrastructure capable of carrying any utility-scale solar generation to load centers." Indeed, many proposed projects specifically identify the substations that will be built as part of the Project as interconnection sites. Therefore, according to Basin and Range Watch, the solar facilities are intrinsically connected to the Project, and the impacts of both those facilities and the Project on the environment and resources must be assessed together.

76.    With respect to the TUSK Transmission Line Route Group Alternatives, Basin and Range Watch and other stakeholders asserted that the Draft EIS failed to consider alternatives that would *avoid* impacts to fossils and other Monument resources, as required by the Organic Act, the TUSK enabling legislation, and the PRPA. Commenters explained that the TUSK "enabling legislation and general management plan do[] not allow for any damage to fossils." However, the activities that will occur in connection with the Project, including boring,

1    auguring, and drilling, are inherently destructive to the fossil resources that the agency *knows*

2    exist and will be adversely affected and/or destroyed. Moreover, the Draft EIS does not provide

3    any evidence to support its claim that Congress's decision to place the ROW outside of the

4    TUSK's boundary was a mere "mapping error." Noting that the Draft EIS failed to provide any

5    meaningful evaluation of the technical feasibility or actual costs of the TUSK Transmission

6    Alternatives that would be placed outside the park, particularly as compared to the cost of

7    professionally surveying for, documenting, and excavating fossils prior to constructing each

8    transmission structure in the TUSK.

9        **E.    BLM's Final EIS**

10       77.    In June 2024, BLM issued the Final EIS for the Project.

11       78.    Despite comments requesting that the Final EIS examine in detail an alternative

12    that avoided impacts to the TUSK, the Final EIS remained steadfast in its refusal. As

13    justification for this refusal, the Final EIS insisted that Congress made a "mistake" in drafting

14    the map accompanying the enabling legislation that shows the ROW south of the Monument

15    boundary. Yet, the Final EIS does not cite to any legislative history to support this assertion.

16    Instead, it argues that "[i]f the utility corridor were to be south of the TUSK boundary, 22

17    residences built in 2006 would be within the 400-foot-wide utility corridor and would need to

18    be removed to construct any transmission facility." Relying on its theory of Congressional

19    "mistake," the Final EIS argues that the Project would be within the 400-foot ROW that

20    Congress meant to establish, and therefore "would not alter, conflict with, or require new

21    management prescriptions and objectives for this [Monument]."

22       79.    The Final EIS somewhat modified the proposed route through the TUSK by

23    increasing the number of monopoles from eight to eleven, each of which would require a 100-

24    foot by 100-foot maintenance pad. The Final EIS also increased the height of these poles from

25    120 feet to 180 feet. Each monopole will require a foundation that will be approximately 6- to -

26    12-feet in diameter and 25- to 35-feet deep. The proposed route will occupy 19.8 acres within

27    the TUSK. While the Draft EIS estimated that this section would cost approximately $2.7

28    million, the Final EIS estimates that this segment will now cost $5.3 million (i.e., twice as

much).

80.    The Final EIS refused to examine in detail alternatives that would avoid the TUSK. Indeed, in response to comments criticizing the Draft EIS's failure to consider reasonable alternatives that would avoid impacts to the irreplaceable resources within the TUSK, BLM reiterated its assertion that the map depicting the utility corridor "incorrectly shows the corridor south of the TUSK boundary." With respect to TUSK Transmission Alterantives D through F, BLM reiterated the reasons given in the Draft EIS for eliminating each from detailed consideration, with minor modifications:

