Riley C. Varner (CO Bar No. 60640)
riley@eubankslegal.com
Elizabeth L. Lewis (DC Bar No. 229702)
lizzie@eubankslegal.com
William S. Eubanks II (DC Bar No. 987036)
bill@eubankslegal.com
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060

Christopher W. Mixson, Esq. (Nev. Bar No. 10685)
Kemp Jones, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
(702) 385-6000
c.mixson@kempjones.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FRIENDS OF NEVADA WILDERNESS *and* BASIN AND RANGE WATCH,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, U.S. FISH AND WILDLIFE SERVICE, *and* U.S. NATIONAL PARK SERVICE,<br><br>*Defendants*,<br><br>*and*<br><br>SIERRA PACIFIC POWER COMPANY AND NEVADA POWER COMPANY, EACH D/B/A NV ENERGY,<br><br>*Intervenor-Defendant*. | Case No. 2:25-cv-00929-CDS-MDC<br><br>**PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for summary judgment in this case challenging Federal Defendants' unlawful actions in connection with authorizing a right-of-way for the Greenlink West Transmission Project on federal lands in Nevada.

As demonstrated in the accompanying Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Memorandum"), there are no material issues in dispute and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In support of this motion, Plaintiffs rely on their Memorandum, the statement of facts therein, the cited portions of the Administrative Record, and the Declarations of Laura Cunningham, *see* Ex. 1, and Julien Pelligrini, *see* Ex. 2.

Dated: August 11, 2026

Respectfully submitted,

*/s/Riley C. Varner*
Riley C. Varner
CO Bar No. 60640

*/s/Elizabeth L. Lewis*
Elizabeth L. Lewis
DC Bar No. 229702

*/s/William S. Eubanks II*
William S. Eubanks II
DC Bar No. 987036

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

Christopher W. Mixson, Esq.
NV Bar No. 10685

KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**


TABLE OF CONTENTS ... ii

LIST OF ACRONYMS ... ix

INTRODUCTION ... 1

STATUTORY BACKGROUND ... 2

A. The Organic Act and TUSK Enabling Act ... 2

B. NEPA ... 5

C. The ESA ... 6

FACTUAL BACKGROUND ... 8

I. SIGNIFICANT NATURAL AND HISTORIC RESOURCES WITHIN THE PROJECT AREA ... 8

II. THE PROJECT AUTHORIZATION PROCESS ... 10

A. Project Goals and Draft EIS ... 10

B. The Final EIS ... 15

C. Final EIS Protests and ROD ... 16

D. BiOp ... 16

1. Listed Species within the Action Area ... 16

2. Project BiOp ... 17

STANDARD OF REVIEW ... 18

ARGUMENT ... 19

I. PLAINTIFFS HAVE STANDING ... 19

II. NPS VIOLATED THE ORGANIC ACT AND THE TUSK ENABLING ACT ... 19

A. NPS Arbitrarily Ignored the Statutorily Designated ROW Corridor ... 19

1. Defendants' Actions Flout the Best Reading of the Enabling Act ... 20

2. Defendants Failed to Give a Reasoned Explanation for their Decision ... 22

B. The Non-Impairment Determination Violated the Organic Act ... 23

III. DEFENDANTS VIOLATED NEPA ... 28

A. Defendants Failed to Consider a Reasonable Range of Alternatives and Arbitrarily Dismissed from Detailed Analysis Reduced-Impact Alternatives ... 28

1. Defendants' Failure to Examine Any Alternative that would Avoid TUSK Violated NEPA ... 29

2. Defendants' Failure to Examine a Reasonable Range of Alternatives for the Goldfield-Tonopah Segment Also Violated NEPA ... 31

B. Defendants Failed to Take a "Hard Look" at the Effects of Solar Energy Facilitated by the Project ... 33

IV. DEFENDANTS' FAILURE TO ADEQUATELY EVALUATE THE EFFECTS OF INDUSTRIAL SOLAR POWER VIOLATED THE ESA ... 37

CONCLUSION ... 40

CERTIFICATE OF SERVICE ... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AquAll. v. Bureau of Reclamation*,
287 F. Supp. 3d 969 (E.D. Cal. 2018)....34

*Bafford v. Northrop Grumman Corp.*,
994 F.3d 1020 (9th Cir. 2021)....20

*Bahr v. U.S. EPA*,
836 F.3d 1218 (9th Cir. 2016)....23

*Bark v. USFS*,
958 F.3d 865 (9th Cir. 2020)....37

*Bluewater Network v. Salazar*,
721 F. Supp. 2d 7 (D.D.C. 2010)....26

*Castillo v. Prime Hydration LLC*,
No. 23-cv-3885, 2025 WL 2978709 (N.D. Cal. Sept. 25, 2025)....13

*Chu v. U.S. CFTC*,
823 F.3d 1245 (9th Cir. 2016)....21

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991)....32

*Cook Inletkeeper v. U.S. Dep't of Interior*,
740 F. Supp. 3d 767 (D. Alaska 2024)....29

*Ctr. for Biological Diversity v. BLM*,
141 F.4th 976 (9th Cir. 2025)....5, 29

*Ctr. for Biological Diversity v. BLM*,
422 F. Supp. 2d 1115 (N.D. Cal. 2006)....33

*Ctr. for Biological Diversity v. U.S. EPA*,
168 F.4th 1164 (9th Cir. 2026)....19

*Daniels-Hall v. NEA*,
629 F.3d 992 (9th Cir. 2010)....13

*Defs. of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001)....39

*EPIC v. Van Atta*,
692 F. Supp. 3d 879 (N.D. Cal. 2023) .......... 38

*Friends of the Earth v. EPA*,
446 F.3d 140 (D.C. Cir. 2006) .......... 23

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000) .......... 19

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) .......... 29

*Garcia v. United States*,
469 U.S. 70 (1984) .......... 21

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. DHS*,
107 F.4th 1064 (9th Cir. 2024) .......... 21, 22, 23

*Greater Yellowstone Coal. v. Kempthorne*,
577 F. Supp. 2d 183 (D.D.C. 2008) .......... 2, 3, 24, 25, 26, 27, 28

*Hausrath v. U.S. Dep't of the Air Force*,
491 F. Supp. 3d 770 (D. Idaho 2020) .......... 33

*Idaho Sporting Cong. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) .......... 6

*Idaho v. ICC*,
35 F.3d 585 (D.C. Cir. 1994) .......... 32

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004) .......... 21, 22

*League of Wilderness Defs./Blue Mountains Diversity Proj. v. Connaughton*,
No. 3:12–cv–02271–HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014) .......... 34

*Loper Bright Enter. v. Raimondo*,
603 U.S. 369 (2024) .......... 20, 21, 23

*Lopez v. Garland*,
116 F.4th 1032,1043 (9th Cir. 2024) .......... 20

*Mich. United Conservation Clubs v. Lujan*,
949 F.2d 202 (6th Cir. 1991) .......... 2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) .......... 19, 28, 35

*Muckleshoot Indian Tribe v. USFS*,
177 F.3d 800 (9th Cir. 1999) ....................29, 30, 31

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
595 U.S. 109 (2022)....................22

*Native Ecosys. Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) ....................37, 38

*Neighbors of the Mongollon Rim, Inc. v. USFS*,
No. 22-15259, 2023 WL 3267846 (9th Cir. May 5, 2023)....................29

*NRDC v. U.S. EPA*,
915 F.2d 1314 (9th Cir. 1990) ....................21

*NWF v. NMFS*,
254 F. Supp. 2d 1196 (D. Or. 2003) ....................39

*NWF v. NMFS*,
524 F.3d 917 (9th Cir. 2008) ....................19

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ....................36

*ONDA v. BLM*,
625 F.3d 1092 (9th Cir. 2010) ....................30, 31

*Or.-Cal. Trails Ass'n v. Walsh*,
467 F. Supp. 3d 1007 (D. Colo. 2020)....................40

*S. Utah Wilderness All. v. Norton*,
237 F. Supp. 2d 48 (D.D.C. 2002)....................32

*Safer Chems., Healthy Families v. U.S. EPA*,
943 F.3d 397 (9th Cir. 2019) ....................20

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ....................20

*Seven Cty. Infrastructure Coal. v. Eagle Cty.*,
605 U.S. 168 (2025)....................34

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006)....................25

*Silvers v. Sony Pictures Entert., Inc.*,
402 F.3d 881 (9th Cir. 2005) ....................21

*Sovereign Iñupiat for a Living Arctic v. BLM*,
555 F. Supp. 3d 739 (D. Alaska 2021) ....................................................................30

*State v. Su*,
121 F.4th 1 (9th Cir. 2024) ....................................................................21

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ....................................................................34

*TVA v. Hill*,
437 U.S. 153 (1973)....................................................................6

*United States v. Temple*,
105 U.S. 97 (1881)....................................................................19

*W. Watersheds Proj. v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ....................................................................18

*W. Watersheds Proj. v. Schneider*,
417 F. Supp. 3d 1319 (D. Idaho 2019) ....................................................................35

*Wildearth Guardians v. U.S. BLM*,
457 F. Supp. 3d 880 (D. Mont. 2020)....................................................................31, 33, 37

**Statutes**

5 U.S.C. § 706(2) ....................................................................2, 18

16 U.S.C. § 470aaa(4)....................................................................3

16 U.S.C. § 1536....................................................................7, 8, 37

16 U.S.C. § 1538....................................................................8

42 U.S.C. § 4332(C) ....................................................................5, 28

54 U.S.C. § 100101....................................................................2, 23

54 U.S.C. § 100501....................................................................2

54 U.S.C. § 100902....................................................................2

54 U.S.C. § 320301....................................................................3

Pub. L. 113-291, § 3092, 128 Stat. 3292, 3861 (2014)................................3, 5, 20, 23, 24, 25, 30

**Regulations**

36 C.F.R. § 14.5 ....................................................................2, 24, 26, 28

40 C.F.R. § 1502.14 ....................6, 28, 32

40 C.F.R. § 1508.1 ....................6

43 C.F.R. § 46.30 ....................6, 35

43 C.F.R. § 46.415 ....................31

43 C.F.R. § 46.420 ....................6, 29, 31

43 C.F.R. § 1610.7-2(a), (d) ....................9

43 C.F.R. § 2804.35(b) ....................10

50 C.F.R. § 402.02 ....................7, 37, 38, 39, 40

50 C.F.R. § 402.14 ....................7

**Other Authorities**

160 CONG. REC. H8373 (2014) ....................5

90 Fed. Reg. 10610 (Feb. 25, 2025) ....................5

90 Fed. Reg. 21720 (May 21, 2025) ....................9, 10

BLM, Draft Programmatic EIS for Utility-Scale Solar Energy Development ES-9 (Jan. 2024), https://tinyurl.com/3myx846e; ....................12

BLM, Final Programmatic EIS for Utility-Scale Solar Energy Development, ES-9 (Aug. 2024), https://tinyurl.com/3myx846e ....................13

S. REP. NO. 113-178 (2014) ....................5, 10, 20, 21

## LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| CEAA | Cumulative Effects Analysis Area |
| CEQ | Council on Environmental Quality |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| ROD | Record of Decision |
| ROW | Right-of-way |
| TUSK | Tule Springs Fossil Beds National Monument |

**INTRODUCTION**

This case challenges decisions by the U.S. Bureau of Land Management ("BLM"), U.S. Fish and Wildlife Service ("FWS"), and the National Park Service ("NPS") (collectively, "Defendants") authorizing a massive transmission line—known as Greenlink West ("Project")—that will slice through the heart of the southern Great Basin and Mojave Deserts, an area that provides irreplaceable habitat for iconic wildlife and federally-listed endangered and threatened species. Not only is the Project expressly intended to facilitate the expansion of solar energy into the region's unique and fragile desert ecosystem, but it will be constructed *in* the Tule Springs Fossil Beds National Monument ("TUSK"), which Congress charged NPS with administering as the most significant assemblage of late Pleistocene fossil resources in the American southwest. The Project will fundamentally alter large swaths of unspoiled desert habitat and destroy priceless fossils, in direct contravention of Congress's express intent in establishing TUSK.

Despite longstanding concerns with the Project's impacts on the region's natural, cultural, and paleontological resources, Defendants issued a right-of-way ("ROW") and associated authorizations under federal law—including the Organic Act ("Organic Act"), 54 U.S.C. §§ 100101-104909, National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m-12, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, —to NV Energy ("Intervenor") to construct and operate the Project. However, in issuing those authorizations—which include the Project's Non-Impairment Determination, Record of Decision ("ROD") adopting the Final Environmental Impact Statement ("EIS") and Resource Management Plan Amendment, and Biological Opinion ("BiOp")—Defendants refused to lawfully examine the impacts of, and alternatives to, the Project, as required by federal law. In particular, Defendants failed to consider a reasonable range of alternatives, and abandoned without adequate explanation reasonable alternatives to the Project that would substantially reduce its effects on the area's exceptional environmental and historic values. Perhaps most egregiously, Defendants refused to meaningfully consider placing the ROW *outside* of the TUSK boundary as required by the TUSK's enabling legislation, and thereby avoid impairing the Monument's natural, cultural, and paleontological resources. Defendants also failed to meaningfully grapple with the foreseeable

impacts of massive, industrial-scale solar development the Project is expressly intended to facilitate, which will only further harm ESA-listed species and other affected resources in this fragile desert ecosystem.

For these reasons, as well as those below, Defendants' authorization of the Project violates federal environmental law and is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," "in excess of statutory jurisdiction [and/or] authority," and "without observance of procedure required by law" within the meaning of the APA. 5 U.S.C. § 706(2). Accordingly, the Court should set aside the Project's ROD and its associated authorizations, including the Non-Impairment Determination, Final EIS, and Biological Opinion, and remand the matter to Defendants for further deliberation in accordance with applicable law.

## STATUTORY BACKGROUND

### A. The Organic Act and TUSK Enabling Act

Unlike other federal lands, the National Park System's sole purpose is conservation. *See Mich. United Conservation Clubs v. Lujan*, 949 F.2d 202, 207 (6th Cir. 1991) ("Congress did not regard the National Park System to be compatible with consumptive uses."). To that end, Congress mandated that NPS manage the units of the National Park System (including National Monuments, *see* 54 U.S.C. § 100501) in accordance with the conservation values and purposes for which the units were established (absent specific legislation to the contrary). *See id.* § 100101(a). Although the Organic Act permits NPS to issue utility ROWs, *see id.* § 100902, such ROWs may only be issued where they "are not incompatible with the public interest and consistent with" the Organic Act and any applicable enabling legislation and planning documents, 36 C.F.R. § 14.5(a)(1). Thus, before issuing a ROW through a National Park unit, NPS must determine that such activity is not in "derogation" of the Organic Act's "conservation mandate." 54 U.S.C. § 100101(b)(2); *see* NPS1658. NPS must also determine that "there is no practicable alternative to locating the [ROW] within the National Park System." 36 C.F.R. § 14.5(a)(2).

The Organic Act requires NPS to ensure that its actions "will leave [national parks] unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). NPS's operative Management Policies set forth the agency's "official interpretation" of the Organic Act. *Greater*

*Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 190 n.1 (D.D.C. 2008). An action constitutes "impairment" when its impacts "harm the integrity of park resources or values, including the opportunities" to enjoy those resources or values. NPS1659.[1] To determine whether an action violates the non-impairment mandate, NPS must evaluate the "particular resources and values that will be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts." *Id*. An impact on a park resource or value is more likely to constitute an impairment to the extent that it affects a resource or value whose conservation is: "necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park"; "key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park"; "identified in the park's general management plan or other relevant NPS planning documents as being of significance *Id*.

NPS has also interpreted the Organic Act to prohibit uses which cause "unacceptable impacts" to park resources or values, i.e., those that, "individually or cumulatively, would": "[b]e inconsistent with a park's purposes or values"; "[i]mpede the attainment of a park's desired future conditions"; "diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values"; or "unreasonably interfere with park programs or activities," an "appropriate use," or "the atmosphere of peace and tranquility." NPS1660.

Congress established TUSK in 2014. *See* Carl Levin and Howard P. "Buck" McKeon National Defense Authorization, Pub. L. 113-291, § 3092, 128 Stat. 3292, 3861 (2014) (statutory note to 54 U.S.C. § 320301) ("TUSK Enabling Act"). The TUSK Enabling Act set forth TUSK's protected purposes: "to conserve, protect, interpret, and enhance" the area's "unique and nationally important paleontological, scientific, educational, and recreational resources and values." 128 Stat. 3861. Hence, NPS must "administer [TUSK] in a manner that conserves, protects, interprets, and enhances [its] resources and values." 128 Stat. 3863.[2]

---

[1] The administrative record consists of FWS's record ("FWSXX"), BLM's record ("BLMXX"), and NPS's record ("NPSXX").

[2] Although the Paleontological Resources Protection Act requires that "paleontological resources" be of "paleontological interest" to merit protection, 16 U.S.C. § 470aaa(4), in accordance with the

TUSK "is in a 'bowtie' configuration," meaning that the Monument is comprised of two distinct areas—the North Unit and the South Unit—separated by a "narrow central corridor" in between (along Moccasin Road). BLM57886; BLM18962. A portion of the land that lies south of TUSK's North Unit is privately held; however, the land *north* of the Monument's South Unit is held by BLM. BLM18962; *see also* Fig. 1, *infra*.




*Fig. 1: Close-up of TUSK configuration and surrounding landownership. See* BLM18962. *The two purple crosshatched areas are the North and South Units of TUSK, separated by a narrow corridor. The Congressionally-designated ROW corridor is represented as the yellow line that crosses just above (and outside of) the northern boundary of TUSK's South Unit, through the corridor, and continues along (and outside of) the southern boundary of TUSK's North Unit.*

The TUSK Enabling Act directs Defendants to "issue" to a "qualified electric utility" a ROW "for the construction and maintenance" of a transmission line, as "depicted on the map

---

Organic Act and the agency's Management Policies, NPS " has established that all fossils on NPS lands are considered paleontological resources and are considered for protection equally, regardless of perceived significance." NPS284.

entitled 'North Las Vegas Valley Overview'" and "dated" from 2013. 128 Stat. 3864. According to that map, the ROW corridor lies along the corridor separating TUSK's North and South Units. BLM18962; *see also* Fig. 1, *infra*. While a small section of the ROW corridor crosses the private land that abuts a section of the North Unit's southern border, the vast majority of the Congressionally-designated corridor falls on BLM land lying to the west of the North Unit, between the two units, and parallel to—*but outside of*—the north boundary of the South Unit. BLM18962; *see also* Fig. 1, *infra*.[3]

**B. <u>NEPA</u>**

NEPA has "twin aims"; it requires that agencies "consider every significant aspect of the environmental impact of a proposed action," and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 993 (9th Cir. 2025) (citation omitted).[4] To that end, NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe: (1) "the reasonably foreseeable environmental effects of the proposed action"; (2) "any reasonably foreseeable adverse environmental effects which cannot be avoided"; and (3) "a reasonable range of alternatives to the proposed action." *Id.* § 4332(C)(i)-(iii).

---

[3] Legislative history clarifies that Congress's placement of the ROW corridor outside of TUSK was deliberate. The TUSK Enabling Act was "based on" two identical stand-alone bills designating TUSK (H.R. 2015 and S. 974). 160 CONG. REC. H8373 (2014); *accord id.* at S6584-85. The Senate Report accompanying the stand-alone bill confirmed Congress's intent that the "designated" ROW corridor be located "*outside the boundary of the monument*." S. REP. NO. 113-178 at 17 (2014) (emphasis added).

[4] On February 25, 2025, the Council on Environmental Quality ("CEQ"), issued an interim final rule to permanently remove CEQ's regulations that have implemented NEPA since 1978. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025). However, the removal of these regulations "does not constitute a retroactive change in agencies' practices or an alteration of the public or project sponsors' engagement under NEPA with respect to those agency actions." 90 Fed. Reg. at 10614. Hence, "agencies should, in defending actions they have taken, continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action under challenge was completed." *Id*. Plaintiffs therefore cite to the NEPA regulations, as well as to the Department of Interior's NEPA regulations, that were effective on May 22, 2022—the NEPA regulations that became effective when Defendants initiated their decisionmaking processes. BLM57415.

Each EIS must objectively evaluate "*all* reasonable alternatives" to the proposed action. 43 C.F.R. § 46.420; *see also* 40 C.F.R. § 1502.14. An alternative is "reasonable" where it is "technically and economically practical or feasible and meet the purpose and need of the proposed action." *Id.* The alternatives analysis is the heart of the NEPA process because it "present[s] the environmental impacts of the proposed action and the alternatives in comparative form" so that the agency (and the public) "may evaluate their comparative merits." 40 C.F.R. § 1502.14.

NEPA further requires that agencies take a "hard look" at the effects of the proposed action and its feasible alternatives. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). The EIS must address the effects of the action, which include direct, indirect, and cumulative effects. 40 C.F.R. § 1508.1(g). Direct effects are those that "are caused by the action and occur at the same time and place," while indirect effects are those that are "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* Indirect effects "may include growth inducing effects and other effects related to induced changes in the pattern of land use." *Id.* Finally, cumulative effects "result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless" of what agency or person "undertakes such other actions." *Id.*

The Department of Interior's NEPA regulations further explain that the "reasonably foreseeable future actions" include both "federal and non-federal activities not yet undertaken, but sufficiently likely to occur," that a decisionmaker "of ordinary prudence would take such activities into account in reaching a decision." 43 C.F.R. § 46.30; *accord* 40 C.F.R. § 1508.1(aa) (similar). Those reasonably foreseeable future actions "must be taken into account in the analysis of cumulative impact" and "include, but are not limited to, activities for which there are existing decisions, funding, or proposals." 43 C.F.R. § 46.30.

**C. <u>The ESA</u>**

The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1973). Section 7(a)(2) requires federal agencies to "insure" that their actions are "not likely to jeopardize" species listed as endangered or threatened, or result in the destruction or adverse modification of

designated critical habitat. 16 U.S.C. § 1536(a)(2).[5] Thus, before undertaking any action that may have direct or indirect effects on listed species or their habitat, the action agency must engage in consultation with FWS to evaluate the impact of the proposed action. *See id*.

During consultation, FWS and the action agency must use "the best scientific . . . data available." *Id*. During consultation, FWS must: (1) "review all relevant information;" (2) "evaluate the current status and environmental baseline of the listed species or critical habitat;" and (3) "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). The "effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action," and include "the consequences of other activities that are caused by the proposed action but that are not part of the action." *Id.* § 402.02. "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." *Id.* "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* "Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* The "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

The product of formal consultation is FWS's BiOp, which must, *inter alia*, discuss the environmental baseline of any listed species and critical habitat and analyze the effects of the proposed action on listed species and critical habitat. 50 C.F.R. § 402.14(h). In the BiOp, FWS must determine whether the action, when added to the environmental baseline and considering the status of the species, will avoid jeopardy and/or adverse modification (i.e., a no-jeopardy BiOp) or result in jeopardy and/or adverse modification (i.e., a jeopardy BiOp). *Id.* § 402.14(g)(4). If, as

---

[5] The ESA's implementing regulations explain that an action will result in jeopardy if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. An action will destroy or adversely modify critical habitat if it results in a "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id*.

part of a no-jeopardy BiOp, FWS determines that the proposed action will nevertheless result in the incidental taking of listed species, then FWS must provide the action agency with a written incidental take statement ("ITS") specifying the "impact of such incidental taking on the species" and any "reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact" and setting forth "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4). Take in excess of that authorized by the ITS violates the ESA's "take" prohibition. *Id.* § 1538.

## **FACTUAL BACKGROUND**

### **I. SIGNIFICANT NATURAL AND HISTORIC RESOURCES WITHIN THE PROJECT AREA**

#### **A. TUSK**

TUSK was established on December 19, 2014 as the 405th unit of the National Park System. NPS2560. TUSK's "foundation document" sets forth the Monument's protected purpose: to "conserve[], protect[], enhance[], and interpret[] late Pleistocene fossils, their geologic context, and other scientific values . . . through education, research, community collaboration, and appropriate public use." NPS2561.

The Monument "is rich with paleontological resources," NPS2560, and "encompasses one of the largest and most diverse late Pleistocene vertebrate fossil assemblages" in the American southwest, NPS2562. Pursuant to its Management Policies, NPS must "protect[], preserve[], and manage[]" these paleontological resources "for public education, interpretation and scientific research." NPS1702. TUSK also "contains an important desert ecosystem with multiple habitats" that support a wide variety of wildlife, including ESA-listed species. NPS2560.

The area containing Defendants' selected route through TUSK "ranks the highest potential to find fossils." BLM4430. At NPS's request, Intervenor applied ground-penetrating radar at seven locations within TUSK to detect fossils; however, only three of those locations were actually located within the Project ROW. NPS288; BLM4430. "Anomalies" consistent with vertebrate fossils were detected at all seven study locations, including the three within the Project ROW. *Id.*

**B. Esmeralda/Fish Lake Conservation Area**

Located on the western edge of the Great Basin Desert, the Esmeralda/Fish Lake conservation area is among the last remaining intact large-scale landscapes in Nevada. Encompassing nearly 850,000 acres, the area harbors a diversity of natural terrain, such as rugged canyons and colorful slopes flanked by prominent alluvial fans, basalt lava flows, rhyolite volcanic crags, and marshes and springs. BLM95751; BLM43243. These varied habitats support myriad wildlife species, including species proposed for listing under the ESA. BLM43243. Indeed, FWS recently proposed listing the Fish Lake Valley tui chub, an olive-brass colored fish found only in Esmeralda County, as endangered under the ESA due to the rapid loss of aquatic habitat. *See* 90 Fed. Reg. 21720 (May 21, 2025). The area also boasts hundreds of sensitive prehistoric archaeological sites, many of which exist within the nationally significant Pleistocene Lake Tonopah Locality. BLM95692; BLM95581. Several prehistoric site types, including rock shelter habitations, lithic scatters and quarries, open habitations, and rock writing sites, are prevalent throughout the proposed Emeralda and Fish Lake region. BLM43087; BLM95581; BLM95693.

In recognition of these and other relevant and important resource values, including expansive intact landscapes, habitat linkages, and dark-sky resources, Plaintiff Friends of Nevada Wilderness ("FNW") proposed that BLM designate the area as an Area of Critical Environmental Concern ("ACEC") and manage the area for conservation and recreation purposes.[6] Although BLM ultimately declined to designate the ACEC, its decision was not based on the relevance or importance of the area's resource values. Indeed, BLM specifically determined that the area contained "relevant" historic, cultural, scenic, and wildlife resources, as well as "important" (i.e., nationally significant) cultural, and vegetative resources that are sensitive to anthropogenic

[6] BLM defines ACECs to encompass areas of public lands requiring "special management attention" to "protect and prevent irreparable damage" to important historic, cultural, visual, wildlife, or geologic resources. 43 C.F.R. § 1610.7-2(a), (d). To be designated as an ACEC, an area must meet three criteria: (1) relevance, i.e., containing "important historic, cultural, or scenic values," "fish or wildlife resources," or "natural systems or processes"; (2) importance, i.e., characterized by "qualities of special worth" that are of "national" importance or "contribute[] to ecosystem resilience, landscape intactness, or habitat connectivity"; and (3) requirement for special management attention. *Id.* § 1610.7-2(d).

disturbance. BLM95730. However, BLM determined that, particularly in light of the large size of the proposed ACEC, the area did not require special management attention. BLM95729. Even so, recognizing the relevant and important resources within the area, BLM encouraged FNW to submit smaller sections of the Esmeralda/Fish Lake conservation area for consideration under the ACEC criteria. *Id.*

## II. THE PROJECT AUTHORIZATION PROCESS

### A. Project Goals and Draft EIS

On July 22, 2020, Intervenor applied for a ROW on federal land for the construction and operation of the Project. NPS71. The Project is expressly intended to "provide greater access to renewable energy resources" by increasing transmission "access, including transmission connections" to designated Solar Energy Zones ("SEZs"). NPS72.[7]

When developing the proposed route and its alternatives, Defendants expressly recognized that the TUSK Enabling Act precluded Project construction within the Monument. Indeed, in a May 2021 scoping meeting, Defendants unequivocally stated that the Project "need[ed] to stay out of [TUSK] and, instead, cross private land in North Las Vegas." BLM883; *accord id.* (directing agency staff to "check the [Project] alignment" around TUSK to "ensure [it] do[es] not cross [the] boundary"). However, one week later, Defendants abruptly reversed course, asserting for the first time that "there was a mistake" such that the ROW "corridor likely extends into" TUSK. BLM917. Defendants did not reconcile their position with the legislative history evincing Congress' explicit intent that the "designated" ROW corridor be located "*outside the boundary of the monument*." S. REP. NO. 113-178, at 17 (emphasis added)).

In May 2023, Defendants issued their Draft EIS for public comment. BLM21524. The Draft EIS's alternatives analysis grouped routing alternatives into nine geographic areas, ostensibly "to allow for localized comparisons among the various line routes." BLM21590.

With respect to the TUSK group of routing alternatives, Defendants disregarded

---

[7] SEZs are designated leasing areas BLM determines to be well suited for utility-scale production of solar energy, and that are therefore prioritized by the agency for solar energy and transmission infrastructure development. *See* 43 C.F.R. § 2804.35(b).

Congress's clear instructions in the TUSK Enabling Act and analyzed only two action alternatives in detail—i.e., the TUSK Alternative B, and the Proposed Action—both of which would cross the TUSK boundary and involve the placement of multiple towers and maintenance pads within the Monument, BLM21591, adversely impacting (and possibly destroying) the irreplaceable paleontological resources that TUSK was established to protect, BLM21795; *cf.* NPS288 (explaining that ground-penetrating radar detected likely fossils within the proposed ROW).

Significantly, Defendants dismissed from detailed consideration *every single alternative* that would *avoid* crossing the TUSK boundary, i.e., TUSK Alternatives D, E, F, and G. BLM21608-09. However, Defendants provided very little analysis as to the alternatives' feasibility under current conditions at the time of the ROW's issuance. For example, Defendants dismissed two of the alternatives—TUSK Alternative D, which would double-circuit the Project with an existing transmission line that runs on the south side of the road bordering the TUSK boundary, and TUSK Alternative F, which would collocate the Project along a highway corridor and add approximately three miles to the Proposed Action—due to "economically infeasib[ility]" because they would add approximately $2.7 million to the $4.24 *billion* Project, as well as the ostensibly greater visual impacts and maintenance costs as compared to the preferred alternative. BLM21608-09.[8] But Defendants did not explain how adding such a comparatively small cost—a tiny fraction of the overall cost of this massive Project—would render it economically infeasible. Nor did Defendants meaningfully weigh the merits of the purportedly greater visual impacts of the eliminated alternatives against the Project's preferred alternative of disturbing (and destroying) irreplaceable fossils within TUSK (contrary to legislative intent).

Defendants also considered—but eliminated from detailed consideration—TUSK Alternative E, which would locate the Project ROW south of the TUSK boundary in accordance with the map accompanying the TUSK Enabling Act. BLM21609. According to Defendants, adhering to the map would "impact a residential subdivision built in 2006," and require the removal

---

[8] In the Final EIS, Defendants revised the maximum increased costs of TUSK Alternatives D and F to $10.5 million and $67 million, respectively. BLM58081-82. Defendants did not provide an explanation for the cost increases, which still amount to a fraction of the Project's total estimated cost of $4.24 *billion*.

of residences. *Id.* Defendants insisted that Congressional action—i.e., a legislative amendment—would be required to "resolve th[e] apparent conflict" between the enabling legislation and the location of the electric utility corridor, which could take several years. *Id.* Defendants thus changed gears, dismissing TUSK Alternative E from detailed consideration based on its unsupported assumption that Congress must have made a mistake in designating the ROW corridor. *Cf.* NPS57 (insisting that the preferred alternative is "within" the ROW "outlined" in the TUSK Enabling Act and thus will "not alter, conflict with, or require new management prescriptions and objectives").[9]

With respect to the Goldfield-Tonopah segment, which slices through the Esmeralda/Fish Lake conservation area, Defendants eliminated from detailed consideration a viable alternative—Goldfield-Tonopah Alternative A—that would have conformed with BLM's own recommendation to revise the existing energy corridor to "collocate with existing infrastructure and provide access to the Millers SEZ," and resulted in "*substantially* less impacts" to Land with Wilderness Characteristics inventoried units, landscapes and other visual resources, and the Mojave desert tortoise. BLM21614. (emphasis added). Defendants dismissed this alternative on the purported grounds of increased costliness, greater visual impacts to the downtown Goldfield and Tonopah historic districts, and "*potential*[] interfere[nce] with authorized mining operations present in the corridor." *Id.* (emphasis added). Ultimately, Defendants only examined in detail a single action alternative—the Proposed Action—in the Esmeralda/Fish Lake conservation area. BLM21590.

The Draft EIS acknowledged that the Project would, as intended, "provide greater access" to Nevada's "abundant solar and geothermal resources." BLM21565. Defendants thus recognized that proximity to transmission lines is an important consideration for solar projects; indeed, according to BLM, many solar projects on public lands are located near (less than 3 miles from) existing or planned transmission line infrastructure. *See* BLM, Draft Programmatic EIS for Utility-Scale Solar Energy Development ES-9 (Jan. 2024) [hereinafter Draft Western Solar Plan],

---

[9] In the Draft EIS, Defendants did not cite additional cost as a reason for eliminating TUSK Alternative E. BLM21609. However, in the Final EIS, Defendants asserted that "acquiring the land to establish the utility corridor would *likely* affect the economic feasibility" of the Project. BLM58082. Defendants did not attempt to define the additional cost of complying with the TUSK Enabling Act.

https://tinyurl.com/3myx846e; *cf.* BLM7428 (Defendants acknowledging that "whatever path [the Project] takes, future projects will take this path too").[10] Yet, rather than address the effects of solar energy development facilitated by the Project as indirect effects of the Project, the Draft EIS purported to evaluate those effects as cumulative impacts from separate projects. Notwithstanding the conceded significance of proximity to solar development, a foundational assumption of the Draft EIS's cumulative impacts analysis was that the reasonably foreseeable future solar projects would move forward notwithstanding Project construction because such projects "would look at other transmission lines to distribute their generated power." BLM22061. No explanation—let alone analysis—was provided to substantiate this conclusory assumption.

The Draft EIS examined cumulative impacts using a three-step analysis. First, the Draft EIS identified the cumulative effects' analysis area ("CEAA") for each resource (e.g., wildlife, visual, cultural). BLM22058. Relevant here, although Defendants were then considering designating all BLM-administered lands within 10 miles of existing or planned transmission projects as presumptively open for solar development (unless affirmatively excluded), *see* Draft Western Solar Plan, *supra*, at ES-6, the CEAAs for the Project's cumulative effects analysis were generally defined by radii ranging from 0.5 miles to five miles from the centerline of the Project ROW. *See* BLM20541-43.

---

[10] The Western Solar Plan is intended to "facilitate improved siting of utility-scale solar energy development" in western states (including Nevada) "by identifying areas of BLM-administered lands where solar energy development proposals may encounter fewer resource conflicts." Draft Western Solar Plan, *supra*, at ES-2. In the Draft Western Solar Plan, which was issued approximately six months before the Project's Final EIS, BLM proposed identifying as "available for application for renewable energy development" BLM-administered lands "within 10 miles of existing and/or planned transmission." *Id.* at ES-6. In the Final Western Solar Plan, which was issued a month after the Project's Final EIS (but before BLM issued the Project ROD), BLM designated as "available" for solar applications all BLM-administered lands "within [fifteen] miles of existing and planned transmission lines . . . or within 15 miles of an existing designated energy corridor, unless otherwise excluded by resource-based criteria." BLM, Final Programmatic EIS for Utility-Scale Solar Energy Development, ES-9 (Aug. 2024) [hereinafter Final Western Solar Plan], https://tinyurl.com/3myx846e. The Court can take judicial notice of BLM's NEPA documents posted on its website. *See Castillo v. Prime Hydration LLC*, No. 23-cv-3885, 2025 WL 2978709, at *2 (N.D. Cal. Sept. 25, 2025) ("Courts routinely take judicial notice of information publicly accessible on websites of government agencies." (citing cases)); *accord Daniels-Hall v. NEA*, 629 F.3d 992, 999 (9th Cir. 2010).

Second, the Draft EIS "identif[ied]" the "past, present, future, and [reasonably foreseeable future actions]" that were "similar in kind and effect" to the action alternatives or "have considerable impact" on the same "environmental resources." BLM22058. The Draft EIS reported that "there are an estimated [fifty-one] solar projects" currently under consideration that are strategically placed along the Project route. BLM21540.

Finally, the Draft EIS purported to "evaluate" the cumulative impacts of the alternatives and the reasonably foreseeable future actions. BLM22058. However, a rigorous analysis of those impacts is conspicuously absent. Indeed, despite acknowledging that together with the Project, reasonably foreseeable future actions (including solar development) would contribute to habitat loss, degradation, and/or fragmentation; increased anthropogenic disturbance (e.g., noise, human presence); vehicular collisions; release of toxins to aquatic resources; and water consumption, *see, e.g.*, BLM22066-68 (special status species); BLM22070-71 (general wildlife); BLM22074 (paleontological resources), the Draft EIS summarily concluded for *every single resource* that "[i]n combination, past, present, and [reasonably foreseeable future actions] would result in cumulative impacts." *See, e.g.* BLM22070-71; BLM22075.

Defendants received numerous comments on the Draft EIS from Plaintiffs and other stakeholders urging Defendants to fully "[e]valuate the [P]roject's role in enabling extensive new solar energy development" and "fully disclose the environmental impacts" of the Project and the "pending or foreseeable energy" projects "made possible by this proposed line." BLM43078. Commenters also requested that Defendants fully evaluate alternatives that would reduce impacts to significant resources. Relevant here, commenters requested that Defendants expand their analysis of alternatives to the Goldfield-Tonopah segment to include a "conservation alternative" that would reduce the Project's impacts on the Esmeralda/Fish Lake conservation area and its resources. *See* BLM43072-73. With respect to TUSK, commenters decried Defendants' failure to meaningfully consider alternatives that would *avoid* impacts to the Monument's paleontological and other resources. BLM42906. Commenters questioned Defendants' decision to disregard the Congressionally-designated ROW corridor—i.e., TUSK Alternative E—and requested that Defendants independently and transparently evaluate its feasibility, as well as the feasibility of

other alternatives that avoid crossing the TUSK boundary. *See* BLM42906-07.

### B. <u>The Final EIS</u>

Defendants issued the Project's Final EIS in June 2024. BLM57349. Despite extensive comments requesting that Defendants examine in detail reduced-impact alternatives for the TUSK and Goldfield-Tonopah segments, Defendants refused to do so. As a result, with respect to the TUSK segment, the Final EIS considered only two action alternatives—the Project's preferred alternative and TUSK Alternative B—which would impact nearly identical acreages of areas with "very high" paleontological potential, BLM57682, and have nearly identical impacts on other resources such as the Mojave desert tortoise, BLM57527, bighorn sheep, BLM57585, and other wildlife, BLM83271. With respect to the Goldfield-Tonopah segment, although Defendants developed additional reduced-impact alternatives (i.e., Goldfield-Tonopah Alternatives A through D), the Final EIS dismissed every single one from detailed consideration and thus considered only a single action alternative—i.e., the Project's preferred route—for that segment. BLM57472-80.

Regarding cumulative impacts, numerous comments from Plaintiffs and other stakeholders requesting a robust analysis that accurately accounted for the impacts of the very solar development that the Project is intended to facilitate, Defendants made few meaningful changes to their analysis. Instead, the Final EIS again cursorily asserted that the "pending solar projects would look at other transmission lines to distribute their generated power" if the Project were not built and insisted that the combined impacts of the Project and the reasonably foreseeable future actions on most of the resources considered—including special status species, general wildlife, cultural resources, and paleontological resources—would be "negligible." *See* BLM57946-75.

The Final EIS included NPS's Non-Impairment Determination for TUSK, in which NPS concluded that, notwithstanding that the Project would depart from the Congressionally-designated ROW and destroy paleontological and other resources, the Project would not impair the resources and values that TUSK was established to protect. NPS649-50. Like the Final EIS, the Non-Impairment Determination assumed without evidence or explanation that the map depicting the Congressionally-designated ROW *outside* of the Monument constituted a mistake.

**C. Final EIS Protests and ROD**

As with the Draft EIS, the Final EIS was met with intense criticism from stakeholders. Plaintiffs timely protested the Final EIS, pointing out several legal and analytical flaws, including: the failure to evaluate a full range of alternatives that would reduce impacts to important resources, particularly with respect to the TUSK and Goldfield-Tonopah segments, *see, e.g.*, BLM94809-11; BLM95572-74; the failure to independently evaluate the feasibility of alternatives dismissed from detailed consideration, *see, e.g.*, BLM94873; BLM95574; and the inadequate examination of the Project's impacts on wildlife, paleontological, cultural, and other resources, particularly in light of the significant expansion of solar energy that the Project is expressly intended to facilitate, *see, e.g.*, BLM94854; BLM94895; BLM95579-87.

In August 2024, Defendants denied the protests. *See* BLM97450. And, in September 2024, Defendants issued a ROD adopting the Project's preferred alternative. BLM98021.

**D. BiOp**

*1. Listed Species within the Action Area*

The Project threatens the survival and recovery of multiple ESA-listed species, including the Mojave desert tortoise. The tortoise is extremely sensitive to ecosystem changes; "moderate" changes in adult survival rates can result in "rapid population declines" because the species takes 13 to 20 years to reach sexual maturity and has low reproductive rates. FWS31755. This is compounded by high mortality early in life due to increased development in their habitat. *Id*. In 2011, FWS updated the tortoise's 1994 Recovery Plan to reflect the "increased" threat of extinction and the "potential conflict" with "development or other forms of economic activity" like renewable energy development. FWS 31754. In 2022, FWS issued a 5-Year Review, which found that the tortoise was in a "more precarious overall situation than at the time of publication of the revised recovery plan" and that "large areas of desert tortoise habitat have been developed or approved for development for utility-scale solar energy." FWS34469, FWS34480.

Renewable energy development presents unique threats to the tortoise's survival and recovery. Those projects demand large amounts of space, in conflict with the 2011 Recovery Plan's recommendation to "conserv[e] sensitive areas that would connect functional habitat."

FWS31749. Additionally, vehicle travel increases along construction roads, which impedes the 2022 5-Year Review's recommendations to "minimiz[e] mortality from roads," restore habitat, and maintain landscape connectivity. FWS34481-82. Moreover, "[c]onserving the smaller-scale, internal redundancy within remaining portions of the habitat linkage[s]" in the Project area "is essential," and "[s]ince redundancy in the linkage network between core populations in this portion of the species' range is extremely limited, maintenance of connectivity along the" areas encompassing the Project ROW "will be imperative." BLM93685.

*2. Project BiOp*

The ROD was accompanied by FWS's BiOp. FWS rested its determination on impacts included within a highly circumscribed "action area." *See* BLM93527. The BiOp acknowledged various threats facing the Mojave desert tortoise, but ultimately concluded that the Project would not jeopardize the tortoise's odds of survival or recovery. BLM93727.

In examining the effects of the Project, FWS narrowly defined the Action Area—i.e., the area subject to ESA consultation—to encompass only those areas immediately adjacent to the Project. *See* BLM93629 (defining the Action Area to consist of: (1) the Project area, including temporary ROWs for transmission lines, distribution lines, and access roads, as well as "the footprint of ancillary facilities"; and (2) minor "buffers around the temporary ROWs and ancillary facilities"). Consequently, the BiOp excluded from ESA analysis all areas that will be indirectly affected as a result of the industrial solar energy development stemming from the Project.

The BiOp characterizes "industrial solar power plants" as a "cumulative effect" rather than an indirect effect of the transmission line itself, the latter of which would necessitate expanding the Action Area to encompass at least all reasonably foreseeable future solar projects facilitated by the Project. BLM93726. In fact, the solar energy development that will result from the Project is barely mentioned in the BiOp. At most, the BiOp briefly acknowledges that there are "pending solar applications in the [sic] along this corridor and adjacent to the Project" which could further limit tortoise habitat connectivity, BLM93670, and notes that "industrial solar power plants would likely continue th[e] trend" of "continued habitat loss, degradation, and fragmentation for the listed and proposed species evaluated . . . as well as increased harm of individuals of those listed and

proposed species." BLM93726. Nowhere in the BiOp did FWS explain, let alone demonstrate, that any of the foreseeable solar projects in the region would be built in the absence of the Project and therefore may be characterized as cumulative effects. Importantly, although some of the subsequent permits to construct and operate the solar energy facilities that the Project is intended to facilitate will be subject to ESA consultation, such project-by-project analysis will be inherently piecemeal. The Project's ESA consultation process constitutes FWS's sole opportunity to consider the full suite of combined direct and indirect effects of the Project and its associated solar development on listed species.

Applying its artificially narrow Action Area and ignoring the effects of solar projects facilitated by the Project, the BiOp in turn insists that "the losses from the proposed Project still would not appreciably reduce the number of desert tortoises within the Northeastern [or] Eastern Mojave Recovery Unit[s]," primarily because "the small number of adult desert tortoises that could be injured or killed as a result of the Project equates to a small fraction of the estimated population." BLM93701. Thus, although the BiOp concedes that the Project will result in habitat loss, the BiOp concludes that the loss of those specific areas "will not impede the recovery of the desert tortoise because the Project is not located within any designated critical habitat or conservation areas established for tortoises," and because "the habitat in the Action Area is already somewhat disturbed by the existing roadways and includes existing disturbance and development near Project boundaries." BLM93703. The BiOp does not consider the indirect effects that the Project will have on tortoise numbers and distribution—and therefore, recovery (much less survival)—through the facilitation of large-scale solar energy development, including the proliferation of substantial industrial-scale development in the form of new roads, facilities, and other infrastructure, in tortoise habitat (including designated critical habitat).

## STANDARD OF REVIEW

Plaintiffs' claims are reviewed pursuant to the APA. *W. Watersheds Proj. v. Kraayenbrink,* 632 F.3d 472, 481 (9th Cir. 2011) (reviewing plaintiff's NEPA and ESA claims under the APA). The APA directs courts to "hold unlawful and set aside" agency action that is arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706(2). A decision is arbitrary

and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or if it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The Court must "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *NWF v. NMFS*, 524 F.3d 917, 927 (9th Cir. 2008); *see also State Farm*, 463 U.S. at 43 (requiring that agencies "examine the relevant data" and articulate a "rational connection between the facts found and the choice made").

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING

To establish standing, a plaintiff must show it has suffered a concrete and particularized injury that is either actual or imminent, the injury is fairly traceable to the defendant, and it is likely that a favorable decision will redress that injury. *See Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000); *Ctr. for Biological Diversity v. U.S. EPA*, 168 F.4th 1164, 1174 (9th Cir. 2026).

Plaintiffs submit declarations from two of Plaintiffs' members. *See* Ex. 1; Ex. 2. The declarations detail the significant aesthetic, spiritual, recreational, and professional interests in the areas and resources impacted by the Project—including TUSK and the Esmeralda/Fish Lake conservation area—their frequent use and enjoyment of the impacted areas, and their concrete plans to continue that use and enjoyment in the near future. *See* Ex. 1 ¶¶ 5, 8-13 (Decl. of Laura Cunningham); Ex. 2 ¶ 4-5, 8, 10-12 (Decl. of Julien Pellegrini). The declarations further explain how their interests are being impaired by the challenged actions, and how judicial relief will remedy those injuries. *See* Ex. 1 ¶¶ 10-11, 17-18; Ex. 2 ¶¶ 9, 11, 16-17.

## II. NPS VIOLATED THE ORGANIC ACT AND THE TUSK ENABLING ACT

### A. NPS Arbitrarily Ignored the Statutorily Designated ROW Corridor

"When the [statutory] language is plain, we have no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision." *United States v. Temple*, 105

U.S. 97, 99 (1881). "[T]he basic nature and meaning of a statute does not change when an agency happens to be involved." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 408 (2024). All laws "do—in fact, must—have a single, best meaning," "fixed at the time of enactment." *Id.* at 400. "In the business of statutory interpretation, if it is not the best [reading], it is not permissible." *Id.*; *see also Lopez v. Garland*, 116 F.4th 1032,1043 (9th Cir. 2024) ("[P]ursuant to *Loper Bright* . . . . [w]e begin, as always, with the plain language of the statute. . . . If the plain language is clear, our inquiry is complete.").

*1. <u>Defendants' Actions Flout the Best Reading of the Enabling Act</u>*

The TUSK Enabling Act requires that Defendants "issue" a utility ROW within the corridor "depicted on the map" accompanying the legislation. 128 Stat. 3864. The Act defines "map" to mean "the map entitled 'North Las Vegas Valley Overview'" and "dated" from 2013. *Id.* And that map unambiguously placed the ROW *outside* of TUSK's boundary. 128 Stat. 3861; *accord* S. REP. NO. 113-178, at 17.

Notwithstanding Congress's clear instructions, Defendants authorized the Project ROW *inside* the Monument on the theory of Congressional mistake. *See* BLM57318 ("[T]he map incorrectly shows the corridor south of the TUSK boundary rather than north of [it]."). But "[t]he preeminent canon of statutory interpretation requires [the Court] to presume that [the] legislature says in a statute what it means and means in a statute what it says." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). Moreover, "[w]here Congress has explicitly provided a definition for a term, and that definition is clear, an agency must follow it." *Safer Chems., Healthy Families v. U.S. EPA*, 943 F.3d 397, 425 (9th Cir. 2019).

Here, Congress defined "map" to identify a specific document: the 2013 map titled "North Las Vegas Valley Overview." 128 Stat. 3861. So, "map" means—and only means—what Congress says it means. *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1030 (9th Cir. 2021) (The "inquiry begins with the statutory text, and ends there as well if the text is unambiguous."). Under traditional principles of statutory interpretation, Congress's explicit designation of a ROW corridor that avoids TUSK and its resources must be understood to preclude Defendants from issuing a

ROW that enters the Monument. *See Silvers v. Sony Pictures Entert., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (The "doctrine of *expressio unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." (citation omitted)); *cf. State v. Su*, 121 F.4th 1, 13 (9th Cir. 2024) ("It is a commonplace of statutory construction that the specific governs the general.").

Defendants' counter-textual reading is further undermined by the fact that they offer no evidence whatsoever that Congress's intent vis-à-vis the placement of the ROW corridor was contrary to the enacted language. *See Garcia v. United States*, 469 U.S. 70, 75 (1984) (requiring "the most extraordinary showing of contrary intentions" to disregard the plain meaning of a statutory provision). Nor could they, as the legislative history establishes the exact opposite—i.e., that Congress intended the ROW be "*outside the boundary of the monument*." S. REP. NO. 113-178, at 17 (emphasis added). Hence, the plain language TUSK Enabling Act governs, not Defendants' wishful interpretation. *See Loper Bright*, 603 U.S. at 379 ("If . . . congressional intent is 'clear,' that is the end of the inquiry."); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. DHS*, 107 F.4th 1064, 1079 (9th Cir. 2024) ("If a statute's provision has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there." (citation omitted)).

Defendants cannot interpret statutes by assuming that Congress made mistakes and failed to express in the statutory text what it wished to accomplish. *Cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent."). To the contrary, "[t]he ordinary presumption is that Congress' drafting of the text is deliberate." *NRDC v. U.S. EPA*, 915 F.2d 1314, 1321 (9th Cir. 1990); *cf. Chu v. U.S. CFTC*, 823 F.3d 1245, 1250 (9th Cir. 2016) ("[W]e have no license to disregard the plain text of the statute."). Here, there is no indication in the statutory text or legislative history that Congress intended to place the ROW within TUSK. Defendants cannot unilaterally declare Congress's choice of the location of the ROW in the statute a clerical error merely because they disagree with the logic of that decision. Nor does the fact that Defendants believe Congress should have chosen differently mean that Congress made an error that

Defendants may informally correct. *See Lamie*, 540 U.S. at 542 ("It is beyond [an agency's] province to rescue Congress from its drafting errors, and to provide for what [it] might think . . . is the preferred result." (citation omitted)).

"Administrative agencies are creatures of statute" and thus "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022). The TUSK Enabling Act empowers Defendants to issue a ROW *outside* the TUSK's boundary; it does not authorize Defendants to issue a ROW that crosses into the Monument. NPS's issuance of the ROW through TUSK thus violated the plain language of the TUSK Enabling Act.

*2. Defendants Failed to Give a Reasoned Explanation for their Decision*

Defendants offered two arbitrary rationales in support of their dubious "Congressional mistake" theory: (1) that "residences built in 2006 would be within" the ROW and "would need to be removed" prior to Project construction; and (2) the area south of the TUSK boundary "has never been under the administration of [BLM]" and "Congress has no authority to legislate electric utility corridors on private lands." BLM57318. Defendants' assertions are unpersuasive for two reasons.

First, Defendants' concerns regarding conflicts between the designated ROW corridor and a discrete number of private properties amount to "undesirable policy consequences" of Congress's decision that "do not sound in statutory interpretation." *Gonzales*, 107 F.4th at 1080 (citation omitted).[11] The map accompanying the TUSK Enabling Act shows that the majority of the ROW traverses BLM-administered lands that border the western boundary of TUSK's North Unit and the northern boundary of its South Unit. *See* BLM18962; Fig. 1, *supra*. Against that backdrop, the map accompanying the TUSK Enabling Act reflects not a "mistake," as Defendants claim, but instead, reveals Congress' conscious choice to balance public and private interests in conservation and energy development. Put differently, the fact that Intervenor must explore routing alternatives that impact private land or are inconvenient *to Intervenor* does not negate Congress's clearly expressed intent to "conserve" and "protect" TUSK and its irreplaceable and iconic

[11] Defendants thus appear to elevate Intervenor's private interests in constructing the Project over the public's Congressionally-recognized interest in preserving TUSK and its paleontological resources in perpetuity.

resources of national importance. 128 Stat. 3861. Whatever the merits of Defendants' policy considerations, they "cannot override the plain language of the statute." *Bahr v. U.S. EPA*, 836 F.3d 1218, 1236-37 (9th Cir. 2016).

Second, Defendants' assertion that Congress lacks authority to designate a ROW across private lands is a non sequitur. It is axiomatic that Congress possesses the authority to designate a ROW over federal lands. And that is exactly what Congress did here: direct Defendants to issue a ROW across *BLM land* that borders TUSK. That constructing the Project requires Intervenor to obtain approval to cross non-federal lands is par for the course in planning and permitting long linear projects. Hence, the "best reading" of the TUSK Enabling Act, as dictated by the plain language and supported by legislative history, is that the statute says what it means: that Defendants' must designate a ROW corridor *outside* of TUSK's boundaries. *Loper Bright*, 603 U.S. at 399-400. Congress is not obligated to adopt legislation that solves all potential obstacles.

"The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress," not in Defendants. *Gonzales*, 107 F.4th at 1080 (citation omitted); *accord Loper Bright*, 603 U.S. at 403, ("Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences."); *Friends of the Earth v. EPA*, 446 F.3d 140, 142 (D.C. Cir. 2006) (If an agency believes that statutory compliance would lead to "undesirable consequences," "then it must . . . take its concerns to Congress"). Defendants' evasion of the now-inconvenient plain language of the TUSK Enabling Act is unpersuasive. *Cf. Loper Bright*, 603 U.S. at 395 ("[T]he role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."). Accordingly, Defendants' ROW placement plainly exceeds their statutory authority.

**B. <u>The Non-Impairment Determination Violated the Organic Act</u>**

Even if the ROW was consistent with the TUSK Enabling Act (it is not), the Court should reject Defendants' issuance of the ROW because NPS's Non-Impairment Determination is fatally flawed. The Organic Act charges NPS with the duty to "provide for the enjoyment" of the Monument's resources and values in "such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Hence, before

authorizing a utility ROW impacting TUSK resources, NPS must determine that the Project: is "not incompatible with the public interest"; "is consistent with" the Organic Act, TUSK Enabling Act, and TUSK Foundation Document; and "there is no practicable alternative to locating the infrastructure within" the Monument. 36 C.F.R. § 14.5; *accord* NPS1762 (providing that NPS will issue a utility ROW only where it is "not incompatible with the public interest" and "will not cause unacceptable impacts"). Here, NPS's cursory Non-Impairment Determination fails to demonstrate that any one of these essential criteria—let alone all three—have been satisfied.

First, NPS failed to offer *any* explanation for its bare assertion that the Project "is not incompatible with the public interest." NPS707. Congress's determination in passing the TUSK Enabling Act was that there is a strong public interest to "conserve, protect, interpret, and enhance for the benefit of present and future generations the unique and nationally important paleontological, scientific, educational, and recreational resources and values" of the Monument. 128 Stat. 3861. Yet, the Project will disturb—and potentially destroy—the very paleontological resources that TUSK was established to protect. *See* BLM57673-74 (acknowledging that "anomalies" consistent with vertebrate fossils have been detected at locations in TUSK within the Project ROW); *accord* BLM11770 (stating that the "whole [Project] area" within TUSK "is high-potential for fossil remains according to BLM data," so the agency "do[es] not need the [ground-penetrating radar] to know that there are probably fossils").

Second, the Non-Impairment Determination failed to establish that the Project "is consistent with" the statutory and management authorities governing TUSK. 36 C.F.R. § 14.5. With respect to the Organic Act, NPS's own interpretation of its authority dictates that it may authorize impacts to park resources only "when necessary and appropriate to fulfill the purposes of [the] park," and even then, only "so long as the impact does not constitute impairment of the affected resources and values" or result in "unacceptable impacts." NPS1658-60; *see also Greater Yellowstone*, 577 F. Supp. 2d at 190 n.1 (noting that NPS recognizes its management policies constitute its "official interpretation" of the Organic Act and are thus enforceable against the agency). NPS's Non-Impairment Determination flunks that test.

To begin, NPS's conclusory Non-Impairment Determination never explained *how* the

Project is "necessary and appropriate to fulfill" TUSK's purposes of "conserv[ing]" or "protect[ing]" the "unique and nationally important paleontological resources" found there. Rather than make that required showing, NPS simply assumed it possessed authority under the TUSK Enabling Act to issue the ROW within TUSK, relying on its "Congressional mistake" theory to evade the Organic Act's limitation on its discretion to authorize impacts to park resources. But NPS "cannot circumvent this limitation" without a reasoned explanation. *Greater Yellowstone*, 577 F. Supp. 2d at 193. Nor can it support its determination that an activity comports with NPS's conservation mandate with "conclusory declarations that certain adverse impacts are acceptable, without explaining why those impacts are . . . appropriate to fulfill the purposes of the park." *Id.*

NPS's insistence that the Project will not "impair" or unacceptably impact TUSK's irreplaceable resources likewise lacks merit. NPS649-50. TUSK's statutory purposes and Foundation Document make clear that TUSK was established to ensure the conservation and protection of paleontological resources. *See* 128 Stat. 3861; NPS2561. Impacts to such resources are therefore "more likely" to constitute impairments or unacceptable impacts. *See* NPS1659 (defining "impairment"); NPS1660 (defining "unacceptable impact"). Yet, neither the Non-Impairment Determination, nor the documents it relies upon (i.e., the Final EIS and Paleontological Resources Mitigation Plan), ever qualitatively or quantitatively described the *extent* of the Project's impacts on TUSK's paleontological resources or statutorily-protected values. Nor did NPS ever "articulate *why*" those impacts were "'acceptable.'" *Greater Yellowstone*, 577 F. Supp. 2d at 195. Instead, NPS merely acknowledged that impacts to paleontological resources—up to and including "[d]amage or destruction,"—may occur and "would be permanent in duration," before asserting that the "actions" included in the Paleontological Resources Mitigation Plan will "avoid and minimize impacts to fossil resources to avoid impairment." BLM57681; NPS645. But "[m]erely describing an impact and stating a conclusion of nonimpairment is insufficient, for this merely sets forth 'the facts found' and 'the choice made,' without revealing the 'rational connection'—the agency's rationale for finding that the impact described is not impairment." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 100 (D.D.C. 2006); *accord Greater Yellowstone*, 577 F. Supp. 2d at 195 (rejecting non-impairment determination where NPS "simply repeat[ed]" the

standards for non-impairment and unacceptable impact "in the context" of particular resources "but fail[ed] to provide any supporting analysis of how the impacts relate to those standards"); *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 25-38 (D.D.C. 2010) (finding non-impairment determination "arbitrary and capricious because NPS' conclusion" that the proposed activity "would result in non-impairment under the Organic Act [was] not based on reasoned explanations"). Because NPS failed to provide any standards or objective criteria "for unacceptable impacts or impairment" of the Monument's resources, NPS's "determination that [Project] impacts will be 'acceptable' [is] fundamentally arbitrary." *Greater Yellowstone*, 577 F. Supp. 2d at 209; *accord Bluewater Network*, 721 F. Supp. 2d at 33 (rejecting non-impairment determination where "the impairment thresholds are not connected to any objective standards that have been announced or evaluated").

Likewise, NPS's issuance of the ROW was inconsistent with the TUSK Foundation Document. The Final EIS asserted that the Project "would be within the Foundation Document-established 400-foot ROW outlined in the TUSK Enabling Act and therefore would not alter, conflict with, or require new management prescriptions and objectives." NPS326. However, as explained, *supra* at 20-22, issuing a ROW that crosses *into* TUSK flagrantly contravenes the TUSK Enabling Act and cannot be sustained. Additionally, NPS never explained how the Project's impacts on paleontological resources were consistent with the Foundation Document's instruction that TUSK be managed to "conserve[], protect[], enhance[], and interpret[] late Pleistocene fossils, [and] their geologic context," NPS2561, given that placing a massive, industrial-scale transmission line in TUSK will do the *opposite* of conservation, protection, and enhancement of these resources.

Third, NPS failed to establish that there was "no practicable alternative to locating" the ROW within TUSK. 36 C.F.R. § 14.5. Defendants eliminated from detailed consideration in the Draft and Final EISs *every single alternative* that would have sited the Project *outside* of TUSK. BLM57466-68; BLM21607-09. With respect to the Congressionally-designated ROW corridor—i.e., TUSK Alternative E—Defendants dismiss the alternative for two reasons: (1) "resolv[ing] th[is] apparent conflict with the [ROW's] location" through legislative action "could potentially take several years"; and (2) relocating affected private residences and acquiring the necessary land

rights "would *likely* affect the economic feasibility" of the Project. BLM58081-82 (emphasis added). However, Intervenor's desire to adhere to its preferred route and schedule cannot overcome the plain language of the TUSK Enabling Act. Likewise, Defendants' unsupported speculation that obtaining the necessary land *could* "affect" the Project's "economic feasibility" cannot be a lawful basis for deeming an otherwise viable option to be impracticable under the Organic Act and its regulations. *Id*.

The conservation mandate is clear: NPS must exercise its discretion so that it is "calculated to protect park resources" and genuinely seeks to avoid or minimize adverse impacts on park resources and values. *Greater Yellowstone*, 577 F. Supp. 2d at 193 (citation omitted). Defendants therefore cannot justify impacts to TUSK's statutorily-protected resources and values with conclusory assertions that an alternative that avoids locating the Project within TUSK *might* not be feasible. Rather, they must clearly explain why such an alternative is "impracticable" and support that determination with concrete evidence. *See id.* To hold otherwise would render the conservation mandate an illusory promise, "depart[ing] from years of well-reasoned precedent and undermin[ing] over 100 years of park management." *Id.*

Defendants likewise summarily dismissed other alternatives that would avoid TUSK, ostensibly because they were costlier or would result in greater impacts. BLM21607-09. However, aside from merely parroting (nearly word for word) Intervenor's asserted rationales for why the routes outside of TUSK were infeasible, *compare* NPS679-681, *with* BLM58081-83, the record is devoid of any *evidence* that NPS independently determined (let alone supplied the public with any analysis supporting such a determination) that the alternatives that would *avoid* TUSK—and thus, result in far less damage to protected Monument resources—would be "economically infeasible" or would result in unacceptable impacts to other resources. Nor have Defendants explained why those additional costs or impacts render the alternate routes not "practicable" under the Organic Act's implementing regulations. Neither the Final EIS, Non-Impairment Determination, nor any other document sets forth any objective metric or yardstick by which route alternatives have been deemed practicable or impracticable—i.e., at what specific expense or impact level an alternative becomes financially "impracticable" for Intervenor and the underlying basis for that assessment.

The lack of any objective metric for NPS's determination of economic practicability for specific alternatives that would indisputably reduce impacts to TUSK and its paleontological resources—a determination the Organic Act, its implementing regulations, and Management Policies *require* NPS to make—is especially troubling because, for the alternatives that Defendants did provide an estimate, the additional cost is exceedingly modest compared to the overall cost of the Project. The Organic Act requires that NPS exercise its discretion so that it is "calculated to protect park resources" and seeks to minimize adverse impacts on park resources and values. *See Greater Yellowstone*, 577 F. Supp. 2d at 193 (citation omitted). Rejecting alternatives that would significantly reduce harm to the resources necessary to fulfill TUSK's statutory purposes while only minimally increasing *Intervenor's* costs by *at most* $67 million—a fraction of the Project's total cost (i.e., 1.58% of the overall Project cost of $4.24 billion)—plainly falls short of this standard. BLM58082. NPS's failure to consider (let alone evaluate) the additional costs that *Intervenor* would owe, and whether that very modest cost differential would genuinely render the Project impracticable for Intervenor, is arbitrary, capricious, and flouts the statutory and regulatory requirement that NPS analyze impracticability and make such a finding before authorizing impacts to Monument resources. *See State Farm*, 463 U.S. at 43 (action is arbitrary if agency "entirely failed to consider an important aspect of the problem").

Hence, because NPS uncritically adopted Intervenor's rationales for impracticability without independently determining (or supplying any analysis or rational basis for such determination) that there was "no practicable alternative to locating the infrastructure within" TUSK, 36 C.F.R. § 14.5, NPS's decision was arbitrary, capricious, and contrary to law.

## III. DEFENDANTS VIOLATED NEPA

### A. Defendants Failed to Consider a Reasonable Range of Alternatives and Arbitrarily Dismissed from Detailed Analysis Reduced-Impact Alternatives

When preparing an EIS, agencies must examine "a reasonable range of alternatives to the proposed agency action" that "are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(c)(iii); *see also* 40 C.F.R. § 1502.14(a) (Agencies must "[r]igorously explore and objectively evaluate reasonable alternatives"). BLM's NEPA regulations

further define "reasonable alternatives" to include those "that are technically and economically practical or feasible and meet the purpose and need of the proposed action." 43 C.F.R. § 46.420(b). "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (internal quotation omitted).

*1. Defendants' Failure to Examine Any Alternative that would Avoid TUSK Violated NEPA*

With respect to the TUSK segment, Defendants analyzed an exceedingly narrow range of alternatives that only evaluated two "action" alternatives in detail, both of which would have nearly identical impacts on paleontological resources within the Monument. BLM57681-82. Defendants ultimately dismissed from detailed consideration *every single alternative* that would *avoid* entering TUSK, including an alternative that would locate the route within the Congressionally designated ROW corridor in the TUSK Enabling Act. Defendants violated NEPA in several respects.

First, BLM's approach of restricting its alternatives analysis to two substantially similar action alternatives constitutes a flagrant NEPA violation that fails to "rigorously explore and explore and objectively evaluate all reasonable alternatives" to a proposed project. *Ctr. for Biological Diversity*, 141 F.4th at 994 (citing *ONDA v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010)). By definition, where all action alternatives are the same in key respects, an agency necessarily has not considered a "range" of reasonable alternatives because there is no range at all. Thus, it is well-established that where an EIS examines only alternatives that are "virtually identical," the agency "failed to consider an adequate range of alternatives." *Muckleshoot Indian Tribe v. USFS*, 177 F.3d 800, 813 (9th Cir. 1999); *see also Friends of Yosemite Valley*, 520 F.3d at 1038-39 (finding that an EIS "lacked a reasonable range of action alternatives" because "the [three action] alternatives are essentially identical" and thus are "not varied enough to allow for a real, informed choice"); *cf. Neighbors of the Mongollon Rim, Inc. v. USFS*, No. 22-15259, 2023 WL 3267846, at *2 (9th Cir. May 5, 2023) (invalidating alternatives analysis where the agency refused to examine a viable alternative between the sole action alternative and no action alternative (citing *High Country Conserv. Advocs. v. USFS*, 951 F.3d 1217, 1224 (10th Cir. 2020)); *Cook Inletkeeper v. U.S. Dep't of Interior*, 740 F. Supp. 3d 767, 785-86 (D. Alaska 2024) (rejecting alternatives analysis where

agency only examined alternatives resulting in substantially similar impacts). For this reason alone, BLM's artificially narrow alternatives analysis flouts NEPA.

Second, Defendants' failure to consider *any* action alternative short of authorizing the ROW through TUSK is highly problematic on *this* record. With the TUSK Enabling Act, Congress imposed substantive constraints on Defendants' decisionmaking by designating the ROW corridor. *See* 128 Stat. 3864; *supra* at 20-22. Defendants were therefore obligated to give serious, meaningful consideration to those constraints when evaluating alternatives under NEPA. *See ONDA*, 625 F.3d at 1109 ("[T]he considerations made relevant by the substantive statute driving the proposed action must be addressed in [the] NEPA analysis."); *id.* ("[T]he statutory objectives underlying the agency's action work significantly to define its analytic obligations" under NEPA). Yet, Defendants summarily dismissed *every single alternative* that would avoid entering TUSK and impacting its protected resources based on Intervenor's objections that such alternatives would result in some modest additional cost and delay. As explained, *supra* at 22-23, those rationales are not remotely sufficient for dismissing such alternatives from detailed consideration in an EIS.

BLM's failure to consider in detail the alternative of using the Congressionally-designated ROW corridor—i.e., TUSK Alternative E—is particularly egregious. Again, Defendants dismissed TUSK Alternative E on the arbitrary grounds of Congressional mistake, asserted delay, and *potential* impacts to economic feasibility. But Defendants' bare assertion of Congressional mistake "entirely distorts" the TUSK Enabling Act's "directive." *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 769 (D. Alaska 2021). Accordingly, "to the extent that [Defendants] failed to consider the statutory directive that" the ROW corridor be located outside TUSK, they "acted contrary to law." *Id.* at 770; *cf. Muckleshoot*, 177 F.3d at 813-14 (rejecting alternatives analysis that "failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration").

Moreover, Defendants failed to actually explain how the additional (undefined) cost of adhering to the TUSK Enabling Act would render the Project infeasible for Intervenor.[12] Likewise,

---

[12] Again, Defendants did not attempt to define the cost of "acquiring the land to establish the utility corridor" in accordance with Congress's express intent. BLM57467.

Intervenor's desire to locate the Project on public lands—and thereby avoid the practical challenges of acquiring private land—cannot be a lawful basis for deeming an otherwise viable option to be infeasible for NEPA purposes because this position would render *any* alternative to *any* project crossing lands with different ownership infeasible because necessary approvals will *always* take some time to obtain. And, in any event, courts have repeatedly rejected agency attempts under NEPA to avoid evaluating alternatives merely because the acquisition of land or funding is outside of the agency's jurisdiction or control. *See, e.g.*, *Muckleshoot*, 177 F.3d at 814 (ordering agency to consider reasonable alternatives that included the possibility of obtaining funding controlled by Congress to outright purchase private inholdings from a landowner, rather than exchanging public and private lands and allowing resource destruction by the landowner).

Accordingly, Defendants' failure to evaluate in detail a reduced-impact alternative on the basis of fatally flawed and ill-explained rationales cannot pass muster under NEPA. *See ONDA*, 625 F.3d at 1123-24 (finding that the agency's failure to examine a reduced-impacts alternative was "precisely" the "sort of uncritical[] privileging of one form of use over another that we have held violates NEPA" (citation omitted)); *Muckleshoot*, 177 F.3d at 813 (finding that the agency "failed to consider an adequate range of alternatives" when the EIS "considered only a no action alternative along with two virtually identical alternatives"); *Wildearth Guardians v. U.S. BLM*, 457 F. Supp. 3d 880, 890-91 (D. Mont. 2020) (invalidating agency's dismissal from detailed consideration an alternative with "an inadequate explanation").

*2. Defendants' Failure to Examine a Reasonable Range of Alternatives for the Goldfield-Tonopah Segment Also Violated NEPA*

With respect to the Goldfield-Tonopah segment of the Project, comments from stakeholders specifically requested that Defendants examine an alternative that would reduce impacts to the intact landscapes, wildlife habitat, and cultural and other resources impacted by the segment (including the Esmeralda/Fish Lake conservation area). Yet, Defendants refused to give detailed consideration to *any* alternative other than the Project's preferred route. Again, Defendants' detailed consideration in its Final EIS of a *single* action alternative for this segment cannot be squared with the requirement to analyze "all reasonable alternatives." *See* 43 C.F.R.

§§ 46.415, .420; *accord* 40 C.F.R. § 1502.14(a) (emphasis added); *see also supra* at 29-30. For this reason, Defendants' consideration of a single action alternative for the Goldfield-Tonopah segment in their Final EIS violates NEPA.

Defendants do not dispute that the reduced-impact alternatives for the Goldfield-Tonopah segment—Goldfield-Tonopah Alternatives A through D—would *all* meet the Project's purpose and need. Instead, Defendants eliminated those reduced-impact alternatives from detailed analysis ostensibly because such alternatives "would have substantially similar or greater effects than the Proposed Action and would be economically infeasible." BLM58087-95. Neither is persuasive.

First, Defendants failed to actually explain how the additional cost of Goldfield-Tonopah Alternatives A through D—which ranged from an additional $20 million to $85.8 million—would render the Project infeasible for Intervenor, especially as compared to the immense overall cost of the Project's preferred alternative. *Id*. Although NEPA requires agencies to consider the needs and goals of the applicant when defining the purpose and need of the action and the range of reasonable alternatives, *see Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991), that obligation does not limit the scope of the agency's analysis to what the applicant says it needs, *S. Utah Wilderness All. v. Norton*, 237 F. Supp. 2d 48, 53 (D.D.C. 2002). The agency cannot merely "rely[] upon the admittedly self-serving statements of the project applicants" where such statements are unsupported by evidence in the record. *Id.*; *see also Idaho v. ICC*, 35 F.3d 585, 596 (D.C. Cir. 1994) (holding that the agency failed to meet its responsibilities under NEPA by "deferr[ing] not only to the judgments of other agencies, but also to that of" the project proponent).

Second, it is impossible to conclude on this record that the Project's preferred alternative is the *only* viable option to fulfill Intervenor's objectives. The Project, as authorized by Defendants, is a massive transmission line slicing across some of the last remaining unspoiled, intact landscapes in Nevada. Defendants acknowledge, as they must, that Goldfield-Tonopah Alternatives A through D would reduce—at times "substantially," BLM21614—impacts to important resources such as the Mojave desert tortoise, Land with Wilderness Characteristics, landscapes, and other habitat. BLM58087-95. However, Defendants dismissed those reduced-impact alternatives from *any* detailed consideration by simply declaring that they would result in purportedly greater impacts

on other resources, including pronghorn movement corridors, historic districts, mining interests, and private lands. BLM58087-95. But Defendants never meaningfully weighed the benefits of conserving intact landscapes and wildlife habitat—particularly in light of the substantial solar development that *will result* from the Project—against the relative (very modest) costs to historic and other resources.[13]

Defendants' conclusory assertions regarding the ostensibly greater impacts of Goldfield-Tonopah Alternatives A through D, and Defendants' concomitant abandonment of those alternatives without *any* detailed consideration, thus unreasonably failed to "present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives contained in the EIS." *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1122 (N.D. Cal. 2006) (quoting *NRDC v. USFS*, 421 F.3d 797, 813 (9th Cir. 2005)).[14]

### B. Defendants Failed to Take a "Hard Look" at the Effects of Solar Energy Facilitated by the Project

Defendants' cursory discussion of cumulative impacts fails to satisfy NEPA's "hard look" requirement. "In a cumulative impact analysis, an agency must take a 'hard look' at all actions."

[13] With respect to mining, Defendants' assert that Goldfield-Tonopah Alternatives A through D "may materially interfere" with mining plans of operation. BLM58088; *see also* BLM58091; BLM58093-94. But BLM's mere speculation that a reduced-impacts alternative *may* "potentially" affect mining claims cannot suffice for a reasoned explanation for why the alternatives are unreasonable or infeasible. *See Wildearth Guardians*, 457 F. Supp. 3d at 890-91 (requiring agencies to "provide[]" a reasoned explanation for "not considering [a] proposed alternative").

[14] That Defendants unreasonably limited their consideration of alternatives in the Goldfield-Tonopah segment of the Project route is reinforced by extensive meeting notes suggesting that Defendants contrived ways to eliminate other action alternatives from detailed analysis. *See, e.g.*, BLM7349-50 (discussing ways to eliminate proposed Goldfield-Tonopah segment alternatives because "[d]oing detailed analysis of" those alternatives "would significantly affect the [P]roject schedule"); BLM7429 (suggesting that Defendants could "dismiss" BLM's own recommendation to revise the existing energy corridor to follow US 95—i.e., Goldfield-Tonopah Alternative A—and "see what happens"); BLM7428-29 (explaining "concerns about the simplicity of eliminating the alternative from detailed analysis due to the resource impacts," and suggesting that "maybe we can note additional cost" or seek information about additional purported conflicts to "eliminate the alternative from detailed analysis and submit [the explanation] to the DOI solicitors for their review and to wordsmith it further"). However, "the kind of thorough consideration of environmental values called for by NEPA is not possible when the end result is predetermined." *Hausrath v. U.S. Dep't of the Air Force*, 491 F. Supp. 3d 770, 800 (D. Idaho 2020) (quoting *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 977 (D. Haw. 2008)) (cleaned up).

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010). Although Defendants' NEPA evaluations receive "substantial deference," *Seven Cty. Infrastructure Coal. v. Eagle Cty.*, 605 U.S. 168, 180 (2025), deference is not abdication. In particular, "[d]eference is not owed" where, as here, "the agency has completely failed to address some factor consideration of which was essential to making an informed decision." *AquAll. v. Bureau of Reclamation*, 287 F. Supp. 3d 969, 987 (E.D. Cal. 2018). Here, Defendants' decision to blind themselves to the significant indirect impacts that will result from the Project's intended stimulation of major solar energy development was neither "reasonable" nor "reasonably explained," *Seven Cnty*., 605 U.S. at 185, and thus violated NEPA in several ways.

First, Defendants' definition of the CEAAs arbitrarily excluded reasonably foreseeable future actions from consideration and artificially truncated Defendants' evaluation of the likely impacts to various affected resources. While determining "the scope of" a cumulative impact analysis "is within the agency's discretion," Defendants must still "provide support for [their] choice of analysis area in the record." *League of Wilderness Defs./Blue Mountains Diversity Proj. v. Connaughton*, No. 3:12–cv–02271–HZ, 2014 WL 6977611, at *8-9 (D. Or. Dec. 9, 2014) (citation omitted). Here, Defendants generally defined the CEAA for each affected resource in terms of radii ranging from 0.5 to five miles from the Project ROW. *See* BLM55327. However, the record is devoid of any meaningful explanation for those narrowly drawn analysis areas.[15]

Defendants' failure is particularly arbitrary in light of BLM's own Western Solar Plan EIS, which was developed and issued at the same time as the Project Final EIS (and before the ROD) and designates as available for solar applications those lands within *15 miles* of existing and planned transmission lines. Final Western Solar Plan, *supra* note 10, at ES-9. As Defendants recognize, "whatever path [the Project] takes, future projects will take this path too." BLM7428.

[15] Defendants' error was not harmless. For example, Defendants identified the proposed the Rhyolite Ridge Lithium-Boron Project in Esmeralda County, Nevada, as a reasonably foreseeable future action that could cumulatively impact certain resources, including air quality and ESA-listed species. BLM55357. However, despite the fact that the proposed mine is located in close proximity to the Project and several solar projects—and thus presumably will impact the same resources—Defendants did not examine cumulative impacts to general wildlife or cultural resources because the mine falls outside of the CEAAs for those resources.

The Project thus places Defendants in a "unique position"; it constitutes the *only* time that Defendants will "evaluate[] the cumulative impacts" of each reasonably foreseeable future action—and Defendants' own actions—"over the entire range of the [Project]." *W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1333 (D. Idaho 2019). Given the Project's expressly intended purpose of facilitating solar development, Defendants were required to produce a "robust cumulative impacts analysis." *Id.*; *cf.* 43 C.F.R. § 46.30. Defendants' failure to account for the full scope of the reasonably foreseeable future effects of the actions that the Project is expressly intended to facilitate is quintessentially arbitrary. *See id.*; *State Farm*, 463 U.S. at 43 (action is arbitrary if the agency "entirely failed to consider an important aspect of the problem").

Second, Defendants' analysis of cumulative impacts rests on a false premise: that the future development of, and impacts from, the solar development that the Project is expressly intended to facilitate will be the same regardless of whether the Project is built. *See* BLM57946 (insisting that if the Project is not built, "the pending solar projects would look at other transmission lines to distribute their generated power"). However, Defendants offer no explanation or evidence for their unsubstantiated assumption that solar developments will be constructed in the same number and locations notwithstanding construction of the Project. To the contrary, proximity to transmission lines is an important consideration for solar projects, *cf.* BLM7428 ("[W]hatever path [the Project] takes, future projects will take this path too."); indeed, according to BLM, many solar projects on public lands are located near (less than 3 miles from) existing or planned transmission line infrastructure, Draft Western Solar Plan, *supra* note 10, ES-9. Hence, if the Project does not move forward, it is likely that at least *some* of the planned solar projects that are strategically located adjacent to the Project ROW would be relocated to be closer to other existing or planned transmission lines. As a result, the impacts to areas with high concentrations of proposed solar development projects, including the fragile Esmeralda/Fish Lake conservation area, would likely be substantially decreased. Because Defendants' erroneous assumption improperly skewed the baseline used as the comparison point for all action alternatives, their cumulative impacts analysis cannot be sustained.

Third, Defendants entirely failed to meaningfully consider the impacts of the future solar

development that the Project is expressly intended to facilitate. As a threshold matter, Defendants' discussion of cumulative impacts offers few details or meaningful comparisons between alternatives. For example, while acknowledging that the Project and its reasonably foreseeable future actions (including solar development) will "result in cumulative impacts" to resources, including wildlife, special status species, and paleontological resources, Defendants insist that because the action alternatives "would disturb less than one percent" of the CEAAs, the Project's "contribution" to such effects will be "negligible." BLM57956 (special status wildlife); BLM57958 (general wildlife); BLM57962 (paleontological resources). Not only does that conclusion rely on the arbitrary premise—refuted above—that solar development will continue unchanged absent the Project, but it also amounts to the kind of "[g]eneral statements about possible effects and some risk" that fail to satisfy Defendants' NEPA obligations. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (citation omitted).

Despite acknowledging that reasonably foreseeable solar projects "would be located predominantly in undeveloped areas and would be grouped in two general areas," including the Esmeralda/Fish Lake conservation area, BLM57970; *accord* BLM57954 (explaining that "[c]umulative impacts to special status terrestrial wildlife populations would be greater where concentrations" of solar developments "would occur"), the Final EIS makes no mention of the intact landscape or the cumulative loss of potentially thousands of acres of intact habitat due to the extensive solar development that is reasonably certain to occur if this transmission line is constructed. For example, with respect to the Project's impacts on bighorn sheep. Defendants acknowledge that the Project will "occur within and fully bisect the Bare to Yucca Mountains bighorn sheep movement seasonal corridor." BLM57586. However, the only discussion of cumulative impacts to sheep from the construction of the transmission line bisecting a critical movement corridor *and* the massive planned solar development that will result in even more disturbance is a brief acknowledgement that the species "may be affected by habitat loss due to these" solar projects. BLM57954. But there is no *analysis* of the magnitude of the combined effects of the Project and the solar development that Defendants not only *know* will result, but play a key role in permitting. Defendants' actions cannot be squared with NEPA's mandate to "give a

sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and difference between the projects, are thought to have impacted the environment." *Wildearth Guardians*, 457 F. Supp. 3d at 892-93 (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971-72 (9th Cir. 2006)) (citing *Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1138 (D. Mont. 2009); *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005)).

For these reasons, Defendants unlawfully restricted the scope of its cumulative impacts analysis and failed to take a hard look at all past, present, and reasonably foreseeable future actions impacting the Project area and the surrounding ecosystem. *See, e.g.*, *Bark v. USFS*, 958 F.3d 865, 872-73 (9th Cir. 2020) (finding that an agency inadequately considered cumulative impacts by limiting the geographic scope of analysis only to the project area and a small buffer, while refusing to consider "future timber projects" in the forest); *Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 896-97 (9th Cir. 2002) (rejecting an agency's cumulative impact analysis that failed to consider the project's effects "in combination with" other projects "proposed for the same national forest [that] will effect separate but additive changes to the density of roads").

## IV. DEFENDANTS' FAILURE TO ADEQUATELY EVALUATE THE EFFECTS OF INDUSTRIAL SOLAR POWER VIOLATED THE ESA

Section 7—the heart of the ESA—requires every agency to ensure that its actions are "not likely to jeopardize the continued existence" of endangered or threatened species. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R § 402.02 (defining "jeopardize" to include impairment of survival or recovery prospects). In the BiOp under review, FWS violated Section 7 and its implementing regulations, and failed to undertake a lawful jeopardy analysis, by: (1) arbitrarily constraining the Project's Action Area used to assess effects to listed species and their critical habitat; and (2) severely downplaying the effects of the proposed action by wrongly characterizing indirect effects of the action as "cumulative" effects having nothing to do with the Project.

Once again, the Project is expressly intended to facilitate a substantial expansion of solar energy in this region—i.e., reasonably foreseeable industrial-scale projects that would not (and could not) be built in the absence of this transmission line and it associated facilities. *See supra* at

12-13. Yet, the BiOp failed to evaluate (let alone accurately) the indirect effects of solar energy in conjunction with the direct effects to listed species resulting from construction and operation of the Project itself, despite a clear duty to do so under the ESA's implementing regulations.

As explained, the "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The "[e]ffects of the action" are "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action." *Id.* "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur"; "[e]ffects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* In the BiOp under review, FWS flouted its regulations in two distinct ways that significantly understated the effects of the action, and arbitrarily skewed FWS's jeopardy analysis and undercut its ultimate no-jeopardy conclusion.

First, in defining the Project's Action Area, FWS included only the immediate area involved in the Project and minor buffers around that area, thus limiting the consideration of "physical, chemical, and biotic effects" under the ESA to this highly circumscribed Action Area directly adjacent to the Project. BLM93530; BLM93629-30. Without any explanation in the BiOp, FWS excluded from the Action Area all areas that will be indirectly affected as a result of reasonably foreseeable solar energy development stemming from, and induced by, the Project. *See supra* at 12-13, 33-37. In this way, FWS artificially restricted the scope of analysis under the ESA, thereby evading review of many effects to listed species and their habitat caused by the Project.

Accordingly, by unlawfully skewing the Action Area in this manner—contrary to FWS's own regulations that require an action area to include "*all areas* to be affected directly *or indirectly* . . . and *not merely the immediate area involved in the action*," 50 C.F.R. § 402.02 (emphases added)—FWS acted arbitrarily, capriciously, and contrary to law, as courts have repeatedly held under similar facts. *See Native Ecosys.,* 304 F.3d at 901-03 (rejecting "action area" that "contains no discussion of scientific methodology, relevant facts, or rational connections linking the project's potential impacts with the [action area's] boundaries"); *EPIC v. Van Atta*, 692 F. Supp.

3d 879, 896-97 (N.D. Cal. 2023) (rejecting action area that included only the immediate area of a dam, but not downstream reaches with affected critical habitat for listed salmon); *NWF v. NMFS*, 254 F. Supp. 2d 1196, 1212 (D. Or. 2003) (holding action area too narrow that excluded areas downstream of primary rivers affected by a multi-dam operation plan despite reasonably certain effects to listed species); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128-30 (D.D.C. 2001) (rejecting "a narrow approach to defining the action area" given "the expansive regulatory definition" of that term, where the action area excluded "where pronghorn may be directly or indirectly affected by the agency action").

Second, compounding FWS's unduly restrictive Action Area that severely curtailed the scope of the BiOp's effects and jeopardy analyses, FWS also erroneously characterized the foreseeable effects resulting from "industrial solar power plants" as mere "cumulative" effects, rather than (indirect) effects *of the Project*. *See* BLM93726. Thus, while acknowledging that solar projects are "reasonably certain to occur" and that they will "continue th[e] trend" of "habitat loss, degradation, and fragmentation" for multiple listed species, *id.,* FWS attempted to distance itself from the obvious relationship between the Project and the related impacts to listed species from myriad industrial solar projects, by labeling them as cumulative effects and thus refusing to expand the Action Area to encompass analysis of the full array of effects from solar projects in the region.

Whereas cumulative effects are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation," 50 C.F.R. § 402.02, the effects *of the action* are "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action." *Id.* Thus, cumulative effects are unrelated to the project subject to consultation but are foreseeable actions overlapping the same geographical area as the project under review. In contrast, indirect effects are *facilitated by the action under review* and have the critically important effect of expanding the "action area" FWS must consider in Section 7 consultation. *Id.* This distinction has immense practical import under the ESA. Because FWS's regulations define the "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely

the immediate area involved in the action," the action area's boundaries are delimited by the area of *the action's* direct and indirect effects (but not cumulative effects). *Id.*

For this reason, courts have rejected functionally indistinguishable attempts to mislabel effects resulting from an action as cumulative effects. For example, in the context of another transmission line, a court concluded that FWS violated the ESA when it classified effects as "cumulative," rather than from the action itself, where the impacts from wind energy projects would be facilitated, and made more probable, by the action (i.e., the transmission line). *See Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1050-51 (D. Colo. 2020). The same result is required here—unless FWS can demonstrate (which it has not in the BiOp) that a particular solar project will be built irrespective of the Project, all solar energy effects facilitated by the Project must be classified as "effects of the action," rather than "cumulative effects." 50 C.F.R. § 402.02. Accordingly, FWS's designation of the Action Area, and its related classification of the effects stemming from solar projects induced by the Project, are arbitrary, capricious, and unlawful.

Because FWS illegally limited the Action Area to the area immediately adjacent to the Project, and it also wrongly classified certain effects of the action as cumulative effects, the Court should vacate and remand the BiOp to FWS to apply the proper scope of analysis.[16]

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court vacate the ROD, ROW, and BiOp, and remand to Defendants for further consideration consistent with federal law.

Dated: August 11, 2026 Respectfully submitted,

*/s/Riley C. Varner*
Riley C. Varner
CO Bar No. 60640

---

[16] There are other major substantive and procedural defects in the BiOp, including FWS's failure to rely upon the best available science (and FWS's own recovery plan) in conducting its effects and jeopardy analyses under the ESA. *See* ECF No. 1 ¶¶ 95-100. But in light of FWS's glaring failure to correctly define the threshold scope of review—via a highly skewed Action Area and the erroneous classification of cumulative effects—Plaintiffs submit that these remaining, myriad ESA defects are best addressed once FWS correctly defines the Action Area and the effects of the action on remand, which will form the basis for new, broader effects and jeopardy analyses.

*/s/Elizabeth L. Lewis*
Elizabeth L. Lewis
DC Bar No. 229702

*/s/William S. Eubanks II*
William S. Eubanks II
DC Bar No. 987036

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

Christopher W. Mixson, Esq.
NV Bar No. 10685

KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2026, I filed the foregoing document electronically through the CM/ECF system which caused all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/Riley C. Varner*
Riley C. Varner