Adam R.F. Gustafson
Principal Deputy Assistant Attorney General

Mark Widerschein
Alexa Penalosa
Natural Resources Section
Alison C. Finnegan
Wildlife & Marine Resources Section
Energy & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Mark.Widerschein@usdoj.gov
Alexa.Penalosa@usdoj.gov
Alison.C.Finnegan@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FRIENDS OF NEVADA WILDERNESS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>SIERRA PACIFIC POWER COMPANY AND NEVADA POWER COMPANY, EACH D/B/A/ NV ENERGY<br><br>Intervenor Defendants. | Case No. 2:25-cv-00929-CDS-MDC |

**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. STATUTORY BACKGROUND ..... 2

A. NEPA ..... 2

B. ORGANIC ACT & ENABLING ACT ..... 3

C. THE ENDANGERED SPECIES ACT ..... 4

D. THE ADMINISTRATIVE PROCEDURE ACT ..... 6

II. FACTUAL BACKGROUND ..... 7

A. THE PROJECT ..... 7

B. TULE SPRINGS FOSSIL BEDS NATIONAL MONUMENT ..... 8

C. THE DESERT TORTOISE ..... 8

D. CONSULTATION PURSUANT TO ESA SECTION 7 ..... 9

III. ARGUMENT ..... 11

A. THE TUSK RIGHT-OF-WAY CORRIDOR IS LAWFUL. ..... 11

i. THE ENABLING ACT DOES NOT PROHIBIT RIGHTS OF WAY. ..... 12

ii. THE DEPARTMENT OTHERWISE COMPLIED WITH THE AUTHORITY UNDER WHICH IT ACTED. ..... 14

B. FEDERAL DEFENDANTS COMPLIED WITH NEPA ..... 18

i. THE EIS CONSIDERED A REASONABLE RANGE OF ALTERNATIVES ..... 19

ii. THE ANALYSIS OF TUSK TRANSMISSION LINE ROUTE ALTERNATIVES COMPLIED WITH NEPA ..... 21

iii. BLM'S ANALYSIS OF THE GOLDFIELD-TONOPAH ALTERNATIVES COMPLIED WITH NEPA ..... 25

iv. FEDERAL DEFENDANTS ADEQUATELY CONSIDERED THE PROJECT'S POTENTIAL IMPACTS ..... 28

C. FWS'S ANALYSIS IN THE BIOP COMPLIES WITH THE ESA. ..... 32

CONCLUSION .......... 40

## TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140 (9th Cir. 2000) .......... 28

*Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073 (9th Cir. 2013) .......... 24, 26

*All. for the Wild Rockies v. Matt Anderson*, No. cv-24–125-M-KLD, 2026 WL 892326 (D. Mont. Mar. 31, 2026) .......... 32

*Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 25-5185, 2026 WL 958126 (9th Cir. Apr. 8, 2026) .......... 20, 23, 26, 27

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983) .......... 3, 27

*Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996) .......... 3

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .......... 14

*Center for Biological Diversity v. Department of the Interior*, 24-cv-4651-JST, 2026 WL 898264 (N.D. Cal. Mar. 30, 2026) .......... 5

*City of Los Angeles v. FAA*, 63 F.4th 835 (9th Cir. 2023) .......... 26

*City of Roseville v. Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002) .......... 25

*Conservation Congress v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189 (E.D. Cal. 2017) .......... 36

*Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006) .......... 27

*Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980 (9th Cir. 2023) .......... 37

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 811 F. Supp. 3d 1206 (D. Mont. 2025) .......... 35

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976 (9th Cir. 2025) .......... 20, 22

*Ctr. for Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633 (9th Cir. 2023) .......... 7, 30

*Ctr. for Env't Law and Policy v. U.S. Bureau of Reclamation*,
655 F.3d 1000 (9th Cir. 2011) .................... 31

*Defs. of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001) .................... 36

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .................... 13

*DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency*,
Case No. C14-5880JLR, 2016 WL 631574 (W.D. Wash. Feb. 16, 2016) .................... 40

*EPIC v. Van Atta,*,
692 F. Supp. 3d 879 (N.D. Cal. 2023) .................... 35

*Friends of Animals v. U.S. BLM*,
514 F. Supp. 3d 290 (D.D.C. 2021) .................... 27

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) .................... 35

*Grand Canyon Trust v. Provencio*,
467 F. Supp. 3d 797 (D. Ariz. 2020) .................... 34

*Grunewald v. Jarvis*,
776 F.3d 893 (D.C. Cir. 2015) .................... 28

*Headwaters, Inc. v. BLM*,
914 F.2d 1174 (9th Cir. 1990) .................... 20

*HonoluluTraffic.com v. Fed. Transit Admin.*,
742 F.3d 1222 (9th Cir. 2014) .................... 19

*Hudson River Fishermen's Ass'n v. Fed. Power Comm'n*,
498 F.2d 827 (2d Cir. 1974) .................... 15

*Laguna Greenbelt, Inc. v. DOT*,
42 F.3d 517 (9th Cir. 1994) .................... 19, 21, 26

*League of Wilderness Defenders v. U.S. Forest Serv.*,
689 F.3d 1060 (9th Cir. 2012) .................... 19

*McDonald v. Sun Oil Co.,*
548 F.3d 774 (9th Cir. 2008) .................... 12

*Medina County Envt'l Action Ass'n v. Surface Transp. Bd.*,
602 F.3d 687 (5th Cir. 2010) .................... 37

*Metro. Edison Co. v. People Against Nuclear Energy*,
460 U.S. 776 (1983) .................... 28

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) .................... 19, 24

*N. Alaska Envt'l Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) .................... 31

*Nat'l Family Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) .................... 35

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
254 F. Supp. 2d 1196 (D. Or. 2003) .................... 35

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) .................... 6, 30, 35

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .................... 21, 25

*Nat'l Parks Conservation Ass'n v. Jewell,*
965 F. Supp. 2d 67 (D.D.C. 2013) .................... 16

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) .................... 36

*Occidental Eng'g Co. v. I.N.S.,*
753 F.2d 766 (9th Cir. 1985) .................... viii

*Oregon-California Trails Association v. Walsh*,
467 F. Supp. 3d 1007 (D. Colo. 2020) .................... 37, 38

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) .................... 34

*River Runners for Wilderness v. Martin*,
593 F.3d 1064 (9th Cir. 2010) .................... 16

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .................... 3, 18

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) .................... 15

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) .................... 12

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025) .................... passim

*Shinseki v. Sanders*,
556 U.S. 396 (2009) .................... 34

*Sierra Club v. Marsh*,
816 F.2d 1376 (9th Cir. 1987) .................... 37

*Strycker's Bay Neighborhood Council*,
444 U.S. .................... 19

*Terbush v. United States*,
516 F.3d 1125 (9th Cir. 2008) .................... 4

*The Wilderness Soc. v. Norton*,
434 F.3d 584 (D.C. Cir. 2006) .................... 16

*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113 (9th Cir. 2012) ........ 6

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ........ 15

*Versluys v. Weizenbaum*, Case No. 3:21-CV-01694-MO, 2023 WL 6880412 (D. Or. Oct. 18, 2023) ........ 40

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519 (1978) ........ 20

*W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018) ........ 3

*Westlands Water Dist. v. Interior*, 376 F.3d 853 (9th Cir. 2004) ........ 19, 22

*Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289 (W.D. Wash. 2014) ........ 35

**Statutes**

5 U.S.C. § 706(2)(A) ........ 6

16 U.S.C. § 1533 ........ 4

16 U.S.C. § 1536(a)(2) ........ 6

16 U.S.C. § 1536(b)(4) ........ 6

42 U.S.C. § 4332(2)(C) ........ 3, 29

54 U.S.C. § 100101 ........ 3

54 U.S.C. § 100902 ........ 12

54 U.S.C. § 100902(b) ........ 12

54 U.S.C. § 100902(b)(1)(A) ........ 4

54 U.S.C. §100902(b)(3) ........ 14

TUSK Enabling Act, Pub. L. No. 113-291, § 3092, 128 Stat. 3861, 3864 (2014) ........ 4

**Regulations**

36 C.F.R. § 14.5 ........ 14, 15, 17

36 C.F.R. § 14.5(a)(1) ........ 16

40 C.F.R. § 1501.3 ........ 3

40 C.F.R. § 1508.1(g)(3) ........ 28, 29

40 C.F.R. § 46.415(b) ........ 26

50 C.F.R. § 17.11 ........ 5

50 C.F.R. § 402.01(b) .................... 5
50 C.F.R. § 402.02 .................... 5, 6, 36, 37
50 C.F.R. § 402.14 .................... 6
50 C.F.R. §§ 402.13-402.14 .................... 5

**Other Authorities**

51 Fed. Reg. 19,926 (June 3, 1986) .................... 5
55 Fed. Reg. 12,178 (Apr. 2, 1990) .................... 9
59 Fed. Reg. 5820 (Aug. 8, 1994) .................... 9, 10
84 Fed. Reg. 44,976 (Aug. 27, 2019) .................... 5
87 Fed. Reg. 23,453 (Apr. 20, 2022) .................... 3
89 Fed. Reg. 96,535 (Dec. 5, 2024) .................... 14

**FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Federal Defendants hereby move for summary judgement on Plaintiffs' claims in the above-captioned matter. Because Plaintiffs' claims are brought under the Administrative Procedure Act, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 770 (9th Cir. 1985). As demonstrated in Federal Defendants' Memorandum in Support, Federal Defendants fully complied with the applicable law in issuing federal approvals for the Greenlink West Project. Accordingly, Federal Defendants are entitled to summary judgment in their favor as a matter of law.

Dated: October 9, 2026

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division

***/s/ Mark J. Widerschein***
Mark Widerschein
Alexa Penalosa
Trial Attorneys
United States Department of Justice
Natural Resources Section

Alison C. Finnegan
Trial Attorney
Wildlife & Marine Resources Section

P.O. Box 7611
Washington, D.C. 20044-7611
Mark.Widerschein@usdoj.gov
Alexa.Penalosa@usdoj.gov
Alison.C.Finnegan@usdoj.gov

*Counsel for Federal Defendants*

## INTRODUCTION

The Greenlink West Project ("Project") is an approximately 480-mile electric transmission line, to be built by NV Energy, that stretches from Las Vegas to Reno, Nevada. The purpose of the Project is to provide reliability, redundancy, and resiliency to electrical power service in Nevada. Construction began in the spring of 2025 and is expected to be completed in summer of 2027. Multiple federal agencies, including, *inter alia*, the Bureau of Land Management ("BLM"), the National Park Service ("NPS"), and the U.S. Fish and Wildlife Service ("FWS"), dedicated years to analyzing the effects of the Project on the environment and endangered species in the Project area. Their analysis under the National Park System Organic Act ("Organic Act"), the Tule Springs Fossil Beds National Monument ("TUSK") Enabling Act ("Enabling Act"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA"), among others, resulted in a comprehensive Environmental Impact Statement ("EIS") aimed at analyzing the environmental impacts and a reasonable range of alternatives. The process concluded in a Record of Decision ("ROD") authorizing the issuance of rights-of-way across federal and tribal land. The process complied with the standards for reasoned decision-making set forth in the Administrative Procedure Act ("APA"). Plaintiffs, however, now challenge the Project on three primary grounds: the approval of a right-of-way in a corridor not specifically identified in the TUSK Enabling Act; the scope of the EIS alternatives analysis and assessment of cumulative impacts; and compliance with the ESA.

Plaintiffs' Enabling Act argument fails as a matter of law because the right-of-way was approved under the general right-of-way authority Congress has granted NPS, not the Enabling Act. Plaintiffs argue the Enabling Act includes an implicit prohibition on approving any other rights-of-way. But the Enabling Act's plain text does not limit NPS's other authorities.

As to NEPA, "the central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 179 (2025). Plaintiffs are wrong that BLM violated NEPA in its alternatives analyses related to two of the nine transmission route groups—the TUSK and Goldfield-Tonopah segments. BLM considered a reasonable range of

alternatives within the scope of its purpose and need, and adequately explained its reasons for eliminating other alternatives from further analysis. Plaintiffs also take issue with BLM's cumulative impacts analysis as it relates to potential future solar facilities. But BLM explained development in the relevant impact areas, which is a matter well within the sound discretion of the agency.

Plaintiffs' ESA challenge to the biological opinion ("BiOp") that FWS prepared for the Project similarly lacks merit. Their entire claim rests on the faulty premise that the Project was built to spur industrial solar power plant development throughout Nevada and that future solar development thus is an "effect of the action" that FWS should have analyzed in the BiOp. But BLM, as the action agency for the Project, explained during its lengthy and thorough environmental analysis that the Project has independent utility, and was planned and designed to provide reliability, redundancy, and resiliency to existing electrical power in the area. This purpose is reflected throughout BLM's administrative record, as well as the agency's understanding that other potential projects were at the application stage and their development did not depend on the Project. FWS, in turn, relied on BLM's identification of the effects of the Project as discussed in its biological assessment and draft environmental impact statement. On these facts, the Project simply cannot be characterized as the "but for" cause of the future solar development that Plaintiffs so vaguely describe. Accordingly, BLM did not include future solar development as an effect of the action that it described to FWS in its biological assessment and FWS did not analyze it as such or include it in the action area for the Project. Rather, FWS used its expertise to reasonably define the action area and then evaluated the effects of the Project on all species listed as threatened or endangered in the action area. Its conclusions in the BiOp complied with the ESA and the APA.

Federal Defendants are entitled to summary judgment on Plaintiffs' claims.

## BACKGROUND

### I. STATUTORY BACKGROUND

#### A. NEPA

NEPA focuses governmental and public attention on potential environmental effects from any proposed "major Federal actions." 42 U.S.C. § 4332(2)(C). However, "NEPA is purely procedural." *Seven Cnty.*, 605 U.S. at 177. It "does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Thus, a court may not require agencies "to elevate environmental concerns over other appropriate considerations." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). When reviewing an agency's choices in undertaking an evaluation under NEPA, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. at 183. NEPA requires that an agency prepare an EIS for "major federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality ("CEQ") formerly promulgated regulations to guide federal agencies in implementing NEPA. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1237 (D.C. Cir. 2018); *see* 40 C.F.R. § 1501.3 (2023).[1] BLM prepared this EIS under the 2022 CEQ NEPA Regulations. BLM_57415.

**B. ORGANIC ACT & ENABLING ACT**

The NPS is governed by the Organic Act, which provides that NPS's "purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. Subject to the requirement to avoid impairment, the "Organic Act is silent as to the specifics of park management" and, accordingly, "the Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate." *Bicycle Trails Council of*

[1] Since the time of the agency decisions at issue here, CEQ's implementing regulations have been withdrawn and are no longer in effect. BLM followed the 2022 version of the prior CEQ regulations, which restore some provisions that had been removed in a more expansive 2020 amendment. 87 Fed. Reg. 23,453 (Apr. 20, 2022); BLM_57415.

*Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996), *as amended* (June 17, 1996) (internal quotation omitted). Identifying impairment "is explicitly recognized as involving a decision by the superintendent that calls for reconciling the inevitable ... tension between conservation of resources on the one hand and public enjoyment on the other." *Terbush v. United States*, 516 F.3d 1125, 1132 (9th Cir. 2008) (citation modified). NPS makes a non-impairment determination ("NID") in association with actions that it takes. NPS also has a number of specific authorities that modify the general mandates. As relevant here, one such provision authorizes the Secretary of the Interior ("Secretary") to "grant a right of way over, across, and on through a System unit" for "electrical poles and lines for the transmission and distribution of electrical power [.]" 54 U.S.C. § 100902(b)(1)(A).

TUSK is a unit of the NPS system established by the Enabling Act in 2014. Of relevance in this case, Congress established a specific mandatory right-of-way mechanism for a mapped corridor by directing the Secretary to approve an application for that specific corridor if one is received. The Enabling Act provides that:

> (A) IN GENERAL.—On receipt of a complete application from a qualified electric utility, the Secretary, in accordance with applicable laws … shall issue to the qualified electric utility a 400-foot-wide right-of-way for the construction and maintenance of high-voltage transmission facilities depicted on the map entitled "North Las Vegas Valley Overview" and dated November 5, 2013, as "Renewable Energy Transmission Corridor" if the high-voltage transmission facilities do not conflict with other previously authorized rights-of-way within the corridor.

TUSK Enabling Act, Pub. L. No. 113-291, § 3092, 128 Stat. 3861, 3864 (2014). As noted above, this provision is in addition to the general NPS right-of-way authority.

### C. THE ENDANGERED SPECIES ACT

The ESA provides for the listing of species as threatened or endangered, 16 U.S.C. § 1533, and protects listed species in several ways. As relevant here, Section 7(a)(2) directs each federal agency (the "action agency") to ensure, in consultation with FWS or the National Marine Fisheries Service ("NMFS") (the "consulting agency"),[2] that "any action authorized, funded, or carried out

[2] Congress assigned responsibility for implementing the ESA to the Secretaries of the Department of Commerce and the Department of the Interior. 16 U.S.C. § 1533. The Department of Interior

by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. *Id.* § 1536(a)(2). "Jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* § 402.02. If the action agency, here BLM, determines that an action "may affect" listed species or critical habitat, the action agency must pursue either "informal" or "formal" consultation with the consulting agency, here FWS. 50 C.F.R. §§ 402.13-402.14.[3]

If a proposed agency action is likely to result in adverse effects to or "take" of listed species, formal ESA consultation is required. *Id.* § 402.14. As part of formal consultation, the action agency provides a biological assessment to the consulting agency that includes a description of the proposed action, an analysis of the effects of the action on listed species and their habitat, the current conditions of the species and its habitat in the action area, and other necessary information. *Id.* § 402.12(f). Under the version of the ESA's regulations in effect at the time of the consultation in this case,[4] "effects of the action" was defined as "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that

---

has responsibility for non-marine species and administers the ESA through FWS, while the Secretary of Commerce has responsibility for marine species and administers the ESA through NMFS. *See id*. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

[3] FWS relied on the 2019 version of the ESA regulations to analyze the Project and prepare its biological opinion. All citations to the ESA regulations are to the 2019 version of the regulations unless otherwise noted.

[4] In drafting the BiOp, FWS relied on the ESA implementing regulations (50 C.F.R. § 402.02) promulgated in 2019. 84 Fed. Reg. 44976 (Aug. 27, 2019). In *Center for Biological Diversity v. Department of the Interior*, 24-cv-4651-JST, 2026 WL 898264 (N.D. Cal. Mar. 30, 2026), the district court held that the regulatory definition of "effects of the action" could violate the text of the ESA and reinstated the pre-2019 version of the regulation, which provided separate definitions for direct effects and indirect effects. Like the 2019 version of 50 C.F.R. § 402.02, however, the pre-2019 version of the regulation also used the "reasonably certain to occur" language, but in the context of indirect effects, and in the context of FWS's long-standing interpretation of its regulations equating "reasonably certain to occur" as synonymous with "likely." 50 C.F.R. § 402.02 (2018); *see also* 51 Fed. Reg. 19926, 19933 (June 3, 1986) (explaining that "reasonably certain to occur" requires there to be "more than a mere possibility that the action may proceed" but "does not mean that there is a guarantee that an action will occur").

are caused by the proposed action but that are not part of the action." *Id*. § 402.02. "A consequence is caused by the proposed action if it would not occur but for the proposed action and is reasonably certain to occur." *Id*. "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id*. The regulations define "cumulative effects" as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* During formal consultation, the consulting agency is required to consider the effects of the action and cumulative effects in addition to the "environmental baseline." *Id*. § 402.14(g).

At the conclusion of formal consultation, the consulting agency provides a biological opinion to the action agency stating its expert opinion on whether the proposed action is likely to jeopardize the continued existence of any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. If the consulting agency finds that a proposed agency action is not likely to jeopardize the continued existence of the species or adversely modify its critical habitat and the action is reasonably certain to incidentally "take" members of a listed wildlife species, the biological opinion will include an "incidental take statement" specifying the amount or extent of anticipated take, reasonable and prudent measures ("RPMs") to minimize the impact of the take, and mandatory terms and conditions to implement the RPMs. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(b)(4).

**D. THE ADMINISTRATIVE PROCEDURE ACT**

None of the statutes Plaintiffs raise contain their own provisions for judicial review and therefore the merits of Plaintiffs' claims are reviewed under the APA. *See* 5 U.S.C. § 706(2)(A); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, "an agency will have acted arbitrarily and capriciously only when the record plainly demonstrates that the agency made a clear error in judgment." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (citation modified). Under this standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and

reasonably explained." *Seven Cnty.*, 605 U.S. at 180 (citation omitted). Plaintiffs bear the burden of persuasion. *Ctr. for Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633, 639–40 (9th Cir. 2023).

## II. FACTUAL BACKGROUND

### A. THE PROJECT

The Project is an "approximately 472-mile transmission project and ancillary facilities in the state of Nevada." BLM_98030. Federal Defendants are not constructing the Project. Instead, the proponents of the Project—Nevada Power Company and Sierra Pacific Power Company, together doing business as NV Energy—have sought federal approvals to build the Project across portions of federal land in Nevada. BLM_98032. The Project will also cross state, county, tribal, and private lands. *Id.* In particular, NV Energy applied for an easement from the Department of Energy and rights of way from the BLM, the NPS (for the limited portion crossing TUSK), and BIA (for the limited portion crossing tribal lands). *Id.* BLM was designated as the lead federal agency, and accordingly, prepared the EIS on its own behalf and on behalf of federal, state, and tribal cooperating agencies and consulting parties. BLM_57421-57423.

Under federal regulations, NV Energy "must plan and construct transmission facilities to deliver the projected electric demand in Nevada," and under Western Electricity Coordinating Council standards, "transmission systems [must] be planned and constructed with sufficient levels of redundancy to maintain reliable operation in the event of a loss or outage of system elements." BLM_98033. Accordingly, NV Energy's "goals are to meet the electrical demand of the end users and respond to electrical service requests, to improve overall system reliability, and to provide regional redundancy." *Id.*

Public scoping for the NEPA analysis was initiated in May 2022 with a Federal Register notice of BLM's intent to prepare an EIS. BLM_98033. A Draft EIS and Resource Management Plan Amendments were published in the Federal Register in May 2023 with a 90-day public comment period. *Id.* After reviewing comments and making associated edits, BLM published the Final EIS in June 2024. *Id.* The proposal required amendments to several land use plans, which BLM considered in the EIS. BLM_980338. BLM offered a 30-day protest period and 60-day

Governor's Consistency Review period following publication of the Final EIS and Proposed Resource Management Plan Amendment. BLM_98033. BLM received six timely protests and denied each of them. *Id.* On September 9, 2024, the Acting Deputy Secretary of the Interior signed the ROD approving the issuance of rights-of-way to NV Energy by BLM and NPS. BLM_98067.

### B. TULE SPRINGS FOSSIL BEDS NATIONAL MONUMENT

As authorized in the ROD, the Project's route will cross a narrow portion of TUSK, a national monument. TUSK preserves "one of the largest and most diverse late Pleistocene vertebrate fossil assemblages in the southern Great Basin and Mojave Deserts." NPS_2634. TUSK sits north of Las Vegas and is made up of two discontinuous units—north and south—which are split by Moccasin Road. *Id.*; *see also* NPS_2635 (map). The monument's General Management Plan divides TUSK into three management zones: research and resource protection zone, visitor experience zone, and orientation and development zone. NPS_2647-48. The orientation and development zone, the zone closest to Las Vegas, "has contemporary structures and amenities, some natural features, a modified landscape, and the presence of both visitors and staff." NPS_2653. "Resources in this zone may be disturbed," but "their protection is considered a high priority in relation to all other activities." *Id.* In this "most developed" zone, "some commercial use may be present." NPS_2654. Accordingly, "paleontological resources are not likely to be found in their natural state and are moved for their protection and study." NPS_2655.

The approved route for the Project runs parallel to Moccasin Road, along the southern boundary of the northern unit of TUSK. BLM_57450 (map); NPS_0600. The approved action consists of "11 180-foot-tall vertical monopoles with only a portion of the structures constructed within TUSK" and encompasses "approximately 19.8 acres of permanent ROW." BLM_98042. The entire right-of-way is within the General Management Plan orientation and development zone. *Compare* BLM_57450 *with* NPS_2648. NPS's right-of-way permit to cross the TUSK, granted pursuant to 54 U.S.C. § 100902(b), issued on June 20, 2025. NPS_0707-0715.

### C. THE DESERT TORTOISE

The desert tortoise is a large, long-lived herbivorous reptile that occurs in the Mojave and

Sonoran deserts within the United States in southern California, southern Nevada, Arizona, and southwestern Utah. FWS_31548. The species occupies a variety of habitats from flats and slopes within creosote bush scrub at lower elevations to rocky slopes in blackbrush scrub and juniper woodland ecotones at higher elevations. *Id*. Tortoises can live over 50 years in the wild and grow slowly, requiring 13 to 20 years to reach reproductive maturity, and have low reproductive rates during a long period of reproductive potential. FWS_31549. The Mojave population of the desert tortoise was listed as threatened under the ESA in 1990. 55 Fed. Reg. 12178 (Apr. 2, 1990). The 1990 listing included the entire Mojave population of desert tortoises north and west of the Colorado River in Arizona, Utah, Nevada, and California. *Id*. FWS designated 6.4 million acres as critical habitat for the tortoise in 1994. 59 Fed. Reg. 5820 (Aug. 8, 1994).

Threats to the species include habitat loss across large areas, including urbanization, large-scale renewable energy development, recreation activity, poor grazing management, and increased fire frequency due to invasive non-native plans in desert habitats. FWS_03004; FWS_31778-82. As outlined in FWS's 2011 Recovery Plan for the desert tortoise, recovery efforts for the species, including protecting existing populations and habitat, and focus on designated tortoise conservation areas in critical habitat and within Federal lands, national monuments, and wildlife refuges. FWS_03002; FWS_31797-98; *see also* FWS_31786 (Figure 2). There are five tortoise recovery units; Project activities will occur within the Northeastern Mojave and Eastern Mojave recovery units. FWS_01193 (BA); FWS_03010 (listing recovery units); FWS_03065. To achieve desert tortoise recovery, each recovery unit must contain well-distributed and self-sustaining populations across sufficient protected habitat to maintain long-term population viability and persistence. FWS_03130-31.

### D. CONSULTATION PURSUANT TO ESA SECTION 7

Beginning in March 2022, BLM and its representatives met with FWS and the Nevada Department of Wildlife to engage in planning discussions for the Project. FWS_02954. These federal and state agency partners collaborated on project design, ESA protected and sensitive species information, geospatial data, survey recommendations, habitat impact determination

guidelines, conservation measures, mitigation proposals, construction schedule, and agency responsibilities. *Id*. BLM determined that the Project is likely to adversely affect desert tortoises. FWS_01131.[5] On July 6, 2023, BLM requested initiation of Section 7 consultation with FWS and provided a biological assessment that analyzed the effects of the Project on the desert tortoise and other plant and animal species. FWS_01122; FWS_01123-1247.

In delineating the action area for the Project, the farthest-reaching physical, chemical, and biotic effects of the proposed action on the environment were evaluated. FWS_02958. Accordingly, the action area contains, but is not exclusive to, the project area and consists of buffers around temporary ROWs and ancillary facilities. *Id*. In total, the action area includes 1,183,604 acres evaluated for potential environmental effects to plants and wildlife protected by the ESA. *Id*. The BiOp assumed that all portions of the action area within Clark and Nye counties contain suitable habitat for desert tortoises. FWS_03068. In total, the action area is estimated to include 162,000 acres of suitable tortoise habitat. FWS_03106.

In evaluating the status of the species, the BiOp acknowledged that there are multiple other projects, including existing and planned solar energy projects, in the action area. These include projects with a federal nexus that have been analyzed in other biological opinions (some not yet built when the BiOp was written) and other actions without a federal nexus that fall under the auspices of a county-wide multiple species habitat conservation plan. FWS_03080-90. The BiOp also discussed cumulative effects, which are defined as the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area. FWS_03154. FWS explained that future Federal actions that are unrelated to the Project are not considered cumulative effects because they will require their own separate ESA Section 7 consultation if they have effects on

---

[5] BLM concluded in its biological assessment that the Project may affect, but is not likely to adversely affect, several other species, and engaged in informal consultation regarding the effects of the Project on those species. FWS concurred in BLM's determination. FWS_02953. In addition to the desert tortoise, BLM concluded that the Project may affect, and is likely to adversely affect, five other listed and candidate species and FWS analyzed them in its biological opinion. FWS_03013-54; FWS_03131-54. Plaintiffs do not challenge the BiOp's conclusions regarding those other species and so Federal Defendants do not discuss them further here.

endangered species or critical habitat. FWS_03154-55. Projects that may result in adverse effects to the tortoise without a Federal nexus are anticipated to fall under the purview of existing habitat conservation plans and associated incidental take permits. FWS_03154. However, FWS explained that it was unaware of any actions that are reasonably certain to occur on non-federal lands that would result from implementation of the Project. FWS_03155.

## III. ARGUMENT

Plaintiffs have not met their burden to show that Federal Defendants violated the APA. First, the right-of-way to cross the TUSK was granted under the Organic Act, not the Enabling Act. Because the Enabling Act does not prohibit this route, the right-of-way is lawful. Nor does the route, which the Department of the Interior ("Department") found was not incompatible with the public interest, violate the Organic Act's non-impairment mandate. Second, Federal Defendants complied with NEPA in developing its comprehensive EIS. They considered a reasonable range of alternatives and appropriately considered the reasonably anticipated cumulative impacts of the Project. Finally, FWS's BiOp comprehensively evaluated the effects of the Project on the desert tortoise and other species.

### A. THE TUSK RIGHT-OF-WAY CORRIDOR IS LAWFUL.

NPS acted in line with Congressional authority when approving the right-of-way through TUSK. Plaintiffs argue that Federal Defendants have violated both the TUSK Enabling Act and the NPS Organic Act by granting a right-of-way for a different route through the TUSK than that identified in the Enabling Act and adopting a NID for the same. Plaintiffs are wrong for one simple reason: Federal Defendants did not approve the right-of-way under the Enabling Act authority. Instead, NPS granted the right-of-way under 54 U.S.C. § 100902. Plaintiffs myopically focus on the TUSK Enabling Act's direction that, if submitted, the Secretary is to approve a right-of-way application for the corridor identified in the Enabling Act. But the Act did not prohibit the Department from using other statutory authority—which it is uncontested that it had—to approve an application for a right-of-way in a different area. And Plaintiffs' argument that, in issuing a ROW under § 100902, the Department did not comply with regulations fails because the

regulations on which Plaintiffs rely had not yet been enacted at the time of the ROD.

**i. THE ENABLING ACT DOES NOT PROHIBIT RIGHTS OF WAY.**

Plaintiffs' entire TUSK Enabling Act argument hinges on a non-existent statutory limitation. The Enabling Act states that the Secretary, "[o]n receipt of complete application," "shall issue" a "right-of-way for the construction and maintenance of high-voltage transmission facilities" for a corridor "depicted on the map" identified in the statute, so long as the "facilities do not conflict with other previously authorized rights-of-way within the corridor." TUSK Enabling Act, § 3092, 128 Stat. at 3864. Under Plaintiffs' theory, because the Enabling Act authorized the Secretary to issue a right-of-way outside of TUSK's boundary, it prohibited the Secretary from issuing a right-of-way that crosses the Monument. Plaintiffs' Motion and Memorandum in Support of their Motion for Summary Judgment ("Pl. Br."), Dkt. No. 55, at 32. But the Enabling Act does not contain such a prohibition.

As Plaintiffs themselves note, *see* Pl. Br. at 30, the Court must "presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Satterfield v. Simon & Schuster, Inc*., 569 F.3d 946, 951 (9th Cir. 2009) (quoting *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008)). The TUSK Enabling Act is certainly unambiguous that the Secretary "shall issue" a right-of-way if it receives an appropriate application within the 400-foot corridor identified. But here, NV Energy did not apply for the 400-foot corridor identified in the Enabling Act. Instead, it applied for a 105-foot by 7,940-foot corridor along the TUSK boundary generally along Moccasin Road. NPS_0654.

The Enabling Act says nothing about limiting other NPS authorities and does not establish a prohibition on rights-of-way within TUSK. Congress has separately authorized the issuance of rights-of-way on land managed by the NPS. Specifically, 54 U.S.C. § 100902 authorizes the Secretary to "grant a right of way over, across, and on through a System unit to a citizen, association, or corporation of the United States that intends to use the right of way for … electrical poles and lines for the transmission and distribution of electrical power[.]" *Id.* § 100902(b).

Plaintiffs do not dispute that TUSK is a system unit or that NV Energy intends to use the requested right-of-way for electric infrastructure. *See* Pl. Br. at 12. The TUSK Enabling Act makes no mention of § 100902(b) at all, nor does it remove the Department's authority under that provision with respect to TUSK. Here, NPS was clear that it was acting under § 100902(b) authority rather than that in the Enabling Act. As the FEIS explains, "[u]nder **54 USC 100902**, the NPS has the authority to issue a ROW permit for utilities." BLM_57419 (emphasis added).

Plaintiffs make much of scattered statements in the administrative record that Congress may have made a mistake in the Enabling Act's map identifying the location of the corridor. But that is ultimately irrelevant to the Court's analysis. The ROD, which Plaintiffs challenge, does not rest on an assertion that Congress made a mistake. Nor does it purport to authorize the Project right-of-way based on the TUSK Enabling Act's authority. It is a "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation modified). Here, Federal Defendants have invoked 54 U.S.C. § 100902, not the Enabling Act.

Plaintiffs misconstrue the administrative record in asserting that Federal "Defendants authorized the Project ROW inside the Monument on the theory of Congressional mistake." Pl. Br. at 30 (quoting BLM_57318 stating that the "map incorrectly shows the corridor south of the TUSK boundary rather than north of [it]."). For one, as explained above, NPS was not making use of its TUSK Enabling Act authority. *See* BLM_98037-38. But regardless, the record page Plaintiffs quote is BLM's response to comments, generally stating "that there was no intention in the TUSK enabling legislation to provide for a 400-foot-wide utility corridor." BLM_57318. That document does not constitute a statement that the ROW was approved in its current location because of Congressional mistake. Instead, it simply describes that the Congressionally approved corridor—which again, is not the corridor in NV Energy's application or the one NPS approved—is unfeasible because if the "corridor were to be south of the TUSK boundary, 22 residences built in 2006 would be within the 400-foot-wide utility corridor and would need to be removed to construct

any transmission facility." *Id.* The comment response reasons that Congress may have made a mistake in the map linked to the Enabling Act provision. *Id.* But this dispute is academic, as Plaintiffs' assertion that the right-of-way was authorized on the theory of Congressional mistake is not supported in the very text Plaintiffs quote, let alone the broader record. Instead, the Department acted under its authority in 54 U.S.C. § 100902 and nothing in the Enabling Act removed or limited that authority.

**ii. THE DEPARTMENT OTHERWISE COMPLIED WITH THE AUTHORITY UNDER WHICH IT ACTED.**

Plaintiffs next argue that the issuance of the right-of-way violates the NPS Organic Act because the NID insufficiently analyzes the factors found in 36 C.F.R. § 14.5. However, Plaintiffs' argument fails, because the substantive provisions of 36 C.F.R. § 14.5 did not exist when the ROD was signed, and thus, it did not apply to NPS's decision here. Instead, the more limited statutory requirement controls, and NPS complied with that requirement.

Plaintiffs' argument rests on 36 C.F.R. § 14.5 binding Federal Defendants. *See, e.g.,* Pl. Br. at 34 (stating that "NPS **must** determine that the Project: is 'not incompatible with the public interest'; 'is consistent with' the Organic Act, TUSK Enabling Act, and TUSK Foundation Document; and 'there is no practicable alternative to locating the infrastructure within' the Monument (emphasis added)). Unfortunately for Plaintiffs, however, 36 C.F.R. § 14.5 was added to the Code of Federal Regulations by a final rule dated December 5, 2024, effective January 6, 2025. *See* 89 Fed. Reg. 96535-01. The ROD authorizing the issuance of rights-of-way was signed several months prior, on September 9, 2024. BLM_98067. It is axiomatic that Federal Defendants could not violate the APA by failing to comply with a regulation not in effect at the time of the decision. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("the APA, as a general matter, forbids retroactive rulemaking").

Instead, the relevant standard is in the right-of-way statute: "A right of way under this subsection shall be allowed within or through a System unit only on the approval of the Secretary and on a finding that the right of way is not incompatible with the public interest." 54 U.S.C.

§100902(b)(3). The statute requires *only* a determination that the right-of-way is not incompatible with the public interest, not the consistency or practicable alternative analyses found in 36 C.F.R. § 14.5. The Department undertook the statutorily-required compatibility analysis here. *See* NPS_707 (incorporating analyses in the ROD and NID). The Secretary's analysis and conclusion were reasonable and supported by the record and should therefore be upheld.

As an initial matter, there is no special standard of review for issuance of rights-of-way. Accordingly, the NPS is entitled to "highly deferential" review. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Plaintiffs suggest that Federal Defendants must do a separate analysis above and beyond the EIS and ROD in support of the determination that the right-of-way is not incompatible with the public interest. But Plaintiffs do not point to anything in the statute that requires a separate document.

Here, NPS made the finding in the permit, *see* NPS_707, and that permit cites to the NID and ROD for the full analysis, *id.*; *see also* BLM_98307 (ROD, noting that "[p]roposed uses of NPS-administered lands and waters may not be incompatible with the public interest or the NPS responsibilities under 54 USC 100101"). In the ROD, BLM determined that "authorization of the [Project] … is in the public interest." [6] BLM_98051. Certainly, something that is in the public interest cannot also be incompatible with the public interest. Similarly, NV Energy's state regulators have determined that the Project is in the public interest. As NV Energy noted in its application to NPS for the right-of-way, "[t]he PUCN has evaluated *costs and public benefits* of various alternatives in the triennial integrated resource plan and ordered NV Energy to proceed with permitting, design, procurement and construction of GLWP." NPS_655. The record is clear that NPS considered the information before it under the applicable statute and reached a reasonable conclusion. The APA requires no more.

---

[6] While cases interpreting the provision are limited, the Supreme Court has noted in a different statutory context, "[a] statement that [an action] is not compatible with the public interest rarely, if ever, is questioned." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 321 (1936); *see also, e.g., Hudson River Fishermen's Ass'n v. Fed. Power Comm'n*, 498 F.2d 827, 835 (2d Cir. 1974) (describing a not incompatible standard as "not as inflexible or stringent" as the opposing party asserted).

The right-of-way analysis and determination is also consistent with the NPS's obligations under the Organic Act.[7] The Organic Act is "is silent as to the specifics of park management" and accordingly, constitutes a "broad grant of discretion to the Secretary[.]" *Bicycle Trails Council of Marin*, 82 F.3d at 1454. The Organic Act does not bar all impacts to a park. Instead, the primary obligation is to prevent impairment, a much lower standard than preventing impact. The NID documents NPS's compliance with the Organic Act. While Plaintiffs suggest that the NID does not describe impacts to "paleontological resources or statutorily-protected values," the NID does exactly that from its very earliest pages. *See, e.g.,* NPS_634-635 (describing the "Key Resources" that will be analyzed, including "paleontological and geological resources," among numerous others). The remainder of the NID goes resource-by-resource and identifies exactly how NPS reached its reasoned determination that the Project will not cause impairment. This is not a case where NPS merely stated an impact and described a conclusion of non-impairment. *See, e.g., Nat'l Parks Conservation Ass'n v. Jewell,* 965 F. Supp. 2d 67, 84 (D.D.C. 2013). As to Plaintiffs' specific concern—paleontological resources—NPS determined that the Project has the potential to impact paleontological resources during construction, but that the impacts could be mitigated to prevent impairment. NPS_644-645. In particular, the NID notes that the ROD will not cause impairment because it incorporates the comprehensive Paleontological Resources Mitigation Plan ("Mitigation Plan"). *Id.* at 645; *see also* BLM_98559-98626. This includes "pre-construction ground penetrating radar (GPR) surveys for the 11 structure footprints to detect anomalies that may

---

[7] As noted above, the 36 C.F.R. 14.5(a)(1) requirement to review whether the right-of-way is "consistent with applicable laws and policies, including statutes governing administration of the National Park System, regulations, and NPS planning documents" is not binding. Perhaps recognizing as much, Plaintiffs also cite the 2006 NPS Management Policies themselves as a basis for binding NPS. But those management policies are internal and not enforceable against NPS. They are "are intended only to provide guidance within the Park Service, not to establish rights in the public generally." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071 (9th Cir. 2010). Plaintiffs' citation to out-of-circuit caselaw is unavailing. Plaintiffs also ignore that the *Greater Yellowstone* district court decision is out-of-step with D.C. Circuit precedent, which has determined that the evidence "supports the Government's contention that the [Management Policies are] no more than a set of internal guidelines for NPS managers and staff." *The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006).

represent fossils, and full scientific excavation of any subsurface paleontological resources detected during the GPR studies including thorough documentation to NPS standards" and "paleontological monitoring during all construction activities." NPS_645. The Mitigation Plan includes an "Unanticipated Discovery Plan," which contemplates "flexibility to mitigate or avoid damaging or destroying fossil resources, potentially including re-siting the poles and/or full scientific excavation and curation of any unanticipated subsurface paleontological resources." *Id.* In light of the comprehensive plan to protect paleontological resources – and the limited geographic scope of work relative to the size of the TUSK – NPS rationally determined that the Project will not impair paleontological resources. *Id.*

Plaintiffs do not engage with this comprehensive analysis. Instead, they handwave that Federal Defendants have insufficiently connected the dots between the impacts assessed and the conclusion that there will not be impairment. But this entirely disregards the extensive and specific Mitigation Plan on which the NID rests. NPS provided specific reasons why the Project would not impair paleontological resources. Indeed, there is reason to believe that, rather than causing impairment, the Project will enhance the preservation of paleontological resources at TUSK. Because of the comprehensive surveying and investigation required in the Mitigation Plan, any paleontological resources within the limited footprint of the Project will be excavated and "must be curated as NPS museum objects … at the expense of the Proponent at a federally approved repository." NPS_644.

Finally, while NPS contests the applicability of the 36 C.F.R. § 14.5 "no practicable alternative" consideration, as the regulation was not in effect when the decision to issue the rights-of-way was made, the EIS is clear that there is no practicable alternative. TUSK Alternatives D, E, F, and G all would have avoided the TUSK. *See* BLM_57465-57468. Each was eliminated for good reason. TUSK Alternative D, which would double-circuit the Project with an existing power line, was eliminated because "it would be more expensive, have a greater visual impact, degrade electric system reliability, and would be less safe for the workers than the Proposed Action" and "would be ineffective in meeting the purpose and need for the Proposed Action by not improving

electric reliability" BLM_57466. TUSK Alternative E, which would run in the corridor identified in the Enabling Act was eliminated because "residences would need to be removed to construct any transmission facility." BLM_57467. BLM rationally determined that "[r]elocating approximately 25 residences outside the corridor and acquiring the land to establish the utility corridor" would be expensive and fail to "meet federal and state mandates and the electrical power needs of Nevada in a timely manner." *Id.* TUSK Alternative F, which would run for seventeen miles along two highways through North Las Vegas was eliminated "because it would be economically infeasible and maintenance on the transmission line would be more difficult as well as disruptive and hazardous to the public;" this includes much greater cost and risks to airport approaches, hospital helipads, and roadway access on the highway that would be impacted. BLM_57467-68. Finally, TUSK Alternative G, which would run south of the Las Vegas metro area, was eliminated because it would be 42 miles longer, and accordingly, "would potentially have greater environmental impacts … because of its additional length, including crossing through the Rainbow Gardens, River Mountains, and Ivanpah [Areas of Critical Environmental Concern] and by creating more ground disturbance within and fragmentation of Mojave desert tortoise (*Gopherus agassizii*) recovery areas and habitat." BLM_57468. On top of the increase in environmental impact, it would also cost an estimated $147 million in additional costs. *Id.* Simply put, while Plaintiffs disagree with NPS's determinations, NPS *did* determine that no routes which avoid TUSK were practicable, and within the routes which crossed the TUSK, selected the least impactful option in an already-disturbed corridor. Summary judgment should be granted in favor of Federal Defendants on Plaintiffs' claims under the Enabling Act and Organic Act.

**B. FEDERAL DEFENDANTS COMPLIED WITH NEPA**

Federal Defendants also fully complied with NEPA. As the Supreme Court recently emphasized: "NEPA is purely procedural …. Otherwise stated, NEPA 'does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Seven Cnty.*, 605 U.S. at 177 (quoting *Robertson*, 490 U.S. at 350). Under NEPA, an agency's only obligation is to prepare an adequate report. *Id.* at 180. "NEPA requires

no more." *Id.* (quoting *Strycker's Bay Neighborhood Council*, 444 U.S. at 228). NEPA imposes no substantive constraints on the agency's decision to build, fund, or approve a proposed project. *Id.* "Because an EIS is only one input into an agency's decision and does not require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision [] was reasonably explained." *Id.* And in reviewing Federal Defendants' compliance with NEPA, "the central principle of judicial review … is deference." *Seven Cnty.*, 605 U.S. at 179.

Plaintiffs argue that Federal Defendants violated NEPA in two ways. First, they argue that Federal Defendants failed to consider a reasonable range of alternatives because they dismissed certain alternatives from detailed consideration. Pl. Br. at 39. Second, they argue that Federal Defendants failed to adequately consider the Project's purported cumulative impacts from solar projects, the development of which, in Plaintiffs' view, the Project could facilitate. Pl. Br. at 43. But Plaintiffs' arguments are, at their core, attacks on the substance of the decision to issue the ROD, rather than the procedure BLM followed. BLM complied with NEPA's procedural mandate because it adequately considered a reasonable range of alternatives, reasonably analyzed the environmental impacts of the proposed action, and offered a reasonable explanation for its conclusions.

**i. THE EIS CONSIDERED A REASONABLE RANGE OF ALTERNATIVES**

NEPA requires an agency to consider a reasonable range of alternatives to its proposed action. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999). Whether an alternative is reasonable depends on whether it meets the project's purpose. *League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1071 (9th Cir. 2012); *Westlands Water Dist. v. Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (agencies need only consider alternatives that are "reasonably related to the purposes of the project") (citing *Laguna Greenbelt, Inc. v. DOT*, 42 F.3d 517, 524 (9th Cir. 1994)). Agencies enjoy "considerable discretion" in defining the purpose and need of a proposed action. *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014).

Here, BLM, as the lead federal agency, was responsible for preparing the EIS and associated analyses. BLM_57421. BLM's identified purpose and need was to:

> [R]espond to the ROW application submitted by [NV Energy] to construct, operate, maintain, and decommission a system of transmission facilities. The need for this action is to fulfill the BLM's responsibility over [the Federal Land Policy and Management Act] and its ROW regulations to manage the public lands for multiple uses, including the transmission of electric energy. The BLM is also responsible for ensuring that [NV Energy] complies with all applicable FERC requirements under the Federal Power Act. Additionally, the BLM's need for this action is guided by the Energy Policy Act of 2005 (EPAct), which directs the agency to expedite applications for the construction of electricity transmission and distribution facilities.

BLM_57358.[8] Plaintiffs do not dispute that BLM reasonably stated the purpose and need. Instead, Plaintiffs argue that BLM failed to examine a reasonable range of alternatives and arbitrarily dismissed alternatives from further detailed analysis and consideration. Pl. Br. at 38. But the "touchstone" for reviewing a challenge to alternatives under NEPA "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt*., 141 F.4th 976, 993 (9th Cir. 2025) (citation omitted). "As the Supreme Court put it[,]" the Court's "review of an agency's alternatives analysis 'must be at its most deferential.'" *Id.* (quoting *Seven Cnty.*, 605 U.S. at 182).

An EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 25-5185, 2026 WL 958126, at *10 (9th Cir. Apr. 8, 2026) (citation omitted); *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990) (agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative); *Seven Cnty.*, 605 U.S. at 169. The Court is to review the range of alternatives under a "rule of reason." *Ctr. for Biological Diversity*, 141 F.4th at 995; *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S.

---

[8] The other decision-making agencies' purpose and need statements are essentially identical to BLM's but describe the respective, narrower potential actions they are evaluating under their own regulations. BLM_57359.

519, 551 (1978) (alternative analyses are "bound[] by some notion of feasibility").

Recognizing the purpose and need for the proposed action, BLM analyzed a wide range of transmission, substation, and microwave site alternatives, including the proposed action and a no action alternative. BLM_57362. Along the 472-mile transmission route system, potential alternatives were grouped into smaller geographic areas (route groups) to allow for more localized comparisons among the various alternative routes. BLM_57362. In total, BLM considered over 30 different transmission line route, substation, and microwave site alternatives. BLM_57445. The record illustrates that this variety of alternatives was reasonable.

Plaintiffs nonetheless argue BLM "analyzed an exceedingly narrow range of alternatives" and "arbitrarily" dismissed "reduced-impact alternatives" from further detailed analysis for two of the nine transmission route groups—the TUSK and Goldfield-Tonopah segments. Pl. Br. at 39-43. As described below, the record shows plainly otherwise.

**ii. THE ANALYSIS OF TUSK TRANSMISSION LINE ROUTE ALTERNATIVES COMPLIED WITH NEPA**

Plaintiffs primarily take issue with the alternatives analyzed for the TUSK transmission line route segment, which runs along the southern portion of the north unit of TUSK. BLM initially evaluated seven alternatives – several of which would not cross TUSK, and several of which crossed larger portions of TUSK.

As an initial matter, Plaintiffs argue that BLM's analysis of "only" two action alternatives for the TUSK segment was "exceedingly narrow." Pl. Br. at 39. But BLM did not just consider two. It considered seven: A, B, D, E, F, G, and the initial proposed action. BLM_57362. It then advanced two alternatives for full analysis: B and the proposed action. BLM_57363. An agency need not consider a specific number of alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). The focus of the reasonable alternatives analysis is on the "substance of the alternatives" rather than "the sheer number of alternatives considered" because there is no minimum number of alternatives that must be discussed. *Id.*; *Laguna Greenbelt, Inc.,* 42 F.3d at 524. Where an agency has rationally defined the scope of analysis, in-depth consideration of two alternatives (with a no-action alternative, *see* BLM_57371) complies with

NEPA. Here, BLM easily met that standard. BLM's alternatives analysis was reasonable and is supported by the record, offering an adequate range of alternatives which "achieved the goals intended by NEPA: open, thorough public discussion promoting informed decision-making." *Westlands Water Dist.,* 376 F.3d at 872. Particularly under the highly deferential judicial review demanded by *Seven County*, the Court should uphold BLM's reasonable line-drawing. *Ctr. for Biological Diversity*, 141 F.4th at 994.

Next, Plaintiffs argue that the TUSK segment action alternatives were "substantially similar" such that BLM did not consider an adequate range of alternatives. Pl. Br. at 39. But contrary to Plaintiffs' contention, the two action alternatives were not the same. In the final EIS, BLM analyzed two TUSK segment action alternatives in detail—Alternative B and the Proposed Action. BLM_57362-57363. While both alternatives proposed routes "generally located" along the TUSK boundary, their structures varied substantially. BLM_57363. Alternative B would require a 77.0-acre temporary right-of-way for construction, and a 36.4-acre permanent right-of-way. BLM_57485; *see also* BLM_57363. The Proposed Action, on the other hand, would only require a 3.5-acre temporary right-of-way, and a 19.1-acre permanent right-of-way. BLM_57485. Alternative B consists of 6 guyed lattice structures with 200-foot by 200-foot maintenance pads, all fully within TUSK. BLM_57450. The Proposed Action consists of 11 vertical monopoles placed 5 feet into the TUSK, with 100-foot by 100-foot maintenance areas, extending only 55 feet into TUSK. *Id.* It cannot reasonably be argued that two alternatives with such vastly different physical footprints on TUSK are identical alternatives.

Plaintiffs also argue that BLM's decision to eliminate from more detailed analysis any alternative that would have avoided entering TUSK altogether—in particular, Alternative E—was "highly problematic." Pl. Br. at 40. But this again ignores the standard of review and the record. An agency is not required to discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives. *Ctr. for Biological Diversity*, 141 F.4th at 998. "[F]or alternatives which were eliminated from detailed study an agency need only 'briefly discuss the reasons for their having been eliminated.'" *Id.* at

993; *see also supra* pp. 19-20.

Here, BLM considered seven action alternatives for the TUSK transmission line segment. BLM_57445. Of these alternatives, four proposed different structure and location options within the TUSK. BLM_57447. As described *supra*, BLM eliminated from detailed analysis the action alternatives which would fully avoid TUSK for a myriad of reasons, including that they would be "ineffective in responding to the purpose and need, technically or economically infeasible" or substantially similar in design or in terms of effects as other alternatives analyzed. BLM_57362; BLM_57465. And BLM offered a robust explanation for eliminating the alternatives from detailed analysis, BLM_57465–57468, more than meeting its burden under NEPA.

Plaintiffs nonetheless contend that BLM's reasons for eliminating Alternative E from further consideration were insufficient for two reasons. Pl. Br. 40-41. First, they argue that BLM acted "contrary to law" in dismissing Alternative E on the "grounds of Congressional mistake." Pl. Br. at 40. As explained above, *supra* at 10-13, Federal Defendants' decision to issue a right-of-way is entirely unrelated to the TUSK Enabling Act. Alternative E was not eliminated because of congressional mistake, but rather, for economic and electric reliability reasons: "[r]elocating approximately 25 residences outside the corridor and acquiring the land to establish the utility corridor would likely affect the economic feasibility of the GLWP" and would not meet "the electrical power needs of Nevada in a timely manner." BLM_57467.

Second, Plaintiffs argue that BLM "failed to actually explain how the additional (undefined) cost" of Alternative E would "render the project infeasible." Pl. Br. at 40. But BLM's explanation that relocation of residences and acquisition of land would "likely affect the economic feasibility" of the Project, BLM_57467, was sufficient for purposes of NEPA. *See Ariz. Mining*, 172 F.4th at 662. Plaintiffs do not cite any support for their suggestion that BLM had to explain with any level of specificity the additional cost of this alternative or that BLM had to justify the infeasibility of the cost in light of the Project's total cost.[9]

[9] As described *supra,* Plaintiffs' repeated assertion that the TUSK Enabling Act constitutes a prohibition, Pl. Br. at 40, continues to misstate the law. The TUSK Enabling Act's direction was that if the Secretary receives an application for a 400-foot-wide right-of-way in the listed

Plaintiffs misconstrue the record in arguing that "Intervenor's desire" to "avoid the practical challenges of acquiring private land" are not a lawful basis for dismissal. Pl. Br. at 41. BLM did not mention nor suggest that "Intervenor's desire" was the reason for its decision to eliminate Alternative E from detailed consideration. BLM_57467. But even if the Project Proponent's needs were part of BLM's consideration, an agency may permissibly consider such private interests for its purpose and need and consideration of alternatives. *See Protect Our Cmtys. Found. v. Jewell*, No. 12-CV-211 2013, WL 5947137 *4-5 (S.D. Ca. Nov. 6, 2013) (Curiel, J.) (decision not to further consider an alternative was appropriate where the agency considered it and explained that its decision was based on more than just the narrow goals of the applicant); *see also Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084-86 (9th Cir. 2013).

Finally, Plaintiffs rely on *Muckleshoot*, 177 F.3d at 814, to argue that the difficulty of acquiring private land is not a viable reason for rejecting Alternative E. Pl. Br. at 41. This argument is unavailing. In *Muckleshoot*, the U.S. Forest Service's purpose and need for action was to "consolidate ownership…by exchanging parcels of National Forest System and [private] land." 177 F.3d at 812. In the context of this specific and narrow purpose and need, the court found that the agency had failed to consider adequate alternatives when it dismissed from further consideration the outright purchase of private parcels as an alternative. *Id.* at 814. Here, in contrast, the acquisition of private land parcels was *not* identified as a purpose or need for BLM's action. *Muckleshoot* is not analogous. Further, in *Muckleshoot,* the Forest Service did not consider a land purchase at all. *See id*. Here, BLM considered Alternative E and reasonably removed it from further detailed consideration.

Ultimately, Plaintiffs' claims make clear that their dispute is not with the adequacy of BLM's evaluation, but instead with BLM's decision not to further consider and select TUSK Alternative E. But that an agency "may not have considered a specific alternative preferred by" Plaintiffs, i.e., one outside the TUSK boundary, "is simply not grounds for finding that the agency

---

corridor that does not conflict with existing rights-of-way, the Secretary must approve the application. That is not a directive that no corridors can exist within TUSK.

failed to meet its obligations" under NEPA. *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 170 (D.D.C. 2002).

**iii. BLM'S ANALYSIS OF THE GOLDFIELD-TONOPAH ALTERNATIVES COMPLIED WITH NEPA**

For similar reasons as those above, Plaintiffs' arguments that BLM "failed to examine a reasonable range of alternatives" for the Goldfield-Tonopah segment also fail.[10] Pl. Br. at 41. In the final EIS, in addition to the proposed action, BLM initially considered four transmission route action alternatives (Alternatives A-D) for the Goldfield-Tonopah segment. BLM_57445, 57457-57460. BLM ultimately eliminated Alternatives A-D from detailed analysis in the final EIS. BLM_57445, 57472-.57480 For each alternative, BLM provided thorough and detailed reasons for elimination. *Id*. For example, BLM explained that Alternative D would have "substantially similar or greater effects than the Proposed Action," including being 12.0 miles longer and creating 13% "more temporary and permanent ground disturbance than the Proposed Action." BLM_57479-57480. Similarly, for Alternative A, BLM explained that it would be 24.5 miles longer than the Proposed Action and would result in roughly 22% more disturbance area. BLM_57472. Alternative A would also have intersected the historic mining towns of Goldfield and Tonopah, coming within close range of many historically significant buildings and structures, and contributing resources. BLM_57473. For this and other reasons, BLM eliminated Alternative A from detailed analysis because it would have substantially similar or greater effects than the Proposed Action and would be economically infeasible. BLM_57476.

The final EIS analyzed two alternatives for the Goldfield-Tonopah transmission segment: the proposed action and the no action alternative. BLM_57427, 57459-60. For purposes of NEPA, this was sufficient. *Native Ecosystems Council*, 428 F.3d at 1246 (deeming sufficient the consideration of two alternatives including the no-action alternative). Plaintiffs argue, however,

---

[10] Plaintiffs reference a purported Esmerelda/Fish Lake conservation area. *See* Pl. Br. at 41. As BLM explained in the EIS, there is no such formal designation. Plaintiffs proposed an Esmeralda/Fish Lake Area of Critical Environmental Concern. *See* BLM_44387. The EIS noted the nomination, but nomination by a private party does not automatically implement any new management prescriptions. *See, e.g.,* BLM_57954 (noting that "no interim special management decision has been identified for these nominated areas.")

that "consideration of a single action alternative" for the Goldfield-Tonopah segment "violates NEPA." Pl. Br. at 41-42. But this is simply not what NEPA requires. *City of Los Angeles v. FAA*, 63 F.4th 835, 847-48 (9th Cir. 2023) (explaining that the Ninth Circuit and other circuits have recognized that in some circumstances, an agency's decision to compare the proposed action to only a no-action alternative may be justified) (citing cases); *Laguna Greenbelt, Inc.*, 42 F.3d at 524; 40 C.F.R. § 46.415(b) ("no specific number of alternatives is required or prescribed").

Next, Plaintiffs argue that BLM's elimination of alternatives—including those "reduced-impact alternatives"—was unreasonable. Pl. Br. at 42-43. These arguments mirror Plaintiffs' arguments against the TUSK alternatives and fail for those same reasons.

First, Plaintiffs argue that BLM "failed to actually explain how the additional cost of Goldfield-Tonopah Alternatives A through D" would render the Project infeasible.[11] Pl. Br. at 42. As Plaintiffs acknowledge, BLM explained that Alternatives A through D would cost an additional $20 million to $85.5 million. *Id.* (citing BLM_57472-57480). For each alternative, BLM explained the various reasons for the projected increased costs—including, for example, additional material costs to construct added miles of transmission line and to build in steeper terrain. *See, e.g.*, BLM_57476. As explained above, NEPA only requires that an agency "briefly discuss" its reasons for eliminating an alternative from detailed consideration. *Ariz. Mining*, 172 F.4th at 662. "Brevity should not be mistaken for lack of detail. A relatively brief agency explanation can be reasoned and detailed." *Seven Cnty.*, 605 U.S. at 181. BLM's estimation of project additional costs—for each alternative—was reasoned and detailed. To require more, as Plaintiffs seem to argue, would contravene NEPA's purposes. *Id.* at 182. "Black-letter administrative law instructs" that when an agency examines the feasibility of an alternative, and "makes those kind of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or

[11] Plaintiffs also argue, as with the TUSK route alternatives, that BLM could not rely on the needs and goal of the Project proponent "where such statements are unsupported by the record." Pl. Br. 42. As explained *supra*, this is not what BLM did. In any event, it would have been permissible for BLM to consider such private interests in determining the reasonableness of the range of alternatives. *See Protect Our Cmtys. Found.*, WL 5947137 at *4-5; *see also Alaska Survival*, 705 F.3d at 1084-86.

feasible or the like, a reviewing court mut be at its 'most deferential'" *Id.* at 181 (quoting *Baltimore Gas & Elec.*, 462 U.S. at 103).

Next, Plaintiffs contend that BLM "never meaningfully weighed the benefits" of Alternatives A through D, such as the "benefits of conserving intact landscapes," against the costs to other resources. Pl. Br. at 42-43. But again, NEPA only required BLM to provide a *brief* discussion of reasons for elimination. *Ariz. Mining*, 172 F.4th at 662. BLM did just that—for Alternatives A through D, it identified various potential resources impacts, benefits to and costs on resources. BLM_57472-57480. In balancing these factors, BLM decided that elimination of such alternatives was reasonable because they would cause "substantially similar or greater effects than the Proposed Action." *Id.* And where, as here, the agency "*decides what qualifies as significant or feasible or the like*, a reviewing court must be at its 'most deferential.'" *Id.* at 181 (emphasis added) (quoting *Baltimore Gas & Elec.*, 462 U.S. at 103). Plaintiffs' suggestion that NEPA requires an agency to examine and select an alternative that has fewer environmental impacts is simply not so. *Seven Cnty.*, 605 U.S. at 180. It is black-letter administrative law that NEPA does not dictate that the most environmentally friendly option be chosen. *Id.* at 173.

Finally, Plaintiffs contend that by dismissing Alternatives A through D, BLM "unreasonably failed" to present complete and accurate information to decision makers and the public. Pl. Br. at 41-43 (citing *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1122 (N.D. Cal. 2006)). But the record—and Plaintiffs' brief—show otherwise. As Plaintiffs point out, BLM received various comments concerning the examination of alternatives that would reduce impacts to landscapes, wildlife habitat, and other resources impacted by the Goldfield-Tonopah transmission route. Pl. Br. at 41. Such comments *and responses* were compiled into 1,231-pages of appendices attached to the Final EIS. *See* BLM_56094. Surely such comments underscore that the public *was* informed about BLM's range of alternatives and the consideration of impacts on various resources. Under these circumstances, BLM did what NEPA required: it considered, disclosed, and discussed various alternatives and reasons for eliminating certain alternatives. *See Friends of Animals v. U.S. BLM*, 514 F. Supp. 3d 290, 294 (D.D.C. 2021) (NEPA "does not impose

substantive limits on agencies' ultimate decisions" but simply obligates an agency to consider environmental impacts and inform the public that it considered such effects).

In conclusion, BLM is the best equipped to determine which alternatives are feasible and would meet the Project's purpose and objectives. *Seven Cnty.*, 605 U.S. at 181-82. And the agency need not have considered alternatives that it reasonably determined would not serve the Project's purpose. *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1148 (9th Cir. 2000). Plaintiffs' arguments about the number of action alternatives considered for the TUSK and Goldfield-Tonopah transmission segments are meritless because there is no specified number of alternatives that the BLM must discuss – much less a specific number for each subcomponent. And their rejection of BLM's reasoned decisions to eliminate certain alternatives from further detailed consideration ignores the record and the governing standard of review. Ultimately, Plaintiffs' position makes clear that they disagree with BLM's selection of routes and approval of the Project. But that is not a NEPA claim. "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency." *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015); *see also Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 776, 777 (1983) ("the political process, and not NEPA, provides the appropriate forum in which to air policy disagreements"). Summary judgment on Plaintiffs' NEPA alternatives claims should be entered in favor of Federal Defendants.

### iv. FEDERAL DEFENDANTS ADEQUATELY CONSIDERED THE PROJECT'S POTENTIAL IMPACTS

Federal Defendants also reasonably assessed potential impacts associated with the Project. Indeed, Plaintiffs largely do not challenge the EIS's assessment of potential effects, limiting their argument to supposed cumulative impacts. Pl. Br. at 43-47. The NEPA regulations in place at the time of BLM's decision included "cumulative effects" within the definition of "effects" to be considered in a NEPA analysis. 40 C.F.R. § 1508.1(g)(3) (2023). Under that definition, cumulative effects are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what

agency (Federal or non-Federal) or person undertakes such other actions." *Id.*

NEPA itself, however, does not include the term "cumulative effects," requiring only that agencies consider "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i). The Supreme Court has been clear that "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration." *Seven Cnty.* 605 U.S. at 186–87. "[I]f the project at issue might lead to the construction or increased use of a separate project—for example, a housing development that might someday be built near a highway—the agency need not consider the environmental effects of that separate project." *Id.* at 187. "So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line—including (i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand." *Id.* at 182. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. Plaintiffs' claims here are a textbook version of what the Supreme Court described in *Seven County*: an effort to convert the NEPA review for one discrete project into a NEPA review of all possible projects into the future, *ad nauseum*.

The EIS here easily meets the *Seven County* NEPA standard. Plaintiffs' "cumulative effects" arguments boil down to one: BLM failed to consider "significant indirect impacts" that will result from the "major solar energy development" allegedly spurred by the Project. Pl. Br. at 44. Thus, Plaintiffs are pursuing precisely the argument that the Supreme Court largely rejected in *Seven County*. In doing so, Plaintiffs again ignore the record and standard of review.

First, even setting aside *Seven County*, Plaintiffs' arguments rest on a faulty premise that the Project was built to spur industrial solar power plant development. *See* Pl. Br. at 45-46. But the agency's purpose and need statement, *supra* page 19, makes *no* mention of solar development. BLM_57358. Instead, as BLM repeatedly explained, the Project's purpose was to provide

reliability, redundancy, and resiliency to existing electrical power in the area. BLM_37332; BLM_56710; BLM_56362; BLM_56445; BLM_57040; BLM_57358; BLM_57361; BLM_57418; BLM_57946.

Second, the administrative record demonstrates that BLM acted reasonably in scoping its effects analyses and in deciding which potential effects to analyze. BLM explained its methodology in the Final EIS and in a separate-105-page appendix entirely devoted to what BLM called the cumulative effects analysis area ("CEAA") and reasonably foreseeable future actions ("RFFA"). BLM_57943-57945; BLM_90663-90767. The CEAA for each resource was determined prior to identifying the past, present, and reasonably foreseeable future actions that would be considered, and those actions were then assessed in detail based on project description and spatial information. BLM_90666. For all RFFAs, projects were categorized by type (i.e., transportation, mining, construction), vicinity (rural, semi-rural, unknown, urban), and land use (roadway, facility, previously disturbed). *Id.* The list of RFFAs focused on the identification of large projects, such as interstate and state route transportation projects, expected to exceed five acres. *Id.* Ultimately, BLM compiled each resource, its defined CEAA, and the total CEAA acres into an illustrative table, found in both the Final EIS and Appendix T. BLM_57943; BLM_90667. The record fully supports BLM's line-drawing in its effects analysis. *See Native Ecosystems v. Dombeck*, 304 F.3d at 902-03 (9th Cir. 2002).

Plaintiffs argue that BLM's definition of the CEAA was drawn in a manner that excluded some RFFAs. Pl. Br. at 44. But as Plaintiffs acknowledge, the scope and nature of the impacts analysis is a "matter committed to the sound discretion of the agency." Pl. Br. at 44. Plaintiffs also complain that the "record is devoid of any meaningful explanation" for these areas. Pl. Br. 44. But Plaintiffs never explain with any particularity what level of detailed explanation should have been required. BLM provided a "sufficient explanation" for its approach and methodology and is owed a significant degree of deference. *Seven Cnty.*, 605 U.S. at 179; *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.,* 61 F.4th 633, 646 (9th Cir. 2023).

Third, Plaintiffs are incorrect in contending that BLM's impacts analysis rests on a "false

premise" that future solar developments and related impacts will be the same regardless of if the Project is built. Pl. Br. at 45. The record is replete with affirmation that the Project is not predicated on, and has independent utility from, future solar projects. BLM_88705; BLM_90666 ("construction of the [Project] is not predicated on the development of the 56 pending applications for solar projects"). Similarly, the record explains BLM's conclusion that, if the Project were not constructed, future solar projects would access other transmission lines to distribute their generated power. BLM_37347-48; BLM_56445; BLM_56688; *see also* BLM_56362; BLM_56457; BLM_56688. The fact that "the effects from a separate project may be factually foreseeable" "does not mean that those effects are relevant to the agency's decision-making process or that it is reasonable to hold the agency responsible for those effects." *Seven Cnty.*, 605 U.S. at 187. Plaintiffs' contention that the Project "constitutes the *only* time" that BLM will evaluate impacts of each reasonably foreseeable future action is also wrong. Pl. Br. at 45. BLM explained that any future solar development on public land would undergo its own separate independent NEPA process, and currently, without the information provided through that process, BLM did not have the necessary information to understand how future development might relate to the Project. BLM_56709; BLM_10341 ("no guarantee" that any potential future solar project will actually be constructed); *See Ctr. for Env't Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1010-11 (9th Cir. 2011) (finding that Reclamation did not violate NEPA because cumulative impacts of a planned drawdown would be analyzed in a subsequent NEPA document); *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir. 2006) ("The cumulative impacts of leasing in the Northeast Planning Area on the NWPA will have to be addressed at a later stage."). Ultimately, the record shows that future solar development lacks the necessary indicia that it is reasonably certain to occur, and it was proper for BLM not to consider it in its analysis of cumulative impacts.[12] BLM drew a "manageable line" in determining the scope and depth of its

[12] Plaintiffs reference BLM's West-wide Energy Corridor and repeatedly excerpt a single sentence from a multi-page November 2022 meeting summary discussing this separate project. Pl. Br. at 44-45 (citing BLM_07428). The availability of areas to solar energy development

impacts analysis and therefore complied with NEPA. *All. for the Wild Rockies v. Matt Anderson*, No. cv-24–125-M-KLD, 2026 WL 892326 at *8 (D. Mont. Mar. 31, 2026) (citing *Seven Cnty.*, 605 U.S. at 191).

**C. FWS'S ANALYSIS IN THE BIOP COMPLIES WITH THE ESA.**

FWS's BiOp thoroughly evaluated the effects of the Project on the tortoise and multiple other species. Individual desert tortoises could face injury or death from the Project's construction activities. FWS_03105. But the Project has design features developed to avoid and minimize impacts on tortoises, including temporary and permanent fencing to reduce the potential that tortoises and hatchlings will access construction areas. FWS_02974-85; *see also* FWS_03004; FWS_03115-17; FWS_03269-91 (BiOp Appendix B). The Project also contains minimization and other measures to reduce the risk of injury or death to tortoises. FWS_02974-89; FWS_03080; FWS_03106. FWS stated that it expects death and injury of most sub-adult and adult tortoises to be avoided during Project activities through compliance with and implementation of the minimization measures. FWS_03106; FWS_03123; FWS_03128. Hatchlings and eggs, however, are harder to detect, in part, because they are below the surface, and are likely to be killed during ground disturbing activities that will take place during construction of the Project.[13] FWS_03122-23. FWS concluded that desert tortoises would be allowed to reinhabit and move freely throughout the Project area during operation and maintenance of the Project. FWS_03114.

The Project is not located within any designated critical habitat for the tortoise, and therefore FWS concluded that the Project activities will not result in destruction or adverse modification of critical habitat. FWS_03131. Nor are any portions of the Project located in conservation areas established for the species. *Id*. Just 179 miles of transmission line are within desert tortoise habitat and 62 of those miles are co-located with other existing transmission line facilities. FWS_03116. In all, the Project will cause the loss of 5,998 acres of suitable desert

based on the proximity to proposed and existing transmission (or a WWEC) does not make any proposed or future project reasonably foreseeable for purposes BLM's NEPA review here.

[13] Ground disturbing activities during operation and maintenance of the line will be substantially less than during construction of the Project. FWS_03123.

tortoise habitat from temporary and permanent disturbance. FWS_03110. This will directly impact approximately 0.09 percent of the total 6,603,891 acres within the Northeastern and Eastern Mojave Recovery Units, and just 0.04 percent of the total habitat across the species' entire nearly 17-million-acre range. *Id*.

Ultimately, the BiOp concluded that the Project is not likely to jeopardize the continued existence of the tortoise because of the numerous measures for ensuring that most tortoises are located and moved out the Project area to minimize potential injury and death to individual members of the species which, in turn, will allow individual tortoises to remain in the population and contribute to recovery of the species. FWS_03155-56.[14] There will be no impacts to designated critical habitat, FWS_03156, and the loss of the small amount of suitable tortoise habitat in the Project area will not considerably affect habitat connectivity overall. FWS_03110-11.

Noting that the minimization measures will be implemented for the life of the Project, FWS determined that it was appropriate to exempt incidental take in the form of mortality or injury for five adult individual tortoises during construction of the Project and no more than one adult individual per year during operation/maintenance and decommissioning of the Project. FWS_03160-61. Adult desert tortoises are used as a surrogate for take of juvenile desert tortoises because juveniles are more difficult to find and locating the carcasses of small tortoises is unlikely. FWS_03160. If take is exceeded, reinitiation of consultation would be necessary. *Id.*

Despite FWS's thorough analysis, Plaintiffs nonetheless argue that FWS erroneously defined the Project's action area and mischaracterized potential future "industrial solar power plants" as cumulative effects, rather than "effects of the action." Pl. Br. 38-40. These arguments, however, rest on the faulty premise that the Project is expressly intended to facilitate substantial expansion of solar energy when, in fact, its stated purpose is to provide reliability, resilience, and

---

[14] Surveys were conducted from September 2021 to December 2023 in the Project area according to FWS's tortoise survey protocol to provide information on where tortoises may be encountered and to locate burrows along the portions of the Project where disturbance may occur. FWS_03068-70; FWS_03078 (noting that surveys generally do not detect all desert tortoises in an area because they spend so much time underground).

redundancy to the electrical power grid, particularly in Reno-Sparks area. FWS_08846; BLM_37332; BLM_57358; BLM_57361; BLM_57418; BLM_57946; BLM_56710 (response to EPA comment); BLM_56362 (response to comment); BLM_56445; BLM_57040; BLM_88075 (describing Project as "required to meet native electric demand"); BLM_83803 (project was consistent with statutory objectives of improving reliability of electricity transmission and distribution). The BiOp defined the action area in a manner consistent with the ESA and its applicable regulations. Plaintiffs' argument that the action area should have encompassed future solar energy development lacks the necessary factual support and, accordingly, Plaintiffs' challenge to the BiOp on this and other grounds fails.[15]

First, Plaintiffs allege that FWS improperly defined the Project's action area to include only the area involved in the Project and "minor buffers" around that area. Pl. Br. at 38. This argument, however, overlooks several key facts. In delineating the action area, the BiOp evaluated the farthest reaching physical, chemical, and biotic effects of the Project on the environment. FWS_02958. The action area includes the Project area (which is the 57,600-acre area designated for temporary ROWs for transmission lines, distribution lines, and access roads and the footprint of ancillary facilities) and consists of buffers around the temporary ROWs and ancillary facilities. *Id*. The buffers, in particular, include a 0.5-mile buffer on the transmission and distribution ROWs. *Id.* There also is a 7.8-mile buffer around temporary transmission and distribution ROWs, ancillary facilities, and new or existing access roads requiring improvements. *Id*. In total, the action area includes 1,183,604 acres, which FWS evaluated for potential effects to plants and wildlife protected by the ESA. This area is more than 20 times the size of the 57,600 acres directly

[15] Plaintiffs assert that it is FWS's burden to "demonstrate (which it has not in the BiOp) that a particular solar project will be built irrespective of the Project[.]" Pl. Br. 40. But this statement is legally baseless. Plaintiffs, not FWS or any other defendant, bear the burden of showing that an agency's alleged errors were harmful. *Grand Canyon Trust v. Provencio*, 467 F. Supp. 3d 797, 816 (D. Ariz. 2020); *see Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination") (quotation marks and citation omitted); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) ("not every violation of the APA invalidates an agency action; rather, it is the burden of the opponent of the action to demonstrate than an error is prejudicial.").

associated with the Project, and more than 197 times the 5,998 acres of suitable desert tortoise habitat expected to be lost to the Project from temporary and permanent disturbance.[16] FWS_02957-58; FWS_03110. On these facts, Plaintiffs' contention that the action area includes "only the immediate area involved in the Project and minor buffers around that area" and is "unlawfully skew[ed,]" Pl. Br. 38, is wrong.

Second, the law is clear that "the choice of appropriate action areas 'requires application of scientific methodology and, as such, is within the agency's discretion.'" *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 950 (9th Cir. 2014); *see also Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289, 1302 (W.D. Wash. 2014) (consulting agency is accorded deference in defining the action area). As described above, the action area includes the entire Project area and buffers around the temporary ROWs and ancillary facilities, ultimately expanding the action area far beyond the expanse of the Project. FWS_02958. FWS determined that these areas were "where noise, lighting, vibration, visual disturbance, and other effects may occur during project construction, operation and maintenance, and decommissioning would occur." *Id.*

When an agency provides a reasonable explanation for how it defined the action area, a court should defer to that decision. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 811 F. Supp. 3d 1206, 1230-31 (D. Mont. 2025); *see also Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 927 (9th Cir. 2020) (action area was properly defined where it accounted for risk of spray drift beyond treated fields). FWS's choice of the action area for the Project complies with these standards. Considering FWS's explanation, Plaintiffs' cited authority does not apply. *E.g.*, *Native Ecosystems v. Dombeck*, 304 F.3d at 901-03 (9th Cir. 2002) (no explanation or justification of choice of analysis area "that neatly excludes [a] nearby [grazing] allotment"). The other cases cited by Plaintiffs involved operations with literal downstream effects or decisions to define an action area based on the action agency's legal authority, facts that simply have no corollary here. *Cf. EPIC v. Van Atta*, 692 F. Supp. 3d 879, 896-97 (N.D. Cal. 2023) (release of reservoir water would have effects beyond where it was released); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254

[16] The Project is not located within any designated critical habitat for the tortoise. FWS_03131.

F. Supp. 2d 1196 (D. Or. 2003) (same); *Defs of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128-30 (D.D.C. 2001) (agency's lack of authority over adjacent lands was not basis for defining action area).

Third, Plaintiffs argue that the BiOp "erroneously characterized the foreseeable effects resulting from 'industrial solar power plants' as mere cumulative effects." Pl. Br. at 39. But this is inaccurate. Cumulative effects are those effects that do not have a federal nexus and, accordingly, will not undergo ESA Section 7 consultation. 50 C.F.R. § 402.02. In its analysis of cumulative effects, FWS stated that projects without a federal nexus that may result in adverse effects to the tortoise are anticipated to fall under the purview of existing habitat conservation plans ("HCPs") and associated incidental take permits. FWS_03154. Existing HCPs were analyzed and discussed in the BiOp's environmental baseline section. FWS_03089-90. The BiOp also stated that FWS was "not aware of any actions that are reasonably certain to occur on non-federal lands that would result from implementation of the proposed Project." FWS_03155. And because the definition of cumulative effects specifically states that they must be reasonably certain to occur, 50 C.F.R. § 402.02, the BiOp did not analyze cumulative effects further, and this decision was appropriate on both the law and the facts. *See Conservation Congress v. U.S. Forest Serv*., 235 F. Supp. 3d 1189, 1206 (E.D. Cal. 2017) (courts generally defer to an agency's determination of the scope of its cumulative effects review); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (upholding action agency's cumulative effects analysis that considered one part of forest, rather than entire forest).

Fourth, even though the BiOp specifically said that FWS was unaware of any actions that are reasonably certain to occur on non-federal lands that would result from implementation of the proposed Project, FWS_03155, Plaintiffs insist that (1) the BiOp acknowledged that solar projects are reasonably certain to occur and (2) then classified them as cumulative effects so as to avoid considering them as "effects of the action." Pl. Br. 39. As explained above, the BiOp itself disproves Plaintiffs' first assertion. *See supra*; *see also* FWS_03155. The language that Plaintiffs cite is taken out of context from the BiOp's discussion of cumulative effects. *See* Pl. Br. 39. And

both the law and the facts establish that Plaintiffs' second assertion lacks support.

"Effects of the action" are all consequences to listed species that are caused by the proposed action, including consequences of other activities that are caused by the proposed action but that are not part of it. 50 C.F.R. § 402.02. "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." *Id.*; *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1387 n.15 (9th Cir. 1987) (considering indirect effects under a prior version of 50 C.F.R. § 402.02 as those that are caused by the proposed action and are later in time, but still are reasonably certain to occur). Case law generally has held that an effect is "reasonably certain to occur" if its occurrence is based on clear and substantial information. That is, an "effect need not be 'guaranteed to occur,' [but] there must be a 'degree of certitude' it will happen." *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 989 (9th Cir. 2023) (citation omitted): *see also Medina County Envt'l Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702-03 (5th Cir. 2010) (future development is "reasonably certain to occur" when it is "free from regulatory and financial contingencies"). Consistent with these interpretations, the ESA Consultation Handbook describes indirect effects[17] as those that:

> may include other Federal actions that have not undergone section 7 consultation but will result from the action under consideration. In order to treat such actions as indirect effects in a biological opinion, they must be reasonably certain to occur, as evidenced by appropriations, work plans, permits issued, or budgeting; they follow a pattern of activity undertaken by the agency in the action area; or they are a logical extension of the proposed action.

ESA Consultation Handbook, at 4-29.[18] In other words, to qualify as an "effect of the action," an occurrence must have more than just the "potential" to develop in the future.

The case on which Plaintiffs primarily rely required similar indicia of definitiveness. In *Oregon-California Trails Association v. Walsh*, 467 F. Supp. 3d 1007, 1050 (D. Colo. 2020), the

[17] The term "indirect effects" was used in the pre-2019 ESA regulations and is used by Plaintiffs throughout their brief to characterize the future solar development that they allege will occur because of the Project. *E.g.*, Pl. Br. 17-18, 37-39.

[18] Available at https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf (last visited Oct. 7, 2026).

district court held that the consulting agency should have considered one wind power project as an indirect effect, rather than a cumulative effect, of the construction and operation of a 225-mile electric transmission line. But there are key differences between this case and *Oregon-California Trails*.[19] For example, one of the express purposes of the electrical transmission line in *Oregon-California Trails* was to provide a way for wind farms to connect to the grid, thus making more probable the single wind project that the district court held to be improperly categorized as a cumulative effect. *Id*. at 1051. Here, however, the administrative record is filled with references to the express purpose of the Project: to provide resiliency, redundancy, and reliability of electrical power to the Reno-Sparks area. FWS_08846; *see also* BLM_57358; BLM_57361; BLM_57418, BLM_57946; BLM_56710 (response to EPA comment); BLM_56362 (response to comment); BLM_56445; BLM_57040; BLM_84164 (FEIS). Also, unlike in the *Oregon-California Trails* case, here, Plaintiffs have not identified any specific solar project that is reasonably certain to occur as a result of the Greenlink Project.

In addition, in *Oregon-California Trails*, the district court held that the consulting agency did not explain why one wind power project identified by the plaintiffs in the action area was not included as an indirect effect. 467 F. Supp. 3d at 1053-54. But the district court accepted the agency's determination that it did not have enough information about at least two others to analyze them as effects of the action, such as where they would be built. *Id*. at 1051-52. Without more specific information, any generalized evaluation of the increased risks to ESA-listed bird species would be "pure guesswork." *Id*. at 1052. So too here. From its earliest stages, the Project was described as "required to increase northern Nevada transmission import capacity required to meet native electric demand" consistent with the project proponent's "obligat[ion] to plan for the electric service to all existing and future network customers." BLM_88705. Accordingly, in response to comments about potential solar development, BLM reiterated that the Project has "independent

---

[19] The plaintiffs in the *Oregon-California Trails* case were represented by the same attorneys as Plaintiffs here. Their description of the Colorado district court's holding as classifying effects as "cumulative effects," rather than "effects of the action," Pl. Br. 40, overlooks that court's detailed discussion about the basis for its decision.

utility" and its construction is not predicated on development of other projects. FWS_08846; BLM_56445; BLM_56688-89. That is, if the Project did not receive the necessary approvals, other future solar projects would access other transmission lines to distribute their generated power. BLM_37347-48; BLM_56445; *see also* BLM_56362; BLM_56457; BLM_56688; BLM_84164 (FEIS). BLM further explained that any future solar development would undergo its own separate independent NEPA process before it could be approved[20] and that without the information provided through that process, BLM did not have the necessary information to understand how future development might relate to the Project. BLM_56709; FWS_08846 (noting that extent to which other projects might be developed is "difficult to predict and dependent [on] numerous factors"); BLM_10341 ("no guarantee" that any potential future solar project will actually be constructed); BLM_84165 (FEIS). Even Plaintiff Basin and Range Watch's own comment submitted during the NEPA process conceded that there was a lack of definitive information about future solar projects, noting that "[n]othing has been approved or really looked at in detail yet." BLM_56594. In short, the administrative record shows that future solar development lacks the necessary indicia that it is reasonably certain to occur, and it was proper for the agencies not to consider it in analyzing the effects of the action.[21] Rather, the relevant action agency will address

[20] Similarly, the BiOp states that any future solar development that has a federal nexus will be subject to ESA Section 7 consultation. FWS_03154-55.

[21] To support their argument, Plaintiffs also excerpt a single sentence from a multi-page meeting summary from November 2022. Pl. Br. 13 (citing BLM_07428). Under the subject header "Goldfield-Tonopah Alternative Feasibility Update" appears discussion about a specific alignment alternative for the Greenlink Project, and the notation that the Goldfield Tonopah alternative must take into account "the WWEC realignment." *Id*. Plaintiffs zero in on the phrase that "[i]t has long been said that whatever path [the Greenlink Project] takes, future projects will take this path too, so the alignment is important." *Id*. (citing BLM_07428). But this single sentence in a single document does not demonstrate that the Project was the but-for cause of industrial scale solar projects that should have been considered effects of the action. To the contrary, it was part of a larger issue before BLM at the time regarding potential re-alignment of the West-wide Energy Corridor, which are corridors designated for siting infrastructure development in eleven western states consistent with Section 368 of the Energy Policy Act of 2005. *See* https://corridoreis.anl.gov/; BLM_59435-46; BLM_83798; BLM_83842-43. The discussion (and more importantly reference about future projects taking the designated path) is not about solar projects nor does it supply the necessary connection between the Project and future solar

the impacts of future solar development on species listed as threatened or endangered under the ESA at the appropriate time. FWS_03155; *see also* BLM_56709 (noting that any future actions would be subject to separate NEPA process and documentation).

Finally, the Complaint alleged that the BiOp failed to comply with the ESA on multiple other grounds, including that it failed to rely on the best available science. Dkt. 1 ¶ 109. Plaintiffs relegate these challenges to a footnote, contending that "these remaining, myriad ESA defects are best addressed once FWS correctly defines the Action Area and the effects of the action on remand[.]" Pl. Br. 40 n.16. However, "[a] party waives an argument at the summary judgment stage if it provides no argument in support of its position or does not adequately develop the argument." *Versluys v. Weizenbaum*, Case No. 3:21-CV-01694-MO, 2023 WL 6880412, at *2 (D. Or. Oct. 18, 2023), *aff'd sub nom. Versluys v. White Pine Circle LLC*, Case No. 23-3982, 2024 WL 5183201 (9th Cir. Dec. 20, 2024); *see DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency*, Case No. C14-5880JLR, 2016 WL 631574, at *25 (W.D. Wash. Feb. 16, 2016) (party waives or abandons an argument at the summary judgment stage "by failing to provide more than a passing remark in support of its position"). Having made no substantive argument in support of their other challenges to the BiOp at the summary judgment stage, the Court should find that Plaintiffs have waived them.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgement and grant Federal Defendants' cross-motion for summary judgment. Plaintiffs have failed to meet their heavy burden to show that Federal Defendants did not act rationally in their review of the Project. Because Federal Defendants fully complied with the law – including the Organic Act, Enabling Act, and NEPA – in preparing their comprehensive EIS, and the ESA in preparing the BiOp, under the deferential standard of APA review, Federal Defendants are entitled to summary judgment in this matter.

---

development. Rather, it is about potential designation of corridors and the siting of other linear transmission projects. In short, the language on which Plaintiffs rely is taken out of context.

Dated: October 9, 2026

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division

***/s/ Mark J. Widerschein***
Mark Widerschein
Alexa Penalosa
Trial Attorneys
United States Department of Justice
Natural Resources Section

Alison C. Finnegan
Trial Attorney
Wildlife & Marine Resources Section

P.O. Box 7611
Washington, D.C. 20044-7611
Mark.Widerschein@usdoj.gov
Alexa.Penalosa@usdoj.gov
Alison.C.Finnegan@usdoj.gov

*Counsel for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that service of the foregoing was made through the Court's electronic filing and notice system (CM/ECF).

Dated: October 9, 2026

*/s/ Mark J. Widerschein*
Mark Widerschein