- With respect to TUSK Transmission Alternative D, which would have double-circuited the line with existing infrastructure, the Final EIS estimated that the costs of implementing the alternative would increase from the newly-stated figure of $5.3 million to between $9.5 million and $10 million. However, the Final EIS failed to disclose any documentation supporting this asserted cost increase, and also failed to explain why such a modest additional cost, when added to a project that according to multiple media reports will be $4.24 *billion*, would render the overall Project impracticable or infeasible. Additionally, although this alternative would require the installation of new, taller structures to support the double-circuited line, there appeared to be confusion about the actual impact of the additional height. While the new line would require towers of 190 feet, the Final EIS variously insisted that the existing towers were either 150 feet or 180 feet, meaning that the alternative would impose additional visual impacts of either 40 feet or 10 feet. In either event, once again, the Final EIS did not explain why these visual impacts outweighed impacts to the non-renewable resources within the National Monument. Finally, the Final EIS repeated the Draft EIS's unsupported and conclusory assertion that double-circuiting the line "would degrade electric system reliability" without any meaningful discussion of the technical feasibility of such an alternative.

- With respect to TUSK Transmission Alternative E, which would have located the Project within the utility corridor identified by Congress in the enabling legislation, the Final EIS reiterated the Draft EIS's unsupported assertion that Congress made a "mistake," and requesting that Congress correct this mistake would simply take too long. The Final EIS therefore dismissed this alternative from detailed evaluation. With respect to TUSK Transmission Alternative F, which would orient the Project along existing roadways, the Final EIS insisted that the additional cost of this route—which would add three miles to the total Project length—had ballooned to $56 million to $67 million. However, the Final EIS failed to disclose any documentation supporting this asserted cost increase, and also failed to explain why such a modest additional cost, when added to a project that according to multiple media reports will be $4.24 *billion*, would render the overall Project impracticable or infeasible. The Final EIS additionally insisted that "the existing highway median does not have enough space to construct" the necessary structures and safety features. The adjacent areas are likewise unsuitable for the Project because there is not "enough space . . . to accommodate planned highway expansions, a 525-kV transmission line, and necessary permanent ROW." Additionally, those areas "are highly developed and primarily zoned for residential or commercial development." Accordingly, the alternative was "eliminated . . .  from detailed analysis because it would be economically infeasible and maintenance on the transmission line would be more difficult as well as disruptive and hazardous to the public compared to the Proposed Action." The Final EIS did not explore whether certain areas could be re-zoned.

81.    Although the Final EIS included three additional alternatives in the Goldfield-Tonopah Transmission Line Route Group (Alternatives B through D), none of the group alternatives were subjected to detailed analysis. Instead, the Final EIS eliminated all four of the Goldfield-Tonopah Transmission Line Route Group Alternatives "from detailed analysis

1    because it would have substantially similar or greater effects than the Proposed Action and

2    would be economically infeasible." The Goldfield-Tonopah Transmission Line Route Group's

3    Alternative A was the only alternative in the group mentioned in the Draft EIS. The Final EIS

4    repeated that this alternative would add an additional 24.5 miles of length. However, the Final

5    EIS insisted that the milage would add $85.8 million to the Project, a sharp—and unexplained—

6    increase from the Draft EIS's prediction of $35.2 million. According to the Final EIS, the

7    remaining alternatives, Goldfield-Tonopah Alternatives B through D, would add between 5.7

8    and 12 miles to the Project's length, costing a purported additional $20 million to $42 million.

9    Yet, the Final EIS failed to disclose any documentation supporting this asserted cost increase,

10   and also failed to explain why such additional costs, when added to a project that, according to

11   multiple media reports, will be $4.24 *billion*, would render the overall Project impracticable or

12   infeasible. The Final EIS also insisted that the Goldfield-Tonopah Transmission Alternatives

13   would have slightly greater impacts on resources such as pronghorn movement corridors,

14   historic districts in Goldfield and Tonopah, mining interests, and private lands. However, the

15   Final EIS did not discuss impacts to resource values as a whole, such as intact landscapes,

16   wildlife and high-value habitat, sensitive, and nationally-significant cultural resources. Instead,

17   the discussion focused on the allegedly greater impacts that the alternatives would have on the

18   Goldfield community and visual landscape character. As a result, the Final EIS did not

19   meaningfully examine *any* alternative that avoids serious impacts to intact habitat areas in the

20   proposed Esmeralda/Fish Lake ACEC.

21        82.    Despite serious concerns voiced by several stakeholders, the Final EIS made few

22   meaningful changes to its discussion of the Project's direct, indirect, and cumulative impacts.

23   For example, despite comments from Plaintiffs and others explaining that the Draft EIS failed to

24   meaningfully assess the Project's significant impacts on already stressed bighorn sheep

25   populations due to habitat fragmentation and loss, the Final EIS declined to further evaluate the

26   impacts that the Project will have on sheep populations, insisting instead that the Draft EIS

27   adequately examined the Project's impacts on "movement corridors and winter ranges that

28   intersect the general wildlife analysis area." Similarly, despite comments criticizing the Draft

EIS's cursory assessment of impacts to fossils and other resources within the TUSK, the Final EIS repeated the Draft EIS's assertion that any such impacts would be minimized by the implementation of mitigation measures. The Final EIS did not attempt to reconcile the impacts to fossils and other Monument resources with the NPS's obligation to determine that any activities it permits in National Park units are not in "derogation of the values and purposes for which the [TUSK] ha[s] been established."

83.    With respect to the Project's express purpose of substantially expanding industrial solar power, the Final EIS again failed to consider any of the adverse impacts associated with such an expansion as "indirect effects," notwithstanding the fact that they are a predictable, intended result of the project itself. Instead, the Final EIS improperly characterized such effects as "cumulative" impacts and again failed to take a hard look at the adverse impacts of the anticipated solar energy expansion on resources, such as wildlife (including ESA-listed species and special status species) and significant cultural and paleontological resources. The Final EIS also ignored the numerous comments from Plaintiffs and other stakeholders requesting a robust analysis that accurately accounts for the growth-inducing effects of the Project, whether characterized as indirect or cumulative. Rather, the Final EIS again incorrectly assumed that the "pending solar projects would look at other transmission lines to distribute their generated power" if the Project were not built and insisted that the combined impacts of the Project and the reasonably foreseeable future actions on most of the resources considered— including special status species, general wildlife, cultural resources, and paleontological resources—would be "negligible."

84.    For the Mojave desert tortoise, BLM identified thirty-eight pending reasonably foreseeable solar developments, and estimated that these actions could result in the loss of up to an "estimated 220,435 acres of suitable habitat" for the species. The Final EIS conceded that:

> [c]ombined with the current status of Mojave desert tortoise in the region, the trend in species declines over the last 10 years, and their reduced ability to tolerate additional stressors, the cumulative impacts on the Mojave desert tortoise would be *substantial* particularly because of the concentration of solar [reasonably foreseeable future actions] within the Eastern Mojave Recovery Unit.

Final EIS at 3-314 (emphasis added). The Final EIS thus acknowledges the devastating impacts that rapid solar development will have on this highly vulnerable species, and highlights the importance of conducting a thorough review of the solar development that the Project is expressly intended to facilitate before it is too late and the die is cast.

85.     The Final EIS included NPS's Non-Impairment Determination, in which NPS concluded that the Project would not impair the resources and values that the Monument was established to protect. For example, despite acknowledging that fossils are significant, non-renewable resources, NPS determined that the Project would not result in impairment "based on the analysis in the [Final EIS], associated measures to minimize adverse effects, and in the context of potential cumulative impacts." However, in reaching this conclusion, NPS did not consider the fact that Congress had already determined that the placement of a major utility line within the TUSK boundary would impair "the unique and nationally important paleontological, scientific, educational, and recreational resources and values of the land." Indeed, over the eight-year negotiation process to establish the Monument, NV Energy sought and obtained a ROW; however, that ROW was established *outside* of the Monument boundary to avoid direct impacts to resources within the park and included a specific provision to limit impacts on the Monument from development immediately adjacent to it. NPS likewise failed to consider its non-impairment determination in light of its obligations under the PPRA, which *requires* the agency to protect and preserve fossils for future generations as "an irreplaceable part of America's heritage."

F.     **Protests to the Final EIS**

86.     As with the Draft EIS, the Final EIS was met with intense criticism from the local community, conservation organizations, and others. By letter dated July 15, 2024, Plaintiff FNW timely submitted an official protest to BLM, explaining that while FNW and the other signatories "support renewable energy development and associated responsible transmission development on public land as part of a strategy to limit the negative effects of climate change," transmission infrastructure must be appropriately sited to avoid impacts to "important intact landscapes, wildlands, wildlife habitat, and cultural resources." However, as explained in the

1  protest letter, BLM failed to "ensure that the routing and design of the [Project] minimizes
2  adverse environmental impacts and that any impacts are appropriately mitigated." For example,
3  FNW argued that the Final EIS failed to meaningfully analyze action alternatives that lessen
4  new transmission line and substation construction in areas with high value resources. In
5  particular, FNW decried "the seeming lack of on-the-ground knowledge of the landscapes
6  through which this [P]roject would run," particularly with respect to those present in Esmeralda
7  County and the proposed Esmeralda/Fish Lake ACEC. FNW noted that BLM's own 2022
8  Energy Corridor Review Report recommended collocating the Project with existing
9  transmission infrastructure and serve the Miller's SEZ, yet BLM flatly refused to examine such
10 an alternative—or *any* of the Goldfield-Tonopah Transmission Alternatives that would avoid or
11 minimize impacts to the proposed ACEC—in detail during the Project's NEPA review.
12 Although the Final EIS cited the additional cost as the primary reason for its refusal to consider
13 any of the Goldfield-Tonopah Transmission Alternatives, FNW explained that the added costs
14 were mere drops in the bucket for the $4.2 billion project, and in any event, will be "passed on
15 to the consumers." Accordingly, "costs incurred alone should not be considered a valid reason
16 for rejecting or not fully analyzing alternatives especially considering the intact landscape and
17 associated cultural resources, wildlife habitat and impacts on other resources we stand to lose
18 and their importance to constituents who are paying for the [Project]."

19       87.    FNW also protested the Final EIS's inadequate discussion of cumulative impacts
20 to several resource values. FNW explained that the reasonably foreseeable future actions
21 include extensive solar energy development that will occur as a direct result of the Project's
22 construction. Moreover, under the Solar Programmatic EIS—which allows solar applications
23 within 15 miles of existing or proposed transmission lines—significant swaths of public lands
24 will be made available for solar energy development by virtue of the Project's existence.
25 Indeed, "[i]n Esmeralda County alone[,] 41% of the entire county, nearly 1 million acres[,]
26 would be open to commercial solar development" as a result of the Project. It is undeniable that
27 solar energy development will have significant adverse cumulative impacts on the region. For
28 example, the Project and associated solar energy development risk destroying the integrity and

41

scientific context of nationally significant cultural, archaeological, and paleontological resources, particularly due to the placement of the Esmeralda substation within culturally and paleontologically sensitive sites. Largescale, industrial solar energy development, which again, is the intended result of the Project, will likewise have significant adverse impacts on wildlife and habitat connectivity, including by severing critical seasonal bighorn sheep movement corridors. The introduction of new, lighted facilities into the intact desert landscape will also negatively affect the nationally recognized dark sky resources of the Monte Cristo Range and the newly-designated Park to Park in the Dark Route. Yet, the Final EIS failed to meaningfully consider either the impacts of the identified reasonably foreseeable future solar facilities on the area's resources, or the "impacts that would directly result from this decision with the implementation of the Solar Programmatic EIS."

88.     By letter dated July 15, 2024, Plaintiff Basin and Range Watch also timely protested the Final EIS, pointing out several legal and analytical flaws. For example, the organization argued that the Final EIS inappropriately dismissed reasonable alternatives from detailed analysis, including those that would avoid direct impacts to the TUSK. Basin and Range Watch reminded BLM that "NEPA requires an analysis of impacts of not just technological and economic goals of project proponents, but to other resources on public lands and goals of managing those lands in the public interest." Yet, the Final EIS appeared to dismiss alternatives that would avoid impacts to the TUSK based solely on NV Energy's stated goals. Nonetheless, the Final EIS failed to provide "a convincing argument" as to why the TUSK Transmission Alternatives were technically and economically infeasible. Nor did the Final EIS "say why the visual impacts [of the alternatives] would be less impactful from the [impacts] to the TUSK monument." These failures are particularly egregious in light of the fact that the Final EIS's preferred routing alternative through the TUSK violates the Organic Act and the park's enabling legislation, which clearly places the energy corridor ROW *outside* of the TUSK's boundary.

89.     Basin and Range Watch likewise protested the Final EIS's inadequate examination of the direct, indirect, and cumulative effects of the Project on the area's resources.

For example, Basin and Range Watch explained that the Final EIS failed to take the requisite hard look at the Project's impacts to paleontological resources in the TUSK, particularly given the Project's location in an area with "high potential" for significant fossils. Indeed, ground-penetrating radar found large fossils at each of the three study areas within the Project ROW. However, despite NPS's request that NV Energy survey the remaining seven pole sites, NV Energy refused to do so. As a result, the scope of the Project's impacts on important fossil resources remains unknown.

90.    Basin and Range Watch further explained that the Final EIS failed to take a hard look at the Project's impacts on wildlife, including listed species and big game. For example, despite the fact that the Project will result in significant "direct, indirect, and cumulative impacts" on the Mojave desert tortoise by "opening up hundreds of thousands of acres of intact landscapes and healthy ecosystems to utility-scale solar energy development," the Final EIS failed to meaningfully examine the full extent of the Project and its associated development on the species. By "opening vast tracts of southwestern Nevada wildlands and tortoise habitat to industrial solar power plant development," the Project "disrupt[s]" prior conservation efforts. However, these impacts were never meaningfully analyzed. Relatedly, the Final EIS failed to recognize that solar energy development is intimately connected to the Project, and therefore must be thoroughly examined as an effect of the Project. However, despite requests from stakeholders that BLM "address the . . . impacts of energy project development that would result from the [Project]," the Final EIS "brushes off [such impacts] as outside the scope of the [Project], even though [commenters] have pointed out that the dozens of solar project applications in remote wildlands of western Nevada require a large new transmission line project be built in order to connect to load centers." This cannot be squared with NEPA's mandate that BLM take a hard look at the impacts that result from its actions.

91.    On August 27, 2024, BLM issued its Protest Resolution Report "conclud[ing] that [the agency] followed the applicable laws, regulations, and policies and considered all relevant resource information and public input." In response to Plaintiffs' protests regarding the cumulative impacts analysis, BLM insisted that the agency "fully analyzed the environmental

effects associated with the [Project] and the alternatives," and that the identification of the effects areas and reasonably foreseeable future actions was appropriate. It did not address Plaintiffs' arguments that the impacts of the solar energy development must be considered as effects of the Project. In response to Plaintiffs' concerns regarding the Final EIS's cursory examination of the direct, indirect, and cumulative impacts to resources, including cultural and paleontological resources, the TUSK, and wildlife (including listed species and special status species), BLM merely directed protesting parties to the relevant section of the Final EIS and insisted that the existing analysis was adequate. With respect to protests regarding the agency's failure to meaningfully consider alternatives that would avoid impacts to important resources and sensitive areas, BLM insisted that the Final EIS "did consider these alternatives" and that they were appropriately "eliminated from detailed analysis . . . because they would be ineffective in responding to the purpose and need; technically or economically infeasible; substantially similar in design to an alternative analyzed; or substantially similar to alternative(s) analyzed in terms of effects." BLM did not provide any additional evidence to support its claims of technical or economic infeasibility. Nor did it address Plaintiffs' assertions that the Final EIS failed to engage in a comparative analysis of the dismissed alternatives by weighing the impacts of the alternatives on, e.g., intact landscapes against the impacts that the alternatives will have on historic districts. Finally, dismissing Plaintiffs' concerns regarding the Project's impacts on the TUSK, BLM again insisted that the Project ROW "was specifically identified and authorized in the legislation that enabled the TUSK," and that the Final EIS "specifically addresses potential impacts on paleontological resources within the TUSK."

### G. The Project ROD and FWS's Biological Opinion

92.    In September 2024, BLM issued a ROD adopting the preferred alternative identified in the Final EIS and approving the necessary amendments to the RMP. The ROD insisted that the Draft EIS and Final EIS "identified the impacts of the [Project] and the other Action Alternative considered in detail to the environment and provided a sound basis for this decision."

93.    In a BiOp signed in June 2024, and made available with the ROD in September

2024, FWS concluded the ESA section 7 consultation process. The BiOp concedes that the "action area" that must be analyzed under ESA section 7 "contains, but is not exclusive to, the Project Area." However, FWS ultimately defined the action area to consist of: (1) the Project area, including temporary ROWs for transmission lines, distribution lines, and access roads, as well as "the footprint of ancillary facilities"; and (2) "buffers around the temporary ROWs and ancillary facilities." The BiOp thus defines the action area for the Project as encompassing only areas immediately adjacent to the Project and excludes all areas that will be indirectly affected as a result of the industrial solar energy development stemming from the transmission line.

94.    Although the BiOp discusses solar energy development as factors that affect listed species and designated critical habitat in the vicinity of the Project, it fails to meaningfully examine the indirect effects that the Project's facilitation of such development will have on listed species and designated critical habitat. Instead, the BiOp erroneously characterizes "industrial solar power plants" as a "cumulative effect" rather than as an indirect effect of the transmission line itself, which would necessitate expanding the "action area" to be analyzed to encompass at least the reasonably foreseeable future solar projects. The BiOp completely ignores the impacts associated with the massive expansion of the very solar facilities that the Project is intended to induce. Instead, it notes simply that "industrial solar power plants would likely continue th[e] trend" of "continued habitat loss, degradation, and fragmentation for the listed and proposed species evaluated . . . as well as increased harm of individuals of those listed and proposed species."

95.    The BiOp contains no discussion of impacts to listed species or designated critical habitat from the solar energy development that the Project is expressly intended to stimulate. For example, with respect to the Mojave desert tortoise, the BiOp acknowledges that solar energy development is a factor contributing to the destruction, modification, or curtailment of the species' range. The BiOp further explains that the Revised Desert Tortoise Recovery Plan recommends connecting blocks of desert tortoise habitat to maintain gene flow between populations. Accordingly, the Solar Programmatic EIS identified high-priority habitat areas for the conservation of desert tortoise connectivity. The BiOp concedes that portions of the Action

Area and surrounding Project lands "support desert tortoise connectivity habitat." Yet, the impacts of solar development are not mentioned at all in the BiOp's discussion of the effects of the action.

96.     In fact, the solar energy development that *will result* from the Project is only mentioned twice in the BiOp. First, when purporting to discuss the status of the species and its habitat, the BiOp briefly acknowledges that "pending solar applications in the [*sic*] along this corridor and adjacent to the Project could further limit connectivity if they are constructed," but then asserts without evidence that "the size, location, and configuration of the Proposed Action is anticipated to maintain sufficient intact habitat remaining where Mojave desert tortoises may forage, breed, and shelter following construction of the GLWP that would minimize effects of fragmentation beyond the existing infrastructure due to the current lack of other development in the surrounding lands." Second, when listing the cumulative impacts, the BiOp acknowledges that "industrial solar power plants would likely continue th[e] trend" of "continued habitat loss, degradation, and fragmentation" for the species. The BiOp thus ignores the effects of the solar energy development that will indirectly result from the construction and operation of the Project.

97.     Importantly, although subsequent permits to construct and operate the reasonably foreseeable future solar energy facilities that the Project is intended to facilitate will be subject to individual ESA consultation, such project-by-project analysis will be inherently piecemeal. The Project's ESA consultation process constitutes FWS's *sole opportunity* to consider the full suite of combined direct *and indirect* effects of the Project *and its associated development* on listed species.

98.     The BiOp's error is particularly apparent in its discussion of the Project's impacts on the threatened Mojave desert tortoise. The BiOp explains that the Project's Action Area "is estimated to include 162,000-acres of potential desert tortoise habitat." However, the BiOp focuses its analysis of the effects of the action on those smaller-encompassed areas in which tortoises will experience "direct effects through the form of ground disturbance, capture, handling, injury or mortality." For example, when discussing the effects of the Project on

population connectivity and habitat linkages, the BiOp acknowledges that "some level of adverse effect . . . linkages may occur from the [Project]," but narrowly focuses on the 5,998 acres of tortoise habitat that will be directly disturbed (whether temporarily or permanently) during Project construction. Because the amount of directly disturbed habitat "represents a small percentage" of both the available habitat in the Eastern and Northeastern Recovery Units (5,998 of 6,603,891 acres, or 0.09 percent), and range-wide (5,998 of 16,926,966, or 0.04 percent), the BiOp ultimately dismisses the Project's contribution to existing habitat connectivity challenges as "small." The BiOp further discounts the Project's impacts by insisting that "sufficient intact habitat would remain where Mojave desert tortoises may forage, breed, and shelter following construction of the [Project]." The BiOp does not attempt to reconcile its conclusion with its own concession that the Project will slice through the Armargosa Valley, "an area with current connectivity constraints between populations" and where there has been significant interest in solar energy development. Nor does the BiOp acknowledge that the solar energy development that the Project is expressly intended to galvanize will impede connectivity in an area that is "already influenced by existing anthropomorphic constrictions that compound effects of natural barriers on desert tortoise population connectivity." This omission is particularly egregious in light of FWS's concessions that "[c]onserving the smaller-scale, internal redundancy within remaining portions of the habitat linkage[s]" in the Project area "*is essential*," and "[s]ince redundancy in the linkage network between core populations in this portion of the species' range is extremely limited, maintenance of connectivity along the" areas encompassing the Project ROW "*will be imperative*." (emphasis added).

99.    Similarly, the BiOp purports to examine the effects of the Project on the Mojave Desert Tortoise's recovery. The BiOp explains that "[t]o achieve desert tortoise recovery, each recovery unit must contain well-distributed and self-sustaining populations across a sufficient amount of protected habitat to maintain long-term population viability and persistence." In other words, the species must both attain and maintain sufficient numbers and distribution to ensure its long-term survival and resilience. The BiOp acknowledges "the population has likely

1    continued to decline since 2014," but insists that "the losses from the proposed Project still

2    would not appreciably reduce the number of desert tortoises within the Northeastern [or]

3    Eastern Mojave Recovery Unit[s]," primarily because "the small number of adult desert

4    tortoises that could be injured or killed as a result of the Project equates to a small fraction of

5    the estimated population."

6         100.    With respect to the Project's effects on tortoise distribution, the BiOp concedes

7    that the Project will result in habitat loss; however, those losses include only the areas that will

8    be directly disturbed by Project construction and operation. The BiOp concludes that the loss of

9    *those specific areas* "will not impede the recovery of the desert tortoise because the Project is

10    not located within any designated critical habitat or conservation areas established for

11    tortoises," and because "the habitat in the Action Area is already somewhat disturbed by the

12    existing roadways and includes existing disturbance and development near Project boundaries."

13    The BiOp does not consider the indirect effects that the Project will have on tortoise numbers

14    and distribution—and therefore, recovery—through the facilitation of large-scale solar energy

15    development, including the proliferation of substantial new industrial-scale development in the

16    form of new roads, associated facilities, and other infrastructure, in tortoise habitat.

17    **CLAIMS FOR RELIEF**

18    **Claim 1: Violations of NEPA and the APA**

19         101.    Plaintiffs hereby incorporate Paragraphs 1-100 by reference.

20         102.    The Final EIS fails to analyze in detail a reasonable range of alternatives for

21    avoiding or minimizing the serious adverse environmental impacts associated with the Project,

22    in violation of NEPA, its implementing regulations, and the APA.

23         103.    The Final EIS rejects reasonable, viable alternatives on cost and/or other dubious

24    feasibility grounds without adequate explanation or substantiation, in violation of NEPA, its

25    implementing regulations, and the APA.

26         104.    The Final EIS fails to take a hard look at the adverse direct, indirect, and

27    cumulative impacts associated with and stemming from the Project as a whole, including, but

28    not limited to: the Project's direct, indirect, and cumulative effects on wildlife (e.g., the Mojave

desert tortoise and desert bighorn sheep), intact landscapes, cultural resources, recreational resources and opportunities, and paleontological resources; and the expected, intended impacts of the project in stimulating the development of commercial solar energy in the Nevada desert, in violation of NEPA, its implementing regulations, and the APA.

### Claim 2: Violations of the Organic Act, the TUSK Enabling Legislation, and the APA

105.    Plaintiffs hereby incorporate Paragraphs 1-100 by reference.

106.    NPS's non-impairment determination and consequent decision to allow the construction and operation of the Project within the boundary of the TUSK National Monument violates the Organic Act, its implementing regulations, the TUSK's enabling legislation, NPS's Management Policies, and the APA for several reasons, including but not limited to the fact that the TUSK enabling legislation clearly places the utility ROW *outside* of the park's boundary; the Project is inconsistent with the TUSK's purposes because it will permanently destroy the very paleontological resources that the park was established to protect; and the Project will impermissibly impair the TUSK's natural, cultural, and paleontological resources. Accordingly, NPS's non-impairment determination is arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, as well as in excess of statutory jurisdiction, within the meaning of the APA.

### Claim 3: Violations of the ESA and the APA

107.    Plaintiffs hereby incorporate Paragraphs 1-100 by reference.

108.    FWS's ESA section 7 consultation violates the ESA and its implementing regulations and is otherwise arbitrary and capricious. The BiOp's definition of the action area to exclude areas where the project will have foreseeable indirect effects on listed species and critical habitat, including on the threatened Mojave desert tortoise, by virtue of the major expansion of commercial solar energy violates the ESA's implementing regulations requiring that the "action area" analyzed in a BiOp include all areas "to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. By unlawfully limiting the action area considered in the consultation to only the area affected by the transmission line itself, FWS unlawfully and arbitrarily failed to consider the

indirect effects of the Project on listed species, including the threatened Mojave desert tortoise.

109.    FWS's findings in the BiOp regarding the impacts of the Project on the Mojave desert tortoise contravenes the best available science, including FWS's own Recovery Plan, in violation of section 7(a)(2) and the APA.

110.    By determining in the BiOp that the Project will not jeopardize the Mojave desert tortoise's survival or recovery prospects despite the myriad serious adverse effects of the Project on the species' survival and/or recovery, FWS violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), its regulations implementing the ESA, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs ordering the following relief:

1.    Declare that Respondents are in violation of NEPA, the ESA, the Organic Act, the TUSK enabling legislation, and the APA, and have acted arbitrarily, capriciously, and not in accordance with law;

2.    Vacate and remand the ROD, Final EIS, BiOp, Non-Impairment Finding, and Project ROW to Defendants for further consideration;

3.    Permanently enjoin Defendants from issuing any further authorizations of construction for the Project until they come into compliance with NEPA, the ESA, the Organic Act, the TUSK enabling legislation, and the APA;

4.    Award Petitioners their attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable provision of law; and

5.    Issue any further relief the Court may deem just and proper.

DATED this 28th day of May, 2025.

KEMP JONES, LLP

 */s/ Christopher W. Mixson*
Christopher W. Mixson, Esq. (Nev. Bar. #10685)
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

Elizabeth L. Lewis (*pro hac vice forthcoming*)
William S. Eubanks II (*pro hac vice forthcoming*)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006

*Attorneys for Plaintiffs